ACCEPTED
05-14-00544-CV
FIFTH COURT OF APPEALS
DALLAS, TEXAS
5/11/2015 10:04:41 AM
LISA MATZ
CLERK

NO. 05-14-00544-CV

_____

IN THE TEXAS COURT OF APPEALS
FOR THE FIFTH DISTRICT AT DALLAS

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
5/11/2015 10:04:41 AM
LISA MATZ
Clerk

_____

**HAL CREWS AND DEBRA LEITCH,**

**Appellants,**

**v.**

**DKASI CORPORATION, DEBRA H. HOLLEY,
DAVID HOLLEY, AND ASI GYMNASTICS, INC.,**

**Appellees.**

_____

On Appeal from the 14th Judicial District Court
Dallas County, Texas
Cause No. DC-11-15393-A

_____

**APPELLANTS' MOTION FOR REHEARING**

_____

Charles "Chad" Baruch
THE LAW OFFICE OF CHAD BARUCH
3201 Main Street
Rowlett, Texas 75088
Telephone: (972) 412-7192
Facsimile:  (972) 412-4028
Email: baruchesq@aol.com

*Counsel for Appellants*

# TABLE OF CONTENTS

Table of Contents ................................................................ i

Index of Authorities .............................................................. ii

Introduction ...................................................................... 1

Statement of Issues ............................................................... 2

Rehearing Argument ................................................................ 2

    1. Crews and Leitch preserved error: The only judgment before this Court is the final summary judgment—which Crews and Leitch opposed based on the e-signature issue ................................... 2

    2. Crews and Leitch did not need to preserve error ............................. 5

        A. The e-signature issue raises a legal sufficiency challenge, which can be raised for the first time on appeal ......... 5

        B. Even if the appeal turns on the original order, Crews and Leitch could challenge its sufficiency for the first time on appeal ................................................................ 6

    3. The Holleys waived reliance on timeliness of the assertion of the e-signature issue by failing to raise or argue it ............................... 7

        A. The Holleys never even mentioned timeliness of the objection .................................................................. 7

        B. The Holleys waived reliance on any defect in preservation of error—even if they somehow raised that issue ................................................................... 9

Conclusion ....................................................................... 11

Certificate of Compliance ........................................................ 12

Certificate of Service ........................................................... 12

Appendix: Opinion and Judgment

# INDEX OF AUTHORITIES

## Cases

*Brock v. Sutker,*
    215 S.W.3d 927 (Tex. App.—Dallas 2007, pet. denied)........................................10

*City of Houston v. Clear Creek Basin Authority,*
    589 S.W.2d 671 (Tex. 1979) ......................................................................................3

*Crocker v. Paulyne's Nursing Home, Inc.,*
    95 S.W.3d 416 (Tex. App.—Dallas 2002, no pet.) ...............................................5-6

*Crown Life Ins. Co. v. Estate of Gonzalez,*
    820 S.W.2d 121 (Tex. 1991) ......................................................................................5

*Dolenz v. Dallas Cent. Appraisal Dist.,*
    293 S.W.3d 920 (Tex. App.—Dallas 2009, pet. denied) .....................................10

*Fruehauf Corp. v. Carrillo,*
    848 S.W.2d 83 (Tex. 1993)....................................................................................3, 4

*Gunter v. Empire Pipeline Corp.,*
    310 S.W.3d 19 (Tex. App.—Dallas 2009, pet. denied)......................................2, 6

*Kupchynsky v. Nardiello,*
    230 S.W.3d 685 (Tex. App.—Dallas 2007, pet. denied) .................................... 11

*Lozado v. Farrall & Blackwell Agency, Inc.,*
    323 S.W.3d 278 (Tex. App.—El paso 2010, pet. denied) ...................................10

*McConnell v. Southside Indep. Sch. Dist.,*
    858 S.W.2d 337 (Tex. 1993 ...................................................................................5-6

*Radelow-Gittens Real Prop. Mgmt. v. Pamex Foods,*
    735 S.W.2d 558 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) ...................................6

*Webb v. Jorns,*
    488 S.W.2d 407 (Tex. 1972) .....................................................................................3

**Rules**

Tᴇx. R. Aᴘᴘ. P. 33.1.................................................................................................3

Tᴇx. R. Aᴘᴘ. P. 38.1 ...............................................................................................9

**TO THE HONORABLE COURT OF APPEALS:**

This rehearing motion addresses one issue: The error-preservation holding by which this Court disposed of the e-signature challenge. Crews and Leitch did not previously address this issue because the Holleys did not raise it. The Holleys said that Crews and Leitch *never* raised their e-signature challenge in the trial court. This Court acknowledged that Crews and Leitch raised that challenge in the trial court, but concluded they did so untimely.

Relying on this conclusion of untimeliness, this Court used waiver to dispose of the e-signature challenge, which implicates a claim involving hundreds of thousands of dollars. Moreover, resolution of the e-signature issue on its merits necessarily would mean that either (1) Crews and Leitch would win this appeal, or (2) a conflict would arise between this Court and the Fort Worth Court of Appeals over a legal issue on which the Texas Supreme Court has twice sought merits briefing.

As this motion explains:

- Crews and Leitch preserved error by raising this issue in response to the motion for summary judgment,

- Crews and Leitch were not even required to preserve error on this issue because it is a "no evidence" point, and

- the Holleys waived any failure to preserve error.

1

## Statement of Issues

1.      Whether Crews and Leitch, in seeking to challenge the trial court's summary judgment finding the existence of a Rule 11 settlement agreement, had to do anything other than raise the e-signature issue in opposition to the summary judgment motion.

2.      Whether Crews and Leitch even had to preserve error on their legal sufficiency challenge.

3.      Whether the Holleys waived reliance on error preservation by failing to raise, brief, argue, or support any contention that Crews and Leitch did not preserve error.

## Rehearing Argument

**1.      Crews and Leitch preserved error: The only judgment before this Court is the final summary judgment—which Crews and Leitch opposed based on the e-signature issue.**

This is an appeal from a summary judgment—nothing else. No one disputes (or could dispute) that the trial court's "enforcement" order was interlocutory. A settlement agreement is a contract. Under "well-settled" law, "the only method available for enforcing a settlement agreement is through summary judgment or trial." *Gunter v. Empire Pipeline Corp.*, 310 S.W.3d 19, 22 (Tex. App.—Dallas 2009, pet. denied) (citation omitted).

2

The trial court's interlocutory enforcement order became final only when it was merged into the later summary judgment order disposing of all claims and parties. *Webb v. Jorns*, 488 S.W.2d 407, 408-09 (Tex. 1972); *Radelow-Gittens Real Prop. Mgmt. v. Pamex Foods*, 735 S.W.2d 558, 560 (Tex. App.—Dallas 1987, writ ref'd n.r.e.). The trial court retained the power to set aside its interlocutory order at any time before entry of final judgment. *Fruehauf Corp. v. Carrillo*, 848 S.W.2d 83, 84 (Tex. 1993).

The grounds for granting and opposing summary judgment need only be presented to the trial court by the time of the summary judgment hearing. *City of Houston v. Clear Creek Basin Authority*, 589 S.W.2d 671, 677 (Tex. 1979). Crews and Leitch raised the e-signature issue before the trial court ruled on the summary judgment motion, merged in the earlier order, and entered a final and appealable judgment enforcing the Rule 11 agreement. As a result, they properly preserved error on this issue.

In any event, Crews and Leitch presented the e-signature issue at a time that afforded the trial court a meaningful opportunity to consider and rule upon it. In ruling on summary judgment, the trial court—based on the e-signature issue—could have denied the Holleys' motion, set aside its earlier interlocutory order, and set the matter for trial. Again, a trial court "retains

continuing control over interlocutory orders and has the power to set those aside any time before a final judgment is entered." *Carrillo*, 848 S.W.2d at 84.

This Court's opinion appears to concede that Crews and Leitch could have raised the issue after the trial court's original enforcement ruling, but criticizes them for waiting to do so until the Holleys sought summary judgment. According to the opinion: "Crews and Leitch did not . . . challenge the trial court's order signed on August 1, 2012 enforcing the Rule 11 agreement . . . [and] also failed to raise the issue in their motion for summary judgment . . . ."[1]

No prejudice resulted from the decision by Crews and Leitch to wait to raise this issue until the Holleys sought final judgment. By the time the case returned to the trial court following merits briefing in the Supreme Court (merits briefing on the e-signature issue, which everyone—including the trial court—knew was at issue long before the summary judgment briefing), the appraisal was completed and the Holleys had deposited the purchase funds into the court's registry. Nothing about this situation changed for the next six months until entry of judgment. If, as this Court's

---

[1] Opinion at 10.
[2] Opinion at 9-10 (citing TEX. R. APP. P. 33.1).

4

opinion suggests, a motion to reconsider filed the day after the mandamus denial would have preserved error, then the summary judgment response also preserved error because nothing occurred in the intervening months to alter the landscape of the decision or its import for the litigation.

Where possible, rules should be interpreted so that "decisions of the courts of appeals turn on substance rather than procedural technicality." *Crown Life Ins. Co. v. Estate of Gonzalez*, 820 S.W.2d 121, 121 (Tex. 1991) (citations omitted). Here, Crews and Leitch raised the e-signature issue in response to the motion for summary judgment and thus properly preserved it for appellate review.

**2.      Crews and Leitch did not need to preserve error.**

    **A.      The e-signature issue raises a legal sufficiency challenge, which can be raised for the first time on appeal.**

Rule 11 requires a signature to make any agreement effective. Thus, the existence of a signature sufficient to support the agreement presents a "no-evidence" question going to the legal sufficiency of the Holleys' motion.

"In *McConnell v. Southside Independent School District*, the Texas Supreme Court held that a nonmovant is not required to object to the legal sufficiency of a traditional motion for summary judgment to raise that

complaint on appeal." *Crocker v. Paulyne's Nursing Home, Inc.*, 95 S.W.3d 416, 419 (Tex. App.—Dallas 2002, no pet.) (citing *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 342 (Tex. 1993)). Thus, Crews and Leitch did not need to preserve this issue under Rule 33.1.

**B.** **Even if the appeal turns on the original order, Crews and Leitch could challenge its sufficiency for the first time on appeal.**

No Texas authority supports the notion that a party appealing from a summary judgment enforcing a settlement agreement must have preserved error by raising grounds at the time of an earlier interlocutory order. But even if this were the law, Crews and Leitch still would be entitled to challenge the trial court's enforcement order, finding evidence to establish the existence of a Rule 11 agreement, on legal sufficiency grounds.

Again, the Rule 11 agreement could be enforced only by summary judgment or trial on a claim for breach of contract. *Gunter*, 310 S.W.3d at 22. The Holleys' enforcement motion, then, really was a motion for partial summary judgment on a claim for breach of contract. The sufficiency of the evidence supporting a Rule 11 agreement presents a legal sufficiency point regardless of the procedural mechanism by which the ruling is sought. And,

under *McConnell* and its progeny, Crews and Leitch may raise this issue for the first time on appeal.

**3.  The Holleys waived reliance on timeliness of the assertion of the e-signature issue by failing to raise or argue it.**

**A.  The Holley never even mentioned timeliness of objection.**

This Court acknowledged that Crews and Leitch raised the e-signature issue but held they did so too late to enable the trial court to make a meaningful decision on it, thus waiving error under Rule 33.1.[2] But the Holleys never argued that Crews and Letich filed to *timely* raise the argument in the trial court; they argued only that Crews and Leitch *never* raised the argument. And that, as this Court noted , is untrue.

The Holleys mentioned the purported failure to raise the e-signature issue three times; each time, they said that Crews and Leitch *never* raised the issue in the trial court:

> Crews/Leitch *never* complained to the trial court that there was not an agreement on the basis that the email exchanges . . . .[3]

> Crews/Leitch assert *for the first time—to the Court of Appeals*—that there was no agreement because it was not signed.[4]

---

[2] Opinion at 9-10 (citing TEX. R. APP. P. 33.1).
[3] Appellees' Brief at 12-13 (emphasis added).
[4] Appellees' Brief at 14 (emphasis added).

> In fact, as referenced above, Crews/Leitch did not even bring this signature issue to the attention of the trial court.[5]

In their reply brief, Crews and Leitch responded by pointing to where they raised the issue in the trial court.[6] They did not address the matter of timeliness under Rule 33.1 because the Holleys never mentioned it.

The Holleys said only that Crews and Leitch never raised the e-signature issue. The truth of that assertion turns on one question: ***Did*** they raise the issue? Crews, Leitch, and this Court agree the answer to that question is: "Yes." It is another thing to say that an issue was raised in the trial court, but not timely. Resolution of that argument turns on a different question: ***When*** did they raise the issue in the trial court? The Holleys never said anything implicating that question.

An appellate issue encompasses every fairly-included subsidiary issue. A factual assertion that Crews and Leitch failed to raise the e-signature issue in a timely manner might fairly encompass the assertion that they never raised it. But the opposite is not true—the Holleys' assertion that Crews and Leitch "never" raised the issue ***specifically excludes*** any assertion that they raised the issue in the trial court at the wrong time.

---

[5] Appellee's Brief at 19.
[6] Appellants' Reply Brief at 10.

8

**B.** **The Holleys waived reliance on any defect in preservation of error—even if they somehow raised that issue.**

Even if Crews and Leitch asserted the e-signature issue too late, the Holleys waived reliance on this mistake by failing to argue (or even mention) it in their brief. Rule 38 requires that any appellate party seeking to rely on an argument must assert it—and then support it by reference to appropriate legal authority. *See* TEX. R. APP. P. 38.1(i). The Holleys did nothing that can be construed as complying with this rule.

First, the Holleys only referred to the purported failure as a factual statement; they never attached any legal import to it. The Holleys simply said what happened (and, even then, they were incorrect). They never explained why it mattered. Indeed, they never even made a conclusory assertion that it did matter. Second, even in their purely factual statements, the Holleys said only that Crews and Leitch ***never*** raised the issue in the trial court; they said nothing suggesting that the assertion occurred too late to permit the trial court to make a meaningful ruling. Again, by using the word *never*, they ruled out such an assertion. Third, they engaged in no analysis of the purported failure; they said nothing explaining its interaction with

governing rules or law. Finally, they cited no legal authority—not even Rule 33.1.[7]

Under governing precedent of this Court, where a party's argument "is conclusory and inadequately briefed," the party waives appellate reliance through inadequate briefing. *Dolenz v. Dallas Cent. Appraisal Dist.*, 293 S.W.3d 920, 923 (Tex. App.—Dallas 2009, pet. denied). For example, in one case, a party waived reliance by making three sentences of argument about a trial court's order with "no attempt to analyze the order within the context of the statute or case law. *Brock v. Sutker*, 215 S.W.3d 927, 929 (Tex. App.—Dallas 2007, pet. denied).

*Dolenz* and *Brock* establish that Rule 38.1's requirement of an argument means a party must ***meaningfully*** argue a point or waive reliance on it. Thus, briefing waiver occurs where a party provides "one or two conclusory sentences" but "engages in no legal analysis, discussion, or argument [and] does not analyze the rules or cases cited, or attempt to apply them to the facts at issue." *Lozada v. Farrall & Blackwell Agency, Inc.*, 323 S.W.3d 278, 287 (Tex. App.—El Paso 2010, pet. denied).

---

[7] Appellees' Brief at v.

All of these decisions involve situations where a party made an argument but the court deemed it conclusory and insufficient. Here, the Holleys made ***no argument***. They simply referred to a purported fact without ever explaining why it mattered or analyzing it in the context of any governing rule or case law. This complete absence of any argument waives reliance on any defect in error preservation. *See Kupchynsky v. Nardiello*, 230 S.W.3d 685, 692 (Tex. App.—Dallas 2007, pet. denied).

Even under the most liberal interpretation of Rule 38.1, the Holleys made no argument—certainly no non-conclusory argument—concerning failure to preserve error on the e-signature issue. The error preservation rules imposed by Rule 33.1 are not jurisdictional; they can be waived. Here, the Holleys waived reliance on any purported failure to preserve error.

## Conclusion

Based on the foregoing, Appellants ask that this Court grant the motion for rehearing, withdraw its original opinion, reverse the trial court's judgment, and remand the case for further proceedings.

11

Respectfully submitted,

/s/Charles "Chad" Baruch
Texas Bar Number 01864300
THE LAW OFFICE OF CHAD BARUCH
3201 Main Street
Rowlett, Texas 75088
Telephone: (972) 412-7192
Facsimile: (972) 412-4028
Email: baruchesq@aol.com

*Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

This brief was prepared using Microsoft Word for Mac. Relying on the word count function in that software, I certify that this brief contains 2,232 words (excluding the cover, tables, signature block, and certificates).

/s/Charles "Chad" Baruch

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of this instrument was served this 11th day of May, 2015, by efiling and by email upon the following counsel of record for appellees:

Bob Jenevein
bjenevein@vilolaw.com
Scott Hayes
shayes@vilolaw.com

/s/Charles "Chad" Baruch



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-00544-CV

**HAL CREWS AND DEBRA LEITCH, Appellants**

**V.**

**DKASI CORPORATION, DEBRA H. HOLLEY, DAVID HOLLEY AND ASI GYMNASTICS, INC., Appellees**

### On Appeal from the 14th Judicial District Court
### Dallas County, Texas
### Trial Court Cause No. DC-11-15393

## OPINION

Before Justices Bridges, Fillmore, and Brown
Opinion by Justice Bridges

Appellants Hal Crews and Debra Leitch, as fifty-percent shareholders in DKASI Corporation, filed a shareholder oppression suit against appellees Debra and David Holley and ASI Gymnastics, Inc. The parties filed cross-motions for summary judgment regarding the interpretation and enforcement of a Rule 11 agreement. The trial court granted the Holleys' motion, denied Crews and Leitch's motion, and later awarded the Holleys $133,840 in attorney's fees.

On appeal, appellants argue (1) the Rule 11 agreement was an unenforceable "agreement to agree" because it lacked essential financing terms; (2) later conduct could not transform incomplete negotiations into an enforceable agreement; (3) the electronically generated signature block at the bottom of the emails creating the purported Rule 11 agreement does not meet the

Rule 11 signature requirement; (4) the Rule 11 agreement is ambiguous as to the meaning of "fair market valuation"; and (5) the trial court abused its discretion by awarding attorney's fees.

We reverse the attorney's fee award of $133,840 in favor of the Holleys. In all other respects, the trial court's judgment is affirmed.

**Background**

Hal Crews, Debra Leitch, David Holley, and Debra Holley each owned twenty-five percent of the shares in DKASI Corporation, which owned and operated three gymnastics centers in conjunction with the Holleys' wholly owned company, ASI Gymnastics. Crews, Leitch, and the Holleys entered into an agreement wherein ASI would manage the DKASI gyms in ASI's name, receive all DKASI's income in the name of ASI, and then remit to DKASI the net income attributable to DKASI's operation.

Crews and Leitch later sued the Holleys and ASI for shareholder oppression and derivative claims. Crews and Leitch sought appointment of a receiver for DKASI. Within a few months, the parties began discussions for a "business divorce," in which the Holleys would buy out Crews and Leitch.

The Holleys' attorney sent a proposal on June 7, 2012 that contained six provisions. Provision 1 required each side to designate a business appraiser within fifteen days of the agreement. Provision 2, the substance of which is an issue on appeal, states the following:

> 2.     The designated consultants will, within 14 days of both of their designations, select a 3rd appraiser to evaluate the Plaintiffs' 50% interest in DKASI, assuming those three gyms were <u>operating independently</u> and *without considering the undeveloped land adjacent to the Keller facility* (hereafter referred to as "the Interests"). The consultants will be free to communicate with the 3rd appraiser regarding data, methodology and assumptions. The 3rd appraiser will provide a report with a fair market valuation of the Interests within 30 days of appointment.

(Emphasis in original).  Provision 3 required ASI to buy the Interests from Crews and Leitch at the price provided by the third appraiser.  Provision 4 discussed the ownership of the "undeveloped land" in Keller.  Provision 5 permitted ASI to pay the assigned purchase price in cash or finance it through a ten-year note.  The final provision stated the agreement would not settle any remaining claims between the parties.

Crews and Leitch's counsel responded the next day and stated, in relevant part, "My clients agree to paragraphs 1 through 4 of your correspondence. . . . As we discussed, my clients agree to the context of paragraph 5, but do not agree to the specific terms offered, either in terms of amount of down payment, length of payment, and/or interest rate, just to the context of taking payments over time to amortize any balance due."  The Holleys' counsel responded, "The heart of my proposal is paragraphs 1-4, to which you have agreed, but we cannot execute on an agreement without reaching a consensus on the mechanics contained in paragraph 5."

Crews and Leitch then proposed a $500,000 down payment, plus the Keller development site with appropriate deed restrictions, and a five-year note amortized at twelve percent interest. The Holleys countered with "6%, 7 years, $250k down, 100% of TCAD value for their half of Keller land."

Crews and Leitch's attorney then said his clients would buy out the Holleys on the same terms they offered to sell.  After further discussions, the Holleys' attorney sent another email agreeing to postpone an upcoming deposition if Crews and Leitch agreed to one of the following proposals: "(a) an interest rate of 9% or less, (b) a down-payment of $400,000 or less, or (c) giving the Holleys 100% of the TCAD evaluation of their interest in the Keller property."  Crews and Leitch agreed to (c).  The Holleys' attorney then sent the following letter, with the email exchanges attached, to Crews and Leitch's attorney and filed it as a Rule 11 Agreement with the trial court on June 13, 2012:

–3–

> Thank you for your proposal at 11:46 a.m.
>
> My clients accept your proposal as reflected by our correspondence attached. Pursuant to our agreement, we are both obligated to designate a business appraiser within 15 days.
>
> I hope we are able to resolve additional issues as effectively as we have resolved the buy-out issue. In that regard, please let me know if you and your clients believe mediation would be worthwhile at this point.

On June 28, 2012, Crews and Leitch filed their notice of designation of business appraiser/consultant "pursuant to paragraph 1 of the correspondence dated June 7, 2012."

On July 19, 2012, the Holleys filed a motion to enforce Rule 11 agreement in which they alleged Crews and Leitch tried to "'change' exactly what the appraiser is charged with evaluating" a full month after filing the original Rule 11 agreement and after both sides had designated their appraiser. The Holleys argued that rather than a neutral appraiser providing a valuation of "Plaintiff's 50% interest in DKASI," Crews and Leitch now argued a neutral appraiser should appraise the company and "50% of this value is to be assigned to the 50% interest being valued." According to the Holleys, Crews and Leitch were attempting to ignore the "fair market valuation of Interests" language in Provision 2 and give it a meaning that did not exist.

Crews and Leitch filed a motion to clarify, or, in the alternative, to declare Rule 11 agreement null and void. On August 1, 2012, the trial court granted the Holleys' motion and ordered:

> Mr. Jeff Balcombe, the neutral appraiser, and/or his company, The BVA Group, LLC, is hereby retained by the parties so that he may be engaged to appraise the fair market value of Plaintiffs' 50% interest in DKASI Corporation in accordance with generally accepted valuation methods and in consideration of the factors outlined in the Uniform Standards of Professional Appraisal Practice Standards.

Balcombe provided his appraisal on October 10, 2012 with a fair market valuation of Crews and Leitch's fifty percent interest in DKASI at $620,000. After subtracting fifty percent of the cost of the appraisal and fifty percent of the TCAD value of the Keller land, the final buy out payment totaled $334,661.50. On December 11, 2012, the Holleys deposited a check in this amount with the trial court's registry.[1]

After delivering the funds to the trial court's registry, the Holleys filed a supplemental counterclaim in which they sought a declaration from the court that Crews and Leitch were no longer shareholders of DKASI, and therefore, should take nothing by their claims as shareholders of DKASI. The Holleys also requested attorney's fees.

In January of 2014, the parties filed cross-motions for summary judgment in which they again argued the enforceability of the Rule 11 agreement. The trial court granted the Holleys' motion, denied the cross-motion, and ordered that Crews and Leitch take nothing on their shareholder oppression claims. In the final judgment, the trial court awarded the Holleys $133,840.00 in attorney's fees. This appeal of the summary judgment and the award of attorney's fees followed.

### Enforceability of Rule 11 Agreement

In their first issue, Crews and Leitch argue the parties never entered into an enforceable Rule 11 agreement because they did not agree on essential terms, and even if they did agree on the essential terms, the agreement was never signed. The Holleys respond the parties repeatedly acknowledged and confirmed the existence of such an agreement, terms of the agreement were sufficiently defined, and the electronic signature block of the emails met the signature requirement of Rule 11.

---

[1] Prior to the deposit, Crews and Leitch filed mandamus petitions in both this court and the Supreme Court of Texas after the trial court denied their motion seeking a continuance of the trial date. In their petition, they again argued the validity of the Rule 11 agreement. Although the Texas Supreme Court granted an emergency stay and requested briefing, the court ultimately denied relief.

We review a trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, indulge every reasonable inference, and resolve any doubts in the nonmovant's favor. *Id.* When both parties move for summary judgment on the same issues and the trial court grants one motion and denies the other, as here, the reviewing court considers the summary judgment evidence presented by both sides, determines all questions presented, and if the reviewing court determines that the trial court erred, renders the judgment the trial court should have rendered. *Id.*

Rule 11 of the Texas Rules of Civil Procedure provides that "[u]nless otherwise provided in these rules, no agreement between attorneys or parties touching any suit pending will be enforced unless it be in writing, signed and filed with the papers as part of the record . . . ." TEX. R. CIV. P. 11. The same rules governing construction of contracts apply in construing Rule 11 agreements. *Dallas Cnty. v. Rischon Dev. Corp.*, 242 S.W.3d 90, 93 (Tex. App.—Dallas 2007, pet. denied). The essential or material terms of a contract must be definite, certain, and clear, and, if they are not, the contract is unenforceable. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992).

The issue of whether a Rule 11 agreement fails for lack of an essential term is generally a question of law to be determined by the court. *Kanan v. Plantation Homeowner's Ass'n Inc.*, 407 S.W.3d 320, 330 (Tex. App.—Corpus Christi 2013, no pet.). Essential or material terms are those terms the parties "would reasonably regard as vitally important elements of their bargain." *Id.* (citing *Potcinske v. McDonald Prop. Invs., Ltd.*, 245 S.W.3d 526, 531 (Tex. App.—Houston [1st Dist.] 2007, no pet.)). Whether a term forms an essential element of a contract depends primarily upon the intent of the parties. *Domingo v. Mitchell*, 257 S.W.3d 34, 41 (Tex. App.—Amarillo 2008, pet. denied). As long as the parties agree to the essential terms of the contract,

the agreement may leave other non-essential provisions open for future agreement. *Kanan*, 407 S.W.3d at 330.

Crews and Leitch admit the parties agreed almost immediately on the appraisal and subsequent buy out based on the appraised value, but the parties never agreed on payment, financing, or preservation of claims, which were essential terms to the agreement. First, Crews and Leitch did not argue to the trial court that preservation of claims for litigation was an essential term of the agreement, nor have they provided argument on appeal supporting their claim. Therefore, we do not consider it in our analysis. *See* TEX. R. CIV. P. 166a(c) ("Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal."); TEX. R. APP. P. 33.1. We do, however, consider whether payment and financing were essential terms of the agreement.

Although Crews and Leitch argue payment and financing were obviously central to the agreement and the Holleys' attorney established the terms materiality "when he rejected the notion of settlement without them," we do not agree with Crews and Leitch's characterization of the settlement negotiations. In the first letter proposing a buy-out procedure between the parties, the Holleys' attorney detailed six different terms and said the Holleys were unwilling to postpone an upcoming deposition "without and [sic] agreement of some kind . . . ." Crews and Leitch's attorney responded that Crews and Leitch "agree to paragraphs 1 through 4 of your correspondence," and although they agreed "to the context of paragraph 5," they did "not agree to the specific terms offered, either in terms of amount of down payment, length of payment, and/or interest rate . . . ."

As negotiations regarding the context of paragraph 5 continued, the Holleys' attorney specifically stated, "The heart of my proposal is paragraphs 1-4, to which you have agreed." Although he also stated the parties could not execute on an agreement without reaching a

consensus on the mechanics of paragraph 5, the continued email exchanges, as discussed below, establish the parties did in fact reach an acceptable consensus.

After a few more email exchanges in which both parties suggested terms for interest rate, duration of loan, amount of down payment, and percentage of TCAD value for the Keller property, the Holleys' attorney finally required Crews and Leitch to "make a proposal that contains at least one of these terms: (a) an interest rate of 9% or less, (b) a down-payment of $400,000 or less, or (c) giving the Holleys 100% of the TCAD evaluation of their interest in the Keller property" or the Holleys would move forward with a scheduled deposition. Crews and Leitch agreed to (c).

This exchange between the parties establishes the "heart of the proposal" was agreed to by the parties, and Crews and Leitch made a proposal containing at least one of the terms to satisfy the "mechanics" of paragraph 5, as required by the Holleys. Through the proposal and acceptance of just one of these terms, the parties likewise indicated the other terms were not essential to the agreement or a vitally important ingredient of their bargain.[2] *See Domingo*, 257 S.W.3d at 41; *see also Ozlat v. Nguyen*, No. 01-97-00568-CV, 1998 WL 255142, at *2 (Tex. App.—Houston [1st Dist.] May 21, 1998, no pet.) (not designated for publication) (noting financing terms were not essential to the contract). Further, in the letter accepting Crews and Leitch's proposal (and filed with the trial court), the Holley's attorney said, "I hope we are able to resolve additional issues as effectively as we have resolved the buy-out issue." Accordingly, the parties' Rule 11 agreement does not fail for lack of an essential term.

In reaching this conclusion, we are unpersuaded by Crews and Leitch's reliance on an email arguing the parties had nothing more than "an agreement to agree." In one email, the Holleys' attorney referenced a need to mediate, if necessary and resume depositions as soon as

---

[2] Indeed, the eventual buy-out was paid in lump sum and no financing was involved.

–8–

practical "after fully exploring the buy-out option." This statement, however, was made before Crews and Leitch proposed giving the Holleys one hundred percent of the TCAD evaluation, which the Holleys accepted. Moreover, because the financing terms were not essential, the parties were free to leave other non-essential provisions open for future agreement. *See Kanan*, 407 S.W.3d at 330. Accordingly, we overrule Crews and Leitch's first issue.

Having concluded the agreement contains the essential and material terms to be enforceable, we need not consider the Holleys' argument that Crews and Leitch repeatedly acknowledged and confirmed the existence of a Rule 11 agreement, nor Crews' and Leitch's response that later conduct could not transform incomplete negotiations into an enforceable agreement. TEX. R. APP. P. 47.1.

We now turn to Crews and Leitch's third issue in which they argue the agreement was unenforceable because the computer-generated signature block in their attorney's email did not meet the signature requirement of Rule 11. *See* TEX. R. CIV. P. 11. The Holleys first argue Crews and Leitch failed to timely raise this argument to the trial court. Alternatively, they argue the Rule 11 signature requirement was met by the computer-generated signature block.

As a prerequisite to presenting a complaint for appellate review, the record must show the complaint was made to the trial court by a timely request, objection, or motion. TEX. R. APP. P. 33.1. The record shows that Crews and Leitch first raised this issue in the trial court in their summary judgment response filed on February 7, 2014. They argue this was enough to preserve their complaint for review. We do not agree.

A "timely" objection for purposes of rule 33.1 is one "interposed at a point in the proceedings which gives the trial court the opportunity to cure any alleged error." *See Driver v. Conley*, 320 S.W.3d 516, 518 n.3 (Tex. App.—Texarkana 2010, pet. denied). The record shows the Holleys first raised the enforceability of the agreement in the trial court in their motion to

–9–

enforce rule 11 agreement on July 19, 2012. Crews and Leitch did not raise the electronic signature argument in their response to the motion to enforce filed on July 26, 2012, or challenge the trial court's order signed on August 1, 2012 enforcing the Rule 11 agreement. They also failed to raise the issue in their motion for summary judgment filed on January 23, 2014. Not until over a year and a half later, did they raise the argument to the trial court.

Under these facts, we cannot conclude Crews and Leitch timely raised their complaint regarding the alleged lack of signature to the trial court as required by rule 33.1. *See* TEX. R. APP. P. 33.1. Accordingly, Crews and Leitch have failed to preserve their issue for review. We overrule their third issue.

Finally, Crews and Leitch argue in the alternative that if a Rule 11 agreement exists, it is ambiguous, and the trial court erred by not construing it against the Holleys. The Holleys respond the contract is not ambiguous.

When construing a written contract, the primary concern is to ascertain the true intentions of the parties as expressed in the instrument. *D Design Holdings, L.P. v. MMP Corp.*, 339 S.W.3d 195, 201 (Tex. App.—Dallas 2011, no pet.). We give contract terms their plain and ordinary meaning unless the contract indicates the parties intended a different meaning. *Id*. We consider the entire writing and attempt to harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement. *Id*. When provisions of a contract appear to conflict, we will attempt to harmonize the provisions and assume the parties intended every provision to have the same effect. *Id*.

If contract language can be given a certain or definite meaning, then it is not ambiguous. *Id*. If we are unable to harmonize the provisions and give effect to all of the contract's clauses, the contract is susceptible to more than one reasonable interpretation and is ambiguous. *Id*.

Whether a contract is ambiguous is a question of law, which we review de novo. *Id*. Likewise, interpretation of an unambiguous contract is reviewed de novo. *Id*.

Here, Crews and Leitch argue the parties differ over the meaning of "fair market valuation" as it relates to "operating independently" in Provision 2 of the Rule 11 agreement, which provides as follows:

> 2. The designated consultants will, within 14 days of both of their designations, select a 3rd appraiser to evaluate the Plaintiffs' 50% interest in DKASI, assuming those three gyms were <u>operating independently and *without considering the undeveloped land adjacent to the Keller facility*</u> (hereafter referred to as "the Interests"). The consultants will be free to communicate with the 3rd appraiser regarding data, methodology and assumptions. The 3rd appraiser will provide a report with a fair market valuation of the Interests within 30 days of appointment.

Crews and Leitch argue the parties disagree over whether the appraisal of their fifty percent interest must include a discount for lack of control based on the "operating independently" language.

All parties agree the term "fair market value" has been defined as "the price at which the stock would change hands between a willing seller, under no compulsion to sell, and a willing buyer, under no compulsion to buy, with both parties having reasonable knowledge of relevant facts." *Ritchie v. Rupe*, 339 S.W.3d 275, 300 (Tex. App.—Dallas 2011), *rev'd on other grounds*, 443 S.W.3d 856 (Tex. 2014). However, Crews and Leitch contend a contractual term is not accorded its plain, ordinary meaning when the contract itself reveals that the term is used in a different sense. *Mid-Continent Cas. Co. v. Castagna*, 410 S.W.3d 445, 456 (Tex. App.—Dallas 2013, pet. denied). They contend the only way to "harmonize" and give effect to both the "operated independently" and "fair market valuation" language in Provision 2 is to conclude their fifty percent interest in DKASI should be valued using the general measure of fair market value, but as though no majority/minority management situation existed. Stated another way, the

–11–

three DKASI gyms should be evaluated as an independent company, and Crews and Leitch should get fifty percent of the value of DKASI.

The Holleys respond "operating independently" simply means the three DKASI gyms should be evaluated independently from the other ASI gyms, and fair market valuation does not take on a different meaning just because there was an underlying shareholder oppression suit. They argue the focus is not who the purchaser is, but rather the determination of fair market value as per the agreement.

Here, the plain language of Provision 2 specifically provides the third independent appraiser will provide a report with a fair market valuation of the Interests within thirty days of the appointment. We agree with the Holleys that by including the language "assuming those three gyms were operating independently . . .," the parties did not somehow modify or change the plain, ordinary meaning of fair market value. Crews and Leitch attempt to argue the phrase has no meaning unless it is construed to mean the three DKASI gyms must be evaluated as an independent company. To further this argument, they assert the Holleys' interpretation is meaningless because everyone agreed Crews and Leitch had no interest in the ASI gyms so there would be no reason to include language excluding those gyms from the value. Thus, Crews and Leitch contend this creates an ambiguity. We cannot agree. Including facts in a contract that all parties agree exist does not create an ambiguity. Rather, it helps clarify the meaning of the contract. Accordingly, the "operating independently" language neither creates an ambiguity nor alters the plain meaning of fair market value.

In further support of our conclusion, the record shows the trial court ordered the BVA Group to appraise the fair market value. The email from Erica Bramer, one of the designated "consultants," to Jeff Balcombe with the BVA Group informed Balcombe that "The standard of

–12–

value is fair market value. . . ." In the final appraisal prepared by Balcombe, he stated the following:

> We were directed to use "fair market value" as the standard of value for this valuation analysis. According to the American Society of Appraiser Business Valuation Standards Glossary, fair market value is defined as the price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arm's-length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts. In the context of this definition of fair market value, we recognize that the Subject Interest was a noncontrolling interest and was not freely marketable on a public exchange.

The evidence shows "fair market value" was given its plain and ordinary meaning by the parties involved, and nothing indicates the parties intended a different meaning or that lack of control should not be taken into account in valuing the interest of Crews and Leitch. *D Design Holdings, L.P.*, 339 S.W.3d at 201. Accordingly, the Rule 11 agreement is unambiguous as a matter of law. We overrule Crews' and Leitch's fourth issue.

**Attorney's Fees**

In their final issue, Crews and Leitch contend the Holleys were not entitled to attorney's fees based on their request for declaratory relief; therefore, the trial court abused its discretion by awarding the Holleys $133,840. The Holleys respond they properly requested declaratory relief, which the trial court granted, thereby entitling them to attorney's fees.

The Declaratory Judgment Act does not require an award of attorney's fees to the prevailing party, or to any party. *Preston State Bank v. Willis*, 443 S.W.3d 428, 440 (Tex. App.—Dallas 2014, pet. denied). Moreover, a party cannot use the Declaratory Judgment Act as a vehicle to obtain otherwise impermissible attorney's fees. *MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 670 (Tex. 2009) (noting that if a party could replead any claim as a declaratory judgment to justify a fee award, attorney's fees would be available to all

–13–

parties in all cases, which would frustrate the limits Chapter 38 imposes on fee recoveries). However, if the trial court awards such fees, the award must be reasonable, necessary, equitable, and just. *Id.* We review a trial court's award of fees for an abuse of discretion. *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998). It is an abuse of discretion to award attorney's fees under the Declaratory Judgment Act when the statute is relied upon solely as a vehicle to recover such fees. *City of Carrollton v. RIHR Inc.*, 308 S.W.3d 444, 454 (Tex. App.—Dallas 2010, pet. denied).

Here, after the trial court entered the order granting the Holleys' motion to enforce the Rule 11 agreement, Crews and Leitch filed their fourth and fifth amended petitions in which they continued to challenge the enforceability of the Rule 11 agreement, along with other claims. On December 5, 2012, the Holleys filed their supplemental answer and supplemental counterclaim. They raised standing and/or capacity as an affirmative defense. Specifically, they argued as follows:

> Plaintiffs and Defendants executed an agreement in which Defendants purchased Plaintiffs' interest in DKASI Corporation. As of December 5, 2012, Defendants have complied with that agreement in all respects and have delivered funds and otherwise performed pursuant to that agreement. As a result, Defendants have completed the purchase of Plaintiffs' interest in DKASI, and Plaintiffs no longer have standing to bring claims in their capacity as shareholders.

Their counterclaim for declaratory judgment then requested a declaration that "Plaintiffs are no longer shareholders in DKASI Corporation and are no longer entitled to any rights or benefits as shareholders."

The Holleys argue the trial court did not abuse its discretion by awarding attorney's fees because filing a counterclaim for declaratory relief was necessary after the Holleys fully performed their obligations under the Rule 11 agreement and Crews and Leitch continued to dispute the issue. Crews and Leitch respond declaratory judgment was not available to the

–14–

Holleys because the dispute was already pending before the trial court, and the Holleys' requested declaration was an affirmative defense that did not seek any additional relief. We agree with Crews and Leitch.

Artful pleading to present affirmative defenses in the form of a declaratory judgment counterclaim is not sufficient to state a claim for affirmative relief. *Pace Concerts, Ltd. v. Resendez*, 72 S.W.3d 700, 703 (Tex. App.—San Antonio 2002, pet. denied). Here, the Holleys' request for a declaration that Crews and Leitch were no longer shareholders was no more than a restatement of their defense that the Holleys had purchased Crews and Leitch's interest in DKASI, which meant Crews and Leitch no longer had standing to bring any claims as shareholders. Thus, the main thrust of the Holleys' counterclaim was whether Crews and Leitch were still shareholders, an issue that could be resolved within the context of the Holleys' affirmative defense. *See, e.g., id.* (party seeking declaration that a partnership agreement terminated on a certain date was no more than a restatement of defense that no agreement existed or that agreement terminated on a certain date and trial court could resolve issue through defenses raised rather than through declaration).

Under these facts, the Holleys used the Declaratory Judgment Act as a vehicle to obtain an otherwise impressible attorney's fee award. Accordingly, the trial court abused its discretion by awarding the fees. We sustain Crews and Leitch's fifth issue and reverse the trial court's award of $133,840 in attorney's fees. Having concluded the Holleys were not entitled to an attorney's fee award, we need not address the parties' arguments regarding whether the evidence is legally sufficient to support the award. TEX. R. APP. P. 47.1.

**Conclusion**

Having considered the parties' arguments, we reverse the attorney's fee award of $133,840 in favor of the Holleys. In all other respects, the trial court's judgment is affirmed.

140544F.P05

/David L. Bridges/
DAVID L. BRIDGES
JUSTICE



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

HAL CREWS AND DEBRA LEITCH, Appellants

No. 05-14-00544-CV          V.

DKASI CORPORATION, DEBRA H. HOLLEY, DAVID HOLLEY AND ASI GYMNASTICS, INC., Appellees

On Appeal from the 14th Judicial District Court, Dallas County, Texas
Trial Court Cause No. DC-11-15393.
Opinion delivered by Justice Bridges.
Justices Fillmore and Brown participating.

In accordance with this Court's opinion of this date, we **REVERSE** the attorney's fee award of $133,840 in favor of Debra H. Holley, David Holley, and ASI Gymnastics, Inc.

In all other respects, the judgment of the trial court is **AFFIRMED**.

Each party shall bear their own costs of appeal.

Judgment entered April 21, 2015.

**215 S.W.3d 927 (Tex.App.—Dallas 2007)**

**Robert BROCK, Appellant**

**v.**

**Alan SUTKER, M.D., Appellee.**

**No. 05-05-01540-CV.**

**Court of Appeals of Texas, Fifth District, Dallas.**

**March 8, 2007**

On Appeal from the 380th Judicial District Court Collin County, Texas Trial Court Cause No. 380-1477-05

Page 928

Jeffrey Warren Hitt, Attorney At Law, Houston, for Appellant.

Peter H. Anderson, David M. Walsh, IV, Chamblee & Ryan, P.C., Dallas, for Appellee.

Before Justices FITZGERALD, RICHTER, and FRANCIS.

**OPINION**

FRANCIS, Justice.

Robert Brock appeals the trial court's order dismissing his medical malpractice lawsuit against Alan Sutker, M.D., for failing to provide an expert report. In a single point of error, he argues an agreed scheduling order extended the time for filing the report. We affirm.

On May 4, 2005, Brock sued Dr. Sutker for treatment he received to his arm. Some 131 days later, on September 12, Dr. Sutker filed a motion to dismiss the suit because Brock had not filed an expert report within 120 days as required in health care liability claims. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a) (Vernon Supp. 2006). In response, Brock asserted that the parties entered into an agreed scheduling order that extended the deadline "for [p]laintiff to designate his experts and produce reports" until January 13, 2006. He contended this agreement included the expert report required by chapter 74. After a hearing, the trial court signed an order dismissing the lawsuit and ordering Brock to pay Dr. Sutker's attorney's fees and court costs. Brock appealed.

We review a trial court's decision to dismiss a lawsuit for failure to file an expert report for an abuse of discretion. *Park v. Lynch,* 194 S.W.3d 95, 97 (Tex.App.—Dallas 2006, no pet.).

Page 929

A trial court abuses its discretion when it acts arbitrarily or unreasonably without reference to any guiding rules and principles. *Id.*

In three sentences, Brock contends the agreed scheduling order was "a written agreement of the affected parties" that extended the 120-day deadline. As legal support for his contention, he cites only section 74.351(a), but makes no attempt to analyze the order within the context of the statute or case law. Under these circumstances, we conclude the issue is inadequately briefed. *See* Tex. R. App. P. 38.1(h).

Even assuming his issue is not waived, it is without merit. Brock does not direct this Court to any specific portion of the scheduling order to support his position; however, only one provision would appear to apply:

On or before January 13, 2006, Plaintiff shall serve all attorneys of record with his written designation and opinions of expert witnesses expected to testify at trial of this cause in the form of supplemental answers to written discovery, and included in such designation shall be a report from any retained experts.

Considering this provision within the context of the order and the record as a whole, we conclude it does not contemplate expert reports filed for purposes of section 74.351.

On June 25, 2005, Dr. Sutker filed a motion for continuance of the January 2006 trial setting and motion for Level III Scheduling Order. In the motion, Dr. Sutker explained that the chapter 74 expert report was not due until September 1 and he could not begin discovery until the report was filed. Dr. Sutker asserted that fact discovery could take two to three months with discovery of experts to follow. He asked the court to reset the trial twelve to fifteen months from the time the case was filed to "provide both parties the opportunity to conduct the necessary fact and expert discovery."

The order that followed is an "Agreed Level III Pre-Trial Scheduling Order Moving and Resetting the Trial Date." The order set deadlines for the plaintiff and defendant to designate testifying experts, including the reports from retained experts; written discovery and depositions; *Daubert* or dispositive objections or motions; filing of amended or supplemental pleadings; pretrial motions, special exceptions, page/line designations of videotaped depositions and any objections thereto; pretrial conference; and mediation. The order removed the case from the January 2006 trial docket and reset the case for jury trial in June 2006, thirteen months after the case was filed. Importantly, the order does not mention section 74.351, and nothing in the order suggests the parties agreed to extend any deadline set by that statute. *See Olveda v. Sepulveda,* 141 S.W.3d 679, 683 (Tex. App.—San Antonio 2004) (concluding docket control order setting deadline for designating experts and providing retained experts' reports did not include expert reports under Texas Medical and Insurance Improvement Act), *pet. denied,* 189 S.W.3d 740 (Tex. 2006). In short, the order was nothing more than the discovery control plan required by the rules of civil procedure. *See* Tex. R. Civ. P. 190.4.

Because Brock failed to serve an expert report as required by statute, the trial court had no discretion but to dismiss his claims with prejudice and award reasonable attorney's fees and costs to Dr. Sutker. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b)(1), (2) (Vernon Supp. 2006).

We overrule the sole point of error.

We affirm the trial court's judgment.

**589 S.W.2d 671 (Tex. 1979)**

**The CITY OF HOUSTON, Petitioner,**

**v.**

**CLEAR CREEK BASIN AUTHORITY, Respondent.**

**No. B-8084.**

**Supreme Court of Texas.**

**October 3, 1979**

Page 672

Robert M. Collie, Jr., City Atty., Fulbright & Jaworski, David J. Beck, Houston, for petitioner.

Kronzer, Abraham & Watkins, Robert E. Ballard, Houston, for respondent.

SPEARS, Justice.

Respondent Clear Creek Basin Authority, a statutory governmental entity existing under article 8280-311 (1965), sued the City of Houston for injunctive relief and statutory penalties, alleging the unlawful discharge of waste waters by treatment plants operated by the City in violation of chapter 26 of the Texas Water Code. [1] The trial court granted summary judgment for the City of Houston, but the court of civil appeals reversed and remanded. 573 S.W.2d 839.

Two questions are presented: (1) whether the respondent, Clear Creek Basin Authority, properly presented its objections to the summary judgment under rule 166-A(c)

Page 673

which provides that only "expressly presented" issues may be considered on appeal as grounds for reversal; and (2) whether the respondent Clear Creek, plaintiff below, has standing to sue under the provisions of the Texas Water Code § 26.001 et seq., which prohibits the unauthorized discharge of polluting waste waters, for discharges occurring upstream and Outside its territorial boundaries. Because the answer to both questions is "no," we reverse the court of civil appeals and affirm the summary judgment entered by the trial court.

Clear Creek's suit alleges numerous violations of waste control orders of the Texas Water Quality Board and a common law nuisance as a result of the discharge of sewage into waters which ultimately flow into Galveston Bay. The Attorney General of Texas, on behalf of the Texas Water Quality Control Board and the State of Texas, intervened as a necessary party-plaintiff pursuant to the requirement of the Texas Water Code.

Clear Creek alleged in its first amended original petition that the City of Houston had committed numerous violations at 31 different locations. Defendant City admitted that four of these plants discharging effluent are situated within the territorial boundaries of Clear Creek Basin Authority set forth in section 2 of Article 8280-311, Supra, and that these four plants exceeded the terms of the City's permit from the Water Quality Control Board during the periods of 1974 and 1976. The remaining plants were located upstream and outside of Clear Creek's territorial jurisdiction.

The City of Houston filed a motion for summary judgment, alleging three grounds:

1. The matters upon which Clear Creek bases its claims for relief fall within the primary

jurisdiction of the Texas Water Quality Board; Clear Creek has failed to exhaust its administrative remedies; and that neither the Texas Water Quality Board nor the Texas Department of Water Resources has authorized the bringing of this action;

2. As a matter of law, Clear Creek cannot obtain relief for violations of the Texas Water Code which occur outside the territorial jurisdiction of the Authority; and

3. The action represents an attempt by Clear Creek to perform a function or service which the City of Houston is authorized to perform without the written consent of the governing body of the City of Houston, all in violation of Article 8280-311, sec. 5.

Clear Creek filed this response to the motion:

I.

The only issue before this Court is a question of law: can a downstream victim of pollution sue an upstream polluter?

II.

The City has admitted that its sewer plants exceed the parameters of its permits on a regular basis. See Answers to Admissions and Interrogatories.

III.

The City's effluent is flushed into Clear Lake on a daily basis and causes pollution there. See deposition testimony of Sidney H. Tanner and Affidavits on file.

There is no Verbatim record of the hearing on the motion, but the trial court's judgment recites that at the hearing, Clear Creek withdrew its common law cause of action in open court and announced its desire to proceed only on the basis of its claims under chapter 26 of the Texas Water Code. It further recites that the City of Houston withdrew paragraphs 1 and 3 of its motion for summary judgment and desired to proceed to hearing only on paragraph 2 challenging Clear Creek's right to sue for violations outside its jurisdictional boundaries. In this context, the trial court granted the City's motion for summary judgment. [2]

Page 674

In the meantime, and apart from the summary judgment proceeding, the City of Houston and the state Attorney General worked out a settlement agreement between them to which Clear Creek was not a party. The settlement agreement was incorporated in the trial court's final judgment but was made expressly contingent upon the judgment that Clear Creek take nothing being upheld on appeal. The settlement provided for an agreed injunction judgment obligating the City to construct and place into operation some $500,000,000 worth of additional waste water treatment plants, sludge disposal plants, and sewage diversion lines with a reporting schedule to the Texas Department of Water Resources and to the trial court.

The court of civil appeals, in reversing and remanding the cause for trial, held that a fact issue existed as to the alleged violations occurring Within Clear Creek's territorial boundaries. The court reasoned that even if the admitted fact of those violations was not presented to the trial court at the hearing on summary judgment, this part of Clear Creek's cause of action was not waived because there was no written agreement of waiver filed under rule 11. The court said that the City had not carried its burden and was not entitled to a summary judgment despite Clear Creek's failure to specify the reasons why the motion should not be granted.

Petitioner City of Houston asserts nine points of error. The first alleged error is that the judgment of the court of civil appeals is erroneous for the reason that it is contrary to the requirement of rule 166-A, that "(i)ssues not expressly presented to the trial court by written motion, answer or other response, shall not be considered on

Page 675

appeal as grounds for reversal." The remaining points claim that Clear Creek waived and abandoned any fact issue and that it is estopped from asserting any complaints of violations occurring within the geographical boundaries of the Clear Creek Basin Authority.

The first question is whether the 1978 amendment to rule 166-A(c), providing that issues not expressly presented to the trial court may not be considered on appeal as grounds for reversal, precludes the court of civil appeals from reversing the summary judgment when the non-movant agreed to the submission to the trial court of a single issue of law. We hold that because the parties agreed on the submission of only one issue to the trial court and its ruling on that issue constituted the basis of the granting of the motion for summary judgment, Clear Creek is precluded from later urging on appeal the issue not presented, i. e., the violations of the four plants located within Clear Creek's boundaries.

A history of the summary judgment rule, rule 166-A, reflects that the high hopes of increasing judicial efficiency advanced by the proponents of the rule did not materialize. While no summary judgment rule was included in the initial promulgation of the rules of civil procedure in 1940, after considerable urging by legal scholars and commentators and by the Texas Civil Judicial Council, rule 166-A was adopted by this court, effective March 1, 1950. Pittsford and Russell, Summary Judgment in Texas: A Selective Survey, 14 Hous.L.Rev. 854 (1977). Despite predictions of success by its supporters, the rule has been fraught with misunderstanding. One prominent writer observed in 1961 that a poll of district judges throughout the state reflected many were skeptical about the efficacy of the rule because of frequent reversals by appellate courts. McDonald, The Effective Use of Summary Judgment, 15 Sw.L.J. 365, 373-4 (1961). In 1977, a survey concluded that fewer than two percent of the civil cases disposed of in Texas in the six preceding years were decided by summary judgment. See Pittsford and Russell, Supra at 854. Another survey of the cases decided by this court between 1968 and 1976 reflected that when a summary judgment was granted in the trial court, seventy percent of those cases were reversed and remanded for trial. Sheehan, Summary Judgment: Let the Movant Beware, 8 St. Mary's L.J. 253, 254 (1976).

Attempts within the bar to clarify summary judgment practice began to gain momentum in the early 1970's. After several unsuccessful attempts at revision, the Committee on the Administration of Justice of the State Bar of Texas voted in March of 1976 to recommend changes in rule 166-A that would require the non-movant to provide some assistance to the trial judge in narrowing the issues to be decided. That proposal was then considered by the Supreme Court Advisory Committee in March of 1977, and after several changes, was recommended to this court for adoption. The proposal recommended significant change in section (c), primarily by requiring the non-movant to "define specifically in writing" the controverted issues and defects in the movant's proof that would defeat the motion. The recorded minutes of the Advisory Committee reflect a prevailing sentiment to change the rule, to make summary judgments a more useful procedure in

judicial administration, to require non-movant to specify his opposition to the motion, and to prevent the non-movant from "laying behind the log" within his objections until appeal. [3]

A comparison of section (c) of the rule as it existed before January 1, 1978, and as amended demonstrates the significance of the change in the mechanics of the summary judgment procedure. The new rule adopts the objectives of the Advisory Committee, but goes even further by precluding from consideration on appeal grounds not raised in the trial court in opposition to a summary judgment motion. The pre-1978 summary judgment rule had a chilling effect on the willingness of trial courts to utilize the intended benefits of the procedure. See McDonald, The Effective Use of Summary Judgment, 15 Sw.L.J. 365, 375-382 (1961). The new rule attempts to encourage the trial court to utilize the summary judgment in appropriate cases.

Prior to January 1, 1978, section (c) read:

(c) Motion and Proceedings Thereon. The motion for summary judgment shall state the specific grounds therefor. The motion shall be served at least ten days before the time specified for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. No oral testimony shall be received at the hearing. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that, except as to the amount of damages, there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Section (c) now reads:

(c) Motion and Proceedings Thereon. The motion for summary judgment shall state the specific grounds therefor. Except on leave of court, the motion shall be served at least twenty-one days before the time specified for the hearing. Except on leave of court, the adverse party, not later than seven days prior to the day of hearing may serve opposing affidavits or other written response. No oral testimony shall be received at the hearing. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, admissions and affidavits, if any, on file at the time of the hearing, or filed thereafter and before judgment with permission of the court, show that, except as to the amount of damages, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the issues as expressly set out in the motion or in an answer or any other response. Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal. A summary judgment may be based on uncontroverted testimonial evidence of an interested witness, or of an expert witness as to subject matter concerning which the trier of fact must be guided solely by the opinion testimony of experts, if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted. (emphasis added)

A concomitant change to section (e) of the rule added this sentence:

Defects in the form of affidavits or attachments will not be grounds for reversal unless specifically pointed out by objection by an opposing party with opportunity, but refusal, to amend.

Responding to the criticism that a non-movant could "lay behind the log" in the trial court and

urge deficiencies for the first time on appeal, the new section (c) specifically prohibits this tactic by clearly requiring:

. . . Issues not expressly presented to the trial court by Written motion, answer or other response shall not be considered on appeal as grounds for reversal. (emphasis added)

The word "written" modifies not only the word "motion," but also the words "answer" and "other response." The "issues" required by the rule to be "expressly presented" are those pointed out to the trial court in written motions, written answers or written responses to the motion. The term "answer" in the context of the rule refers to an answer to the motion, not an answer generally filed in response to a petition. *Feller v. Southwestern Bell Tel. Co.,* 581 S.W.2d 775 (Tex.Civ.App. Houston (14th Dist.) 1979, no writ). The movant must also expressly set out his grounds in writing:

. . . The judgment sought shall be rendered forthwith if . . . and the moving party is entitled to judgment as a matter of law On the issues as expressly set out in the motion or in an answer or any other response. (emphasis added)

Thus, both the reasons for the summary judgment and the objections to it must be in writing and before the trial judge at the hearing. The appellate court which must later decide whether the issue was actually presented to and considered by the trial judge will then be able to examine the transcript and make its determination. To permit "issues" to be presented orally would encourage parties to request that a court reporter record summary judgment hearings, a practice neither necessary nor appropriate to the purposes of such a hearing. *Richards v. Allen,* 402 S.W.2d 158, 161 (Tex.1966); rule 166-A(c).

If the issues are to be further restricted or expanded by the parties beyond those "expressly presented" by the written motion, the answer to the motion, or any other written response, the change must meet the requirements of rule 11 which provides:

No agreement between attorneys or parties touching any suit pending will be enforced unless it be in writing, signed and filed with the papers as a part of the record, Or unless it be made in open court and entered of record. (emphasis added)

The City of Houston contends that the parties orally agreed in open court at the hearing on the motion to narrow the issue to a single question of law does Clear Creek have standing under the code to sue for pollution originating outside its territorial boundaries? The City further maintains that if that agreement must comply with rule 11, the recitations in the judgment satisfy the requirements of the rule.

We agree that the parties in open court should be able to narrow the issues presented to the trial court provided the agreement is reduced to writing, signed, and filed with papers or "entered of record." If a party represents to the court that he waives a ground or objection that he has previously asserted in a written motion or response and agrees that a certain issue is the only issue before the court, rule 11 is satisfied if the oral waiver or agreement made in open court is described in the judgment or an order of the court. Rule 11 expressly approves this procedure.

The trial court's judgment [4] reflects that the parties by agreement expressly presented only one issue to the court, and the requirements of rule 11 were met when the agreement was reflected in the judgment. Counsel for the City announced in open court that he was withdrawing grounds 1 and 3 of its motion for summary

judgment. Clear Creek agreed to withdraw its common law cause of action, and the City of Houston agreed not to object to its revival if the case were remanded for a new trial. The only issue then remaining to be determined at the hearing on the motion for summary judgment, taking into consideration the motion, the written response, and the open-court representations of counsel recited in the judgment, was the second ground asserted by the City's motion the standing of Clear Creek to file a suit under the Texas Water Code for violations which occur upstream and Outside the jurisdictional boundaries of the Clear Creek Basin Authority. No other issues were presented to the trial court by either party, and he ruled on no others.

Clear Creek next argues that its pleadings on file in the case adequately assert its claim of violations by the four plants located within its territorial boundaries, that its response to the City's motion for summary judgment does not supercede Clear Creek's previous pleadings, and that it should not have to replead in its response to the motion what it had already pled.

Pleadings do not constitute summary judgment proof. *Hidalgo v. Sur. Sav. & Loan Ass'n,* 462 S.W.2d 540 (Tex.1971). The new rule requires that contentions be expressly presented in the written motion or in a written answer or response to the motion, and pleadings are not to be considered in determining whether fact issues are expressly presented in summary judgment motions. The terms "answer" and "response" as used in the context of the rule clearly refer to the motion and not to the pleadings generally. Feller v. Southwestern Bell Tel. Co., supra. To hold otherwise would be to perpetuate the evil the rule change was designed to eliminate. The written answer or response to the motion must fairly apprise the movant and the court of the issues the non-movant contends should defeat the motion.

We are not to be understood, however, as shifting the burden of proof that exists in summary judgment proceedings. The trial court may not grant a summary judgment by default for lack of an answer or response to the motion by the non-movant when the movant's summary judgment proof is legally insufficient. [5] The movant still must establish his entitlement to a summary judgment on the issues expressly presented to the trial court by conclusively proving all essential elements of his cause of action or defense as a matter of law. See *Swilley v. Hughes,* 488 S.W.2d 64, 67 (Tex.1972). Summary judgments must stand on their own merits, and the non-movant's failure to answer or respond cannot supply by default the summary judgment proof necessary to establish the movant's right.

While it would be prudent and helpful to the trial court for the non-movant always to file an answer or response, the non-movant needs no answer or response to the motion to contend on appeal that the grounds expressly presented to the trial court by the movant's motion are insufficient As a matter of law to support summary judgment. The non-movant, however, may not raise any Other issues as grounds for reversal. Under the new rule, the non-movant may not urge on appeal as reason for reversal of the summary judgment any and every New ground that he can think of, nor can he resurrect grounds that he abandoned at the hearing.

With the exception of an attack on the legal sufficiency of the grounds expressly raised by the movant in his motion for summary judgment, the non-movant must expressly present to the trial court any reasons seeking to Avoid movant's entitlement, such as those set out in rules 93 and 94,

and he must present summary judgment proof when necessary to establish a fact issue. No longer must the movant negate all possible issues of law and fact that Could be raised by the non-movant in

Page 679

the trial court but were not. See, e. g., "*Moore" Burger Inc. v. Phillips Petroleum Co.,* 492 S.W.2d 934 (Tex.1972); *Doyle v. USAA,* 482 S.W.2d 849 (Tex.1972); *Hidalgo v. Sur. Sav. & Loan Ass'n,* 462 S.W.2d 540 (Tex.1971); *Womack v. Allstate Ins. Co.,* 156 Tex. 467, 296 S.W.2d 233 (1957). In cases such as *Torres v. Western Cas. & Sur. Co.,* 457 S.W.2d 50 (Tex.1970) (existence of good cause for late filing of worker's compensation claim), and *Gardner v. Martin,* 162 Tex. 156, 345 S.W.2d 274 (1961) (failure of movant to attach certified copies of prior case to establish res judicata), the non-movant must now, in a written answer or response to the motion, expressly present to the trial court those issues that would defeat the movant's right to a summary judgment and failing to do so, may not later assign them as error on appeal.

Having held that Clear Creek is not entitled to defeat the summary judgment by raising a fact issue for the first time on appeal which was not expressly presented to the trial court, we now determine if the City of Houston is entitled to its summary judgment as a matter of law for the reason asserted in its motion. Specifically, the question is whether under the Texas Water Code, Clear Creek Basin Authority can sue to enforce the Code provisions prohibiting unauthorized discharges of polluting waste into the waters of the state when those discharges occur upstream and Outside the territorial jurisdiction of the Clear Creek Basin Authority. As we have said, this issue was the only question before the trial court.

Clear Creek insists that it is authorized to bring this suit under Tex.Water Code Ann. § 26.124 (Vernon 1972):

§ 26.124. Enforcement by Others

(a) Whenever it appears that A violation or threat of violation of any provision of Section 26.121 of this code or any rule, permit, or order of the department Has occurred or is occurring within the jurisdiction of a local government, exclusive of its extraterritorial jurisdiction, the local government, in the same manner as the department, may have a suit instituted in a district court through its own attorney for the injunctive relief or civil penalties or both, as authorized in Subsection (a) of Section 26.123 of this code, against the person who committed or is committing or threatening to commit the violation. This power may not be exercised by a local government unless its governing body adopts a resolution authorizing the exercise of the power. In a suit brought by a local government under this section, the department is a necessary and indispensable party. (emphasis added)

Section 26.121, prohibiting unauthorized discharges of waste, provides:

§ 26.121. Unauthorized Discharges Prohibited

(a) Except as authorized by a rule, permit, or order issued by the department, no person may:

(1) Discharge sewage, municipal waste, recreational waste, agricultural waste, or industrial waste into or adjacent to any water in the state;

(2) Discharge other waste into or adjacent to any water in the state which in itself or in conjunction with any other discharge or activity causes, continues to cause, or will cause pollution

of any of the water in the state; or

(3) Commit any other act or engage in any other activity which in itself or in conjunction with any other discharge or activity causes, continues to cause, or will cause pollution of any of the water in the state, unless the activity is under the jurisdiction of the Parks and Wildlife Department, the General Land Office, or the Railroad Commission of Texas, in which case this subdivision does not apply.

(b) In the enforcement of Subdivisions (2) and (3) of Subsection (a) of this section, consideration shall be given to the state of existing technology, economic feasibility, and the water quality needs of the water that might be affected.

(c) No person may cause, suffer, allow, or permit The discharge of any waste or the performance of any activity in violation

Page 680

of this chapter or of any rule, permit, or order of the department.

(d) Except as authorized by a rule, permit, or order issued by the department, no person may Discharge any pollutant, sewage, municipal waste, recreational waste, agricultural waste, or industrial waste from any point source into any water in the state.

(e) No person may cause, suffer, allow, or permit The discharge from a point source of any waste or of any pollutant, or the performance or failure of any activity other than a discharge, in violation of this chapter or of any rule, regulation, permit, or other order of the board. (emphasis added)

Clear Creek contends that the plain meaning of the language of subsections (a) (2) and (3) of § 26.121, containing the phrase "or will cause pollution," and of subsection (e), is that a violation takes place where pollution is caused not where waste water or sewage enters the stream. It further argues that under section 1.002 of the Water Code and art. 5429b-2, § 3.03, in construing the Water Code, the object of the code must be considered. Clear Creek says the object indicated in § 26.012 is the development of a general, comprehensive plan for the control of water quality in the state, and that objective can best be implemented by construing the statute to allow all downstream victims of upstream polluters to protect their rights by maintaining suits under chapter 26 of the code. Clear Creek urges that such suits are proper without regard to where the pollutant enters state waters so long as the local government can show that the defendant caused the resulting pollution.

The "discharge" of waste is prohibited in § 26.121, the Occurrence of which constitutes a "violation" under § 26.124. The term "discharge" is defined in § 26.001(20):

"To discharge" includes to deposit, conduct, drain, emit, throw, run, allow to seep or otherwise release or dispose of, or to allow, permit, or suffer any of these Acts or omissions. (emphasis added)

Thus, "discharge" is defined as the equivalent of an "act or omission," which must "occur." An "act" is not a continuous process existing indefinitely, but an event that can be traced to a particular place and a particular time or time period. "Discharge" is not a process that continues on to the sea but an "act," and "an act can only occur where it actually takes place." *City of Friendswood v. Clear Creek Basin Auth.,* 545 S.W.2d 201, 205 (Tex.Civ.App. Houston (1st Dist.)

1976, writ ref'd n. r. e.). Nor does the language of (a)(3) expand the term "discharge" to acts or activities occurring outside the territorial limits of the occurrence of those acts or activities. The phrase "other act or . . . other activity" in (a)(3), when read together with (a)(1) and (2), constitutes a "Mother Hubbard" or catch-all phrase designed to prohibit those acts or activities that may not literally come within the definition of "discharge" but which cause pollution. The context of the language of (a)(3) demonstrates it was not intended to expand the word "occur" but rather to make sure that no act or activity which causes pollution was excluded by using the term "discharge." It is abundantly clear from the Code that the violation "occurs" at the time and place where the discharge "occurs." Accordingly, we hold that a local government may not bring a statutory action for civil penalties and injunctive relief pursuant to § 26.124 of the Texas Water Code for discharges that occur outside its geographical boundaries.

Our reading of legislative intent is reinforced by comparing In pari materia other sections of chapter 26. The general authority for administering and enforcing the act is vested in the Department of Water Resources. Section 26.011 provides "(e)xcept as otherwise specifically provided, the department shall administer the provisions of this chapter (26) and shall establish the level of quality to be maintained in, and shall control the quality of, the water in this state as provided by this chapter. . . ." Sections 26.171 through 26.174, relating to the authority of a local government to inspect public waters, to recommend water

Page 681

quality standards to the Texas Department of Water Resources, to enter property, and to bring an enforcement action, are expressly limited to the territorial jurisdiction of that particular local government. Section 26.175 provides that a local government may execute cooperative agreements with the department or other local governments, and these local governments may be assigned and delegated "the pertinent powers and functions vested in the department under this chapter as in the judgment of the executive director (of the department) may be necessary or helpful to the local government in performing those management, inspection, and enforcement functions." The general authority for the civil enforcement of the statute is given by § 26.123 to the Department of Water Resources, while § 26.124, granting enforcement power to local governments, limits enforcement to violations occurring "within the jurisdiction of a local government, exclusive of its extraterritorial jurisdiction." It seems evident that the legislature sought to vest overall statewide authority for the act in the Texas Department of Water Resources with concurrent authority for local governments to act only within their boundaries, thus eliminating duplication, overlapping, and even conflict between local governments in their efforts. The statute attempts to establish an orderly plan of enforcement with the department at its summit.

This legislative scheme is further demonstrated by the history of § 26.124 authorizing local governments to bring enforcement suits. The forerunner of § 26.124 authorized suit "if the violation of such section causes or would cause a condition of pollution in any of the waters in its boundaries." 1967 Tex.Gen.Laws, ch. 313, § 16(c), at 756. Two years later in 1969, however, the legislature amended that section to its present form, limiting suits by local governments to a violation that "has occurred or is occurring within the jurisdiction of a local government, exclusive of its extraterritorial jurisdiction . . . ." 1969 Tex.Gen.Laws, ch. 760, § 4.03(a), at 2247. The use of

the last phrase, "exclusive of its extraterritorial jurisdiction," is but a further indication that specific geographical limitations were intended. Similarly, the 1967 act had no specific territorial restrictions on the right of a local government to enter public and private property to make inspections and investigations of conditions relating to water quality. 1967 Laws, Supra § 16(b), at 756. The 1969 legislature by amendment limited this right to "property within its territorial jurisdiction." 1969 Laws, Supra § 5.03, at 2249. It is apparent that in amending the statute, the legislature intended some change in the existing law, and this court will endeavor to effect the change. See *American Surety Co. v. Axtell Co.,* 120 Tex. 166, 36 S.W.2d 715, 719 (1931).

The judgment of the court of civil appeals is reversed, and the judgment of the trial court is affirmed.

---------

Notes:

[1] All references to statutes are to Texas Revised Civil Statutes Annotated; all references to rules are to the Texas Rules of Civil Procedure.

[2] The pertinent part of the trial court's judgment reads:

BE IT REMEMBERED that on the 3rd day of April, 1978, came on to be heard the motion for summary judgment of defendant, The City of Houston, with respect to All claims and causes of action asserted in this suit by the plaintiff, Clear Creek Basin Authority, and came on to be heard the joint motion of plaintiff-intervenor, the Attorney General of Texas acting for and on behalf of the State of Texas and the Texas Water Quality Board, now the Texas Department of Water Resources, and defendant, The City of Houston, to enter judgment resolving All claims and causes of action asserted by the Attorney General of Texas acting for and on behalf of the State of Texas, against The City of Houston, whereupon the Court proceeded to hear the motion for summary judgment of The City of Houston with respect to All Claims and causes of action asserted by the Clear Creek Basin Authority; and counsel for Clear Creek Basin Authority Having represented in open court to the Court that the Clear Creek Basin Authority desired to withdraw from its First Amended Original Petition all claims and causes of action asserted against The City of Houston predicated on the theory of common law nuisance and desired to proceed only against The City of Houston on the basis of its claims and causes of action asserted against The City of Houston under Chapter 26 of the Texas Water Code, and defendant, The City of Houston, Having represented to the Court that should this matter be reversed and remanded for a new trial, it would have no objection to the Clear Creek Basin Authority amending its pleadings to reassert the claims and causes of action asserted against The City of Houston based on the common law nuisance theory, and The City of Houston Having further represented to the Court that it desired to withdraw from consideration by the Court paragraphs I and III of its motion for summary judgment and to proceed to hearing only on paragraph II of its motion for summary judgment, which complains that the Clear Creek Basin Authority is not entitled to sue for or obtain injunctive relief or penalties against The City of Houston under Chapter 26 of the Texas Water Code for violations which occur outside of the jurisdictional or geographical boundaries of the Clear Creek Basin Authority, and the Clear Creek Basin Authority having proceeded to file its response and affidavits in opposition to the motion for summary judgment of The City of Houston, and the City having agreed to waive any

objections to the late filing of said response and affidavits, and the Court, after considering the motion for summary judgment, the summary judgment evidence, the pleadings on file herein, and the representations, stipulations, and arguments of counsel, and it being the opinion of the Court that the motion for summary judgment of The City of Houston should be in all things granted, it is, therefore;

ORDERED, ADJUDGED and DECREED that the motion for summary judgment of defendant, The City of Houston, be,

and the same is hereby in all things GRANTED, and it is further ORDERED, ADJUDGED and DECREED that plaintiff, Clear Creek Basin Authority, do have and recover nothing of or from defendant, The City of Houston. (Emphasis added.)

[3] The full text of section (c) as recommended by the 1976 Committee on the Administration of Justice of the State Bar of Texas is set forth, showing the proposed additions and deletions. Its suggested deletions in the rule are lined through; the suggested additions are underlined.

In the Advisory Committee's deliberations in 1977, amendments were offered and voted upon by the members. Words that were added in the Committee's meeting by vote are double underlined, and words deleted by Committee vote are double lined-through.

"(c) Motion and Proceedings Thereon. The motion for summary judgment shall state the specific grounds therefor. Except on leave of court, the motion shall be served at least (Ten) Twenty-one days before the time specified for the hearing. Except on leave of court, the adverse party, not later than seven days prior to the day of hearing, may serve opposing affidavits Or other written response. No oral testimony shall be received at the hearing. (The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that, except as to the amount of damages, there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.)

"If the moving party has by motion, pleadings, depositions, answers to interrogatories, admissions on file, or affidavits relied upon by the moving party, if any, shown that there is no genuine issue for trial, And that the moving party is entitled to judgment as a matter of law, The adverse party may not rest upon the mere allegations or denials of his pleadings, but must define specifically in writing the issue or issues he contends are controverted or point out the defects in the movant's proof, and, if necessary to demonstrate a factual dispute, respond with facts from depositions, answers to interrogatories, admissions on file, affidavits, if any, Or written response showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

[4] See note 2, Supra.

[5] The function of the summary judgment is not to deprive a litigant of his right to trial by jury, but to eliminate patently unmeritorious claims and untenable defenses. Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.2d 929, 931 (1952).

---------

95 S.W.3d 416 (Tex.App. —Dallas 2002), 05-01-01643, Crocker v. Paulyne's Nursing Home, Inc.

Page 416

**95 S.W.3d 416 (Tex.App. —Dallas 2002)**

**Johnny R. CROCKER, Individually and as Representative of the Estate of Debbie Kay Crocker, Robby Joe Crocker, Billy Jack Crocker, and Billie Smith, Appellants,**

**v.**

**PAULYNE'S NURSING HOME, INC. a/k/a the Rembrandt Center, the Estate of Wentworth Carter, Norma Carter and the Carter Living Trust, Appellees.**

**No. 05-01-01643-CV.**

**Court of Appeals of Texas, Fifth District, Dallas**

**November 8, 2002**

Rehearing Overruled Feb. 7, 2003.

Page 417

William J. Dunleavy, Windle Turley, P.C., Thomas B. Cowart, Law Office of Windle Turley, P.C., Dallas, for Appellant.

Shannon Welch, Sullivan, Parker & Cook, L.L.C., Dallas, for Appellee.

Page 418

Before Justices WHITTINGTON, O'NEILL, and LAGARDE. [1]

**OPINION**

Opinion By Justice O'NEILL.

In this wrongful death and survival action, appellants Johnny R. Crocker, individually and as representative of the Estate of Debbie Kay Crocker, Robby Joe Crocker, Billy Jack Crocker, and Billie Smith appeal a "no evidence" summary judgment granted in favor of Paulyne's Nursing Home, Inc. a/k/a the Rembrandt Center, L.L.C., the Estate of Wentworth Carter, Norma Carter, and the Carter Living Trust (referred to collectively as the Rembrandt Center). Appellants present nine issues generally contending (1) the Rembrandt Center's motion for summary judgment was legally insufficient, (2) the Rembrandt Center waived its objections to appellants' summary judgment evidence, (3) the trial court erred in sustaining the Rembrandt Center's objections to appellants' summary judgment evidence, and (4) appellants presented competent summary judgment evidence to show the Rembrandt Center's acts or omissions were the proximate cause of an injury to Debbie Kay Crocker. For the following reasons, we affirm the trial court's judgment.

On January 4, 1997, at the age of forty-four, Debbie Kay Crocker (Crocker) suffered a subarachnoid hemorrhage. Crocker never regained full consciousness and the following month she was admitted to the Rembrandt Center, a nursing home, in a semi-comatose state. On April 18, 1997, Crocker was hospitalized for pneumonia and respiratory distress. Crocker was subsequently discharged from the hospital and transferred to another nursing home. Crocker died on January 18, 1998, nine months after being discharged from the Rembrandt Center.

Appellants subsequently sued the Rembrandt Center for negligence and gross negligence. They alleged the Rembrandt Center failed to provide Crocker adequate nursing care by failing to give her adequate oxygen and failing to adequately monitor her blood sugar. They alleged these acts and omissions caused Crocker to suffer from severe respiratory distress and hyperglycemia

that ultimately resulted in her death. The Rembrandt Center filed a motion for summary judgment asserting appellants had no evidence that:

1. Any act or omission of any defendant proximately caused any injury to Debbie Kay Crocker or Plaintiffs.

2. Any failure of any defendant to provide proper care to Ms. Crocker proximately caused any injuries to Ms. Crocker or Plaintiffs.

In their response, appellants presented summary judgment evidence of various acts of negligence by the Rembrandt Center, including evidence it gave Crocker less oxygen than ordered by her doctors, gave her unhumidified instead of humidified oxygen, failed to properly monitor whether she was receiving adequate oxygen, and failed to properly monitor her glucose levels. To raise a fact question on whether the complained-of actions proximately caused Crocker any injury, appellants presented (1) the affidavit and deposition testimony of Doris Moore, a licensed vocational nurse and former employee of the Rembrandt Center, (2) the affidavit of S. Francis Scholl Foster, a registered nurse, and (3) Crocker's death certificate. Appellants also attached Crocker's medical

Page 419

records and records from the Texas Department of Human Services to Foster's affidavit, which she reviewed to form her opinion. The Rembrandt Center objected to almost all of appellants' summary judgment evidence. Following a hearing, the trial court granted the Rembrandt Center's motion for summary judgment.

In a no-evidence summary judgment, the movant must specifically state the elements for which there is no evidence. TEX.R. CIV. P. 166a(i). The non-movant must then bring forth evidence that raises a fact issue on the challenged elements. Id. A no-evidence summary judgment is essentially a pretrial directed verdict to which we apply the same legal sufficiency standard of review. See *Two Thirty Nine Joint Venture v. Joe,* 60 S.W.3d 896, 904 (Tex.App.-Dallas 2001, pet. filed). Although the nonmoving party is not required to marshal its proof, it must present evidence that raises a genuine issue of material fact on the challenged elements. Id. A no-evidence summary judgment is properly granted if the nonmovant fails to bring forth more than a scintilla of probative evidence to raise a genuine issue of material fact on the challenged elements. Id. In determining whether the nonmovant has met its burden, we review the evidence in the light most favorable to the nonmovant and resolve all doubts in its favor. Id.

In its first issue, appellants contend the trial court erred in granting the Rembrandt Center's motion for summary judgment because its motion was legally insufficient. Appellants did not object to the specificity of the Rembrandt Center's motion in the trial court. Appellants nevertheless assert they were not required to object to the motion because it was legally insufficient. See *McConnell v. Southside Ind. Sch. Dist.,* 858 S.W.2d 337, 341 (Tex.1993). The Rembrandt Center responds that a nonmovant is required to object to the legal sufficiency of a no-evidence motion for summary judgment to raise that complaint on appeal.

In McConnell v. Southside Independent School District, the Texas Supreme Court held that a nonmovant is not required to object to the legal sufficiency of a traditional motion for summary judgment to raise that complaint on appeal. See id. at 342. According to the Rembrandt Center,

McConnell applies only to traditional motions for summary judgment and does not apply here. In the alternative, it asserts its motion was legally sufficient.

The San Antonio and Houston Fourteenth courts of appeals have both held that McConnell applies to "no evidence" motions for summary judgment and therefore a non-movant may challenge the legal sufficiency of a no-evidence motion for the first time on appeal. See *Cuyler v. Minns,* 60 S.W.3d 209, 213-214 (Tex.App.-Houston [14th Dist.] 2000, pet. denied); *Callaghan Ranch, Ltd. v. Killam,* 53 S.W.3d 1, 3 (Tex.App.-San Antonio 2000, pet. denied) (same). We agree with the San Antonio and Houston Fourteenth courts and disagree with the courts of appeals that have suggested otherwise. See *Walton v. City of Midland,* 24 S.W.3d 853, 857-58 (Tex.App.-El Paso 2000, no pet.)(concluding non-movant must object to preserve complaint motion did not meet the requirements of rule 166a(i)); *Williams v. Bank One, Texas, N.A.,* 15 S.W.3d 110, 117 (Tex.App.-Waco 1999, no pet.)(same); *Roth v. FFP Operating Partners, L.P.,* 994 S.W.2d 190, 194-95 (Tex.App.-Amarillo 1999, pet. denied)(same).

Nevertheless, we conclude the Rembrandt Center's motion was legally sufficient. As noted above, the Rembrandt Center asserted in its motion that there was no evidence that (1) any act or omission

Page 420

of any defendant proximately caused any injury to Crocker or Plaintiffs, or (2) any failure of any defendant to provide proper care to Crocker proximately caused any injuries to Crocker or Plaintiffs. A common-sense reading of the motion supports the Rembrandt Center's assertion it challenged only the proximate cause element of appellants' cause of action. At a minimum, the element challenged was unclear or ambiguous. Under McConnell, a nonmovant must object to an unclear or ambiguous motion for summary judgment. Id. at 342-43. Therefore, appellants waived any objection that the motion was not more specific.

Having determined the motion was legally sufficient, we next decide what evidence was properly before the trial court when it ruled on the motion. The Rembrandt Center objected to appellants' proximate cause evidence on the grounds that (1) appellants' experts, two nurses, were not qualified to give an opinion on proximate cause, (2) one of appellants' experts was not designated as an expert, and (3) the death certificate and medical records attached to one of the affidavits were hearsay. In its order granting summary judgment, the trial court stated:

The Court, having considered the Motion, the Plaintiffs' Response, the summary judgment evidence admitted for consideration, the objections to the summary judgment evidence, the arguments of counsel and the briefs submitted by the parties, is of the opinion that the Defendant's Motion should be granted.

The summary judgment thus indicates the trial court considered the Rembrandt Center's objections and admitted only certain summary judgment evidence. It is therefore apparent the trial court ruled on the Rembrandt Center's objections when it granted summary judgment. However, the trial court did not sign a written order sustaining the Rembrandt Center's objections until eighty-nine days after it rendered its judgment. Appellants assert the Rembrandt Center waived its objections to the summary judgment evidence by not obtaining a written ruling until "well after" the trial court ruled on the motion for summary judgment. The Rembrandt Center responds the rulings

were timely reduced to writing because the trial court still had plenary jurisdiction when it entered the order. [2]

It is well established that rulings on summary judgment evidence must be reduced to writing. The purpose of this rule is two-fold. First, a ruling is necessary to comply with the ordinary rules of preservation of error. See generally, TEX.R.APP. P. 33.1(a)(2)(A). Second, a written ruling is necessary so that a court of appeals can ascertain what summary judgment evidence was considered by the trial court in reaching its decision. See *Utilities Pipeline Co. v. American Petrofina Mktg.,* 760 S.W.2d 719, 722 (Tex.App.-Dallas 1988, no writ).

Appellants rely on authority concerning preservation of appellate complaints to support its contention that the Rembrandt Center waived error. See *Dolcefino v. Randolph,* 19 S.W.3d 906, 926 (Tex.App.-Houston [14th Dist.] 2000, pet. denied); Chapman Children's Trust v. Porter & Hedges, 32 S.W.3d 429, 436 (Tex.App.-Houston [14th Dist.] 2000, pet. denied). In doing so, appellants confuse a party's duty to preserve error with a trial court's authority to rule on objections. The issue in this case is not whether the Rembrandt

Page 421

Center (which obtained a favorable ruling in the trial court) preserved its complaint for appellate review. Rather, the issue is whether the trial court's order, which was reduced to writing eighty-nine days after the summary judgment was signed, was effective. Appellants have cited no authority for the proposition that rules of preservation of error affect the trial court's authority to delay reducing its rulings to writing if it so chooses. Indeed, the authority relied on by appellants suggests otherwise. Specifically, the court in Dolcefino stated only that a party must obtain a written ruling on its objections, "at, before, or very near the time the trial court rules on the motion for summary judgment or risk waiver." See Dolcefino, 19 S.W.3d at 926. Thus, Dolcefino, indicates only that a trial court is not required to reduce to writing any rulings on summary judgment evidence if it is not timely requested to do so. See also Chapman Children's Trust, 32 S.W.3d at 436. Dolcefino does not suggest the trial court is not permitted to do so.

Moreover, appellants concede an order on objections can be signed after a summary judgment order is signed. They merely complain that, in this case, the trial court waited too long. In their brief, appellants do not attempt to provide any specific time period in which a trial court has to sign an order on objections to summary judgement evidence. However, in oral argument, appellants suggested the trial court has until any motion for new trial is overruled. We disagree for several reasons.

First, appellants base their proposal on the assumption that after a motion for new trial is overruled, the trial court has necessarily disposed of the objections to the summary judgment evidence. However, the same could be said of when the trial court signs its summary judgment order. Second, we are not determining whether a trial court can decide summary judgment objections following the grant of summary judgment, but only whether a trial court's written order reducing its previous rulings to writing is effective. Finally, because a trial court has authority to completely set aside a summary judgment while it retains plenary jurisdiction, it is only logical the trial court has authority to reduce its previous rulings to writing during the same time period. We conclude a trial court may reduce its rulings on summary judgment evidence to writing as long it

retains plenary jurisdiction.

In this case, the summary judgment order reflects the trial court considered and ruled on the summary judgment objections before it rendered judgment. However, the summary judgment order does not reveal the substance of those rulings. During the trial court's plenary jurisdiction, it reduced its rulings to writing to show it sustained the Rembrandt Center's objections. We conclude that because the record shows the trial court ruled on the objections before it granted summary judgment and because the trial court signed a written order memorializing its rulings while it retained plenary jurisdiction, the trial court's rulings were effective.

Appellants next assert the trial court erred in sustaining the Rembrandt Center's objections to their summary judgment evidence. The trial court's ruling sustaining the Rembrandt Center's objection to the nurses' qualifications to give expert testimony on proximate cause is dispositive; thus, we will address it first.

In a medical malpractice suit, the proximate causation element must generally be proven by expert testimony. See *Bowles v. Bourdon,* 148 Tex. 1, 6, 219 S.W.2d 779, 782-83 (1949); *Lesser v. St. Elizabeth Hosp.,* 807 S.W.2d 657, 659 (Tex.App.-Beaumont 1991, writ denied). When

Page 422

a party relies on expert testimony to defeat a movant's motion for summary judgment, the party must include proof of the expert's qualifications. See *United Blood Servs. v. Longoria,* 938 S.W.2d 29, 30 (Tex.1997). Whether a witness is qualified to give expert testimony is a matter committed to the trial court's discretion. Id. The burden of establishing an expert's qualifications is on the offering party. Id. at 31.

In this survival action and wrongful death suit, appellants alleged the Rembrandt's acts and omissions caused Crocker to suffer from severe respiratory distress and hyperglycemia that ultimately resulted in her death. Thus, the question presented is whether the trial court abused its discretion in determining the nurses were not qualified to provide expert opinion testimony regarding the proximate cause of those injuries. In reaching this conclusion, we reject appellants suggestion that they needed only to establish the nurses qualifications to testify about the proximate cause of any injury Crocker may have suffered while at Rembrandt. Appellants petition alleged the Rembrandt Center proximately caused specified injuries: (1) respiratory distress, (2) hyperglycemia, and (3) death. Therefore, to raise a material fact issue, they were required to present some evidence to support their allegations. Cf. Cook v. Brundidge, Fountain, Elliott & Churchill, 533 S.W.2d 751, 759 (Tex.1976)(movant in a traditional summary judgment must meet a plaintiff's case as pleaded); *Jones v. Wal-Mart Stores, Inc.,* 893 S.W.2d 144, 147 (Tex.App.-Houston [1st. Dist.] 1995, no writ) (same). Consequently, appellants were required to show their nurse experts were qualified to provide an expert opinion with respect to proximate cause of the injuries alleged. [3]

Appellants correctly note that nurses are not per se barred from providing an expert opinion on proximate cause in medical malpractice cases. Specifically, a nurse expert can testify about issues within her knowledge, skill, experience, and training. *Arlington Mem'l Hosp. Found., Inc. v. Baird,* 991 S.W.2d 918, 920 (Tex.App.-Fort Worth 1999, pet. denied). Here, appellants have not attempted to show the nurses were qualified to testify with respect to whether the Rembrandt

Center proximately caused Crocker's death, and the nurses proffered no such testimony. Instead, appellants suggest the nurses were qualified to testify to proximate cause with respect to Crocker's respiratory distress and hyperglycemia. In her affidavit, to show her qualifications, Foster stated only that she was a registered nurse, was board certified as a gerontological nurse practitioner, and was familiar with the applicable standard of care. Moore stated only that she was a licensed vocational nurse who has received training in the care of patients with feeding tubes and on ventilators. Neither nurse established any specialized expertise with respect to causation of any condition, much less respiratory failure or hyperglycemia. Therefore, we cannot conclude the trial court abused its discretion in concluding appellants' expert nurses were not qualified to testify as to proximate cause.

Appellants next assert expert testimony was not necessary to raise a fact question on proximate cause. Specifically, they contend "it is common knowledge that depriving a person of oxygen will cause them injury." Crocker was not on a respirator, but was administered oxygen through her tracheotomy with a mist machine. We cannot agree that it is common knowledge that the Rembrandt Center's

Page 423.

actions in giving Crocker (a semi-comatose patient suffering from pneumonia) less oxygen than ordered by her doctors, giving her unhumidified instead of humidified oxygen, and failing to properly monitor whether she was receiving adequate oxygen proximately caused her respiratory distress or hyperglycemia. Therefore, expert testimony was required to raise a fact question on whether the Rembrandt Center's negligence proximately caused Crocker's alleged injuries.

Appellants next assert the trial court erred in granting summary judgment because they presented sufficient evidence of proximate cause apart from the expert testimony that was stricken. They rely on Texas Department of Human Services (TDHS) records for the Rembrandt Center concerning a complaint filed regarding Crocker. The records show several allegations were made against the Rembrandt Center concerning Crocker. Allegation 2 alleged the Rembrandt Center was negligent in that:

1. Staff set the resident's oxygen tank on (1) instead of (3) as ordered and she went without the correct amount of oxygen for several days.

2. The resident's mist machine was broken for several days until she became "dehydrated, her mucous completely dried up and her legs turned black."

A notation on the record shows allegation 2 was "substantiated." To the extent the "substantiated" notation suggests allegation 2 was correct in its entirety, we nevertheless conclude the records fail to raise a fact issue on proximate cause. Specifically, the records do not show that Crocker's broken mist machine or incorrect oxygen dosage proximately caused Crocker's respiratory distress, hyperglycemia, or her death. Therefore, the records do not raise a fact issue on proximate cause.

Appellants also complain the trial court erred in sustaining the Rembrandt Center's objections to Crocker's medical records and her death certificate. However, appellants have directed us to no evidence in the medical records or the death certificate showing proximate cause. Therefore, we need not decide whether the trial court erred in sustaining those objections.

See TEX.R.APP. P. 44.1(a)(1); 17090 *Parkway, Ltd. v. McDavid,* 80 S.W.3d 252, 259 (Tex.App.-Dallas 2002, no pet.)(party complaining of error in the exclusion of evidence has the burden to show error probably caused the rendition of an improper judgment.)

We have reviewed the summary judgment evidence and conclude the trial court properly determined appellants did not present more than a scintilla of evidence of proximate cause. Therefore, the trial court properly granted the Rembrandt Center's motion for summary judgment.

We affirm the trial court's judgment.

---------

Notes:

[1] The Honorable Sue L. Lagarde, Justice, Court of Appeals, Fifth District of Texas at Dallas, Retired, sitting by assignment.

[2] Because appellants filed a timely motion for new trial, the trial court had plenary jurisdiction for 105 days after it signed its judgment. See L.M. Healthcare, Inc. v. Childs, 929 S.W.2d 442, 444 (Tex.1996).

[3] We recognize that in its motion, the Rembrandt Center asserted there was no evidence of proximate cause of any injury. The Rembrandt Center was necessarily referring to any alleged injury.

---------

**820 S.W.2d 121 (Tex. 1991)**

**CROWN LIFE INSURANCE COMPANY, Petitioner,**

**v.**

**ESTATE OF Eduardo J. GONZALEZ, et al., Respondents.**

**No. D-1452.**

**Supreme Court of Texas.**

**November 6, 1991**

Rehearing Overruled Dec. 11, 1991.

Joe R. Greenhill, Patrick O. Keel, Austin, John C. Holmgren, Shirley Selz, and Valerie M. Fogleman, Corpus Christi, for petitioner.

C.M. Zaffirini and Yvonne Salinas Gonzalez, Laredo, for respondents.

PER CURIAM.

We consider whether a party who otherwise timely files a record on appeal should be granted pre-submission leave to supplement the record absent any finding of unreasonable delay. We conclude that TEX.R.APP.P. 55(b) should be liberally construed so that in such cases, leave should be granted.

This cause arises from a claim of bad faith filed against Crown Life Insurance Company (Crown) by the Estate of Eduardo J. Gonzalez (the Estate). Following the trial court's grant of summary judgment in favor of the Estate, Crown appealed. After the case was set for submission in the court of appeals, but before the actual submission date, Crown filed a motion for leave to supplement the record with two depositions considered by the trial court in granting summary judgment. [1] The court of appeals denied the motion and affirmed the trial court, in part because the record was incomplete.

We have previously held that TEX.R.APP.P. 55(b) [2] is to be liberally construed so that the decisions of the courts of appeals turn on substance rather than procedural technicality. *Gay v. City of Hillsboro,* 545 S.W.2d 765, 766 (Tex.1977) (interpreting former TEX.R.CIV.P. 428 (Vernon

Page 122

1985)); see also *Smirl v. Globe Laboratories Inc.,* 144 Tex. 41, 44, 188 S.W.2d 676, 678 (1945) (appellant should be given opportunity to have disposition on the merits unless such causes violence to the rules). Here, the court of appeals made no finding that permitting supplementation would have unreasonably delayed the appeal. Moreover, while leave to supplement post-submission is often denied, seldom is a party who otherwise timely files a record denied pre-submission leave to supplement. See *Williams v. Mack Fin. Corp.,* 505 S.W.2d 316, 319-20 (Tex.Civ.App.--Tyler 1974, writ ref'd n.r.e.) (party denied post-submission leave). But see *General Life & Accident Ins. Co. v. Handy,* 766 S.W.2d 370, 372-73 (Tex.App.--El Paso 1989, no writ) (in dicta, court denied pre-submission leave finding that to grant motion would necessitate unwarranted delay).

The court of appeals was correct in holding that, absent a complete record on appeal, it must presume the omitted depositions supported the trial court's judgment. See *DeSantis v.*

*Wackenhut,* 793 S.W.2d 670, 689 (Tex.1990), cert. denied, 498 U.S. 1048, 111 S.Ct. 755, 112 L.Ed.2d 775 (1991). For the court of appeals to affirm the trial court's judgment on the basis of omitted items after having denied pre-submission supplementation of those items without having determined that such would unreasonably delay disposition of the appeal, however, offends the spirit of TEX.R.APP.P. 55(b). See also Advisory Opinions of Subcommittee on Interpretation of the Texas Rules of Practice and Procedure in Civil Cases, 8 Tex.B.J. 6, 26 (1945).

Accordingly, pursuant to TEX.R.APP.P. 170, without hearing oral argument, a majority of this court grants Crown's application for writ of error, reverses the judgment of the court of appeals, and remands this case to that court for further proceedings consistent with this opinion.

---------

Notes:

[1] Crown made its motion pursuant to TEX.R.APP.P. 55(b), and urged that the additional depositions were necessary to the disposition of the case on appeal. See Goldsmith v. Stephenson, 634 S.W.2d 331, 332 (Tex.App.--Dallas 1982, no writ).

[2] TEX.R.APP.P. 55(b) [formerly TEX.R.CIV.P. 428 (Vernon 1985) ] provides:

If anything material to either party is omitted from the transcript or statement of facts, before submission the parties by stipulation, or the trial court, upon notice and hearing, either before or after the record has been transmitted to the appellate court, or the appellate court, on a proper suggestion or on its own initiative, may direct a supplemental record to be certified and transmitted by the clerk of the trial court or the official court reporter supplying such omitted matter. The appellate court shall permit it to be filed unless the supplementation will unreasonably delay disposition of the appeal.

---------

293 S.W.3d 920 (Tex.App.-Dallas 2009), 05-08-00485-CV, Bernard Dolenz, Life Estate v. Dallas Cent. Appraisal Dist.

**293 S.W.3d 920 (Tex.App.-Dallas 2009)**

**Bernard DOLENZ, LIFE ESTATE, Appellant,**

**v.**

**DALLAS CENTRAL APPRAISAL DISTRICT and Appraisal Review Board of Dallas County, Appellees.**

**No. 05-08-00485-CV.**

**Court of Appeals of Texas, Fifth District, Dallas**

**August 13, 2009**

Rehearing Overruled Sept. 21, 2009.

Bernard Dolenz, Dallas, TX, pro se.

Peter G. Smith, Nichols, Jackson, Dillard, Hager & Smith, L.L.P., Dallas, TX, for appellee.

Before Justices MOSELEY, FITZGERALD, and LANG-MIERS.

**OPINION**

LANG-MIERS, Justice.

This is an ad valorem tax dispute. Bernard Dolenz, Life Estate, appeals the trial court's order dismissing his lawsuit for want of subject-matter jurisdiction. We affirm.

On December 11, 2003, Bernard Dolenz conveyed the property at 6102 Swiss Avenue in Dallas by quitclaim deed to the Universal Life Church of Texas Trust. Dolenz is trustee of ULC. Contemporaneous with the quitclaim deed, the Trust and Dolenz, as trustee, conveyed a life estate in the property to Dolenz. The conveyance also contained the following language:

For administration of the ULC of Texas Trust, Bernard Dolenz as Trustee of the same, shall have allof [sic] his necessaries paid by the ULC of Texas Trust as they become due as living expenses, transportaton [sic] expenses, housing expenses, clothing expenses, and any and all other necessaries.

In 2006 and 2007, Dolenz protested the tax assessments on the property, asserting that ULC qualifies as a religious organization and the Swiss Avenue property is therefore exempt from taxation pursuant to section 11.20 of the Texas Tax Code.[1] After a hearing, the Appraisal Review Board denied the exemption.

Dolenz then filed suit. Although captioned in the name of " Bernard Dolenz, Life Estate," the body of the petition identified the plaintiff as " Trustee of the ULC of Texas a/k/a COMMUNITY OF HIS DIVINE MERCY" and asserted that the ULC " contends it is an unincorporated non-profit religious association that qualifies as a religious organization" consistent with the tax code and the Texas Constitution. Dolenz sought, on behalf of ULC, a declaration that ULC was exempt from taxes.

Appellees filed a motion to show authority and plea to the jurisdiction, asserting that Dolenz did not have authority to represent ULC because he is not an attorney and that he did not have standing because he failed to meet the statutory definition of owner. After a hearing, the trial court granted appellees' plea to the jurisdiction, but gave Dolenz thirty days to show authority to

prosecute the case on behalf of the Trust. Dolenz filed a pro se motion to reconsider. After the deadline to show authority passed, an attorney filed a notice of appearance as counsel " for the Plaintiff, Bernard Dolenz, Life Estate." The attorney appeared on behalf of Dolenz at the hearing on Dolenz's pro se motion to reconsider. On the same day, the trial court signed an order finding that Dolenz did not show sufficient authority, granted appellees' plea to the jurisdiction and motion to show authority, and dismissed the case with prejudice.

In his first issue, Dolenz argues that the trial court erred by dismissing his suit for want of jurisdiction. We review a trial court's ruling on a plea to the jurisdiction de novo. *Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 225-26 (Tex.2004). When the plea to the jurisdiction challenges the existence of jurisdictional facts, we consider the relevant evidence submitted by the parties when it is necessary to resolve jurisdictional issues. *Id.* at 227.

A property owner is entitled to appeal an order of the appraisal review board determining a protest by the property owner of the denial of an exemption. TEX. TAX CODE ANN. §§ 41.41(a)(4), 42.01(1)(A) (Vernon 2008). Additionally, a person who is leasing real property and who has a contractual obligation to pay the taxes on the property may appeal the review board's determination of a protest on the appraised value of the property and will be considered the property owner for purposes of the appeal. TEX. TAX CODE ANN. §§ 41.413(b), 42.015 (Vernon 2008).

Dolenz argues that he has a " personal stake" in this controversy and will be " personally aggrieved" if " the ULC of Texas d/b/a Community of his Divine Mercy and/or the Life Estate does not prevail on tax exemption status as Dolenz will be ousted since he himself cannot pay the taxes through foreclosure for taxes or other remedies." In response, appellees assert that Dolenz is not a property owner nor does he have a leasehold interest requiring him to pay taxes.

First, we note that in the proceedings below, Dolenz repeatedly took the position that ULC Texas Trust was the owner of the property and that he had only a " right to use and enjoy property vested in another." For example, in a September 19, 2007 letter to the Appraisal District protesting the 2007 denial, Dolenz specifically asserted that the " vested true owner is the ULC of Texas Trust, not the Life Estate of Bernard Dolenz" and that the life estate " has no property interest." Additionally, the evidence establishes that Dolenz is not liable for the taxes on the property. The document conveying a life estate to Dolenz expressly provided that Dolenz " shall have allof [sic] his necessaries paid by the ULC of Texas Trust as they become due as living expenses, transportaton [sic] expenses, housing expenses, clothing expenses, and any and all other necessaries." The clear import of this provision is to ensure that Dolenz have " all of" his expenses paid, and in particular, all " housing expenses." We construe this language, as did the trial court, to mean that Dolenz, as the life tenant, had no obligation to the owner to pay the taxes. Further, we note that Dolenz made no argument below that the trial court misconstrued the provision. Under these circumstances, we cannot conclude that the trial court erred in determining that Dolenz had no standing to challenge the exemption ruling. To the extent that he contends that he is being denied access to the courts in violation of the open courts provision of the Texas Constitution, his argument is conclusory and inadequately briefed. TEX.R.APP. P. 38.1(i). We overrule the first issue.

In his second issue, Dolenz contends that the trial court erred by dismissing his case because appellees did not file a verified pleading pursuant to Texas Rule of Civil Procedure 93. As support for this issue, appellant recites law regarding capacity to sue. Capacity to sue and standing are separate legal concepts, and rule 93 does not require verification of a standing issue. *See Prostok v. Browning,* 112 S.W.3d 876, 921 (Tex.App.-Dallas 2003), *rev'd in part on other grounds,* 165 S.W.3d 336 (Tex.2005). Regardless, appellees' motion to show authority and plea to the jurisdiction was verified. We overrule the second issue.

In his third issue, Dolenz contends that he was entitled to prosecute his rights as an assignee of ULC. Here, Dolenz recites a paragraph from Texas Jurisprudence containing a general description of the law of assignments, but he does not discuss how that law applies to a judicial appeal of an administrative proceeding where there is no compensable recovery, simply the determination as to whether an exemption applies for ad valorem tax purposes. Given the failure to provide any discussion of the law to the applicable facts, we conclude that the issue is inadequately briefed. *See* TEX.R.APP. P. 38.1(i). We overrule the third issue.

In his fourth issue, Dolenz asserts that the trial court erred by dismissing the case " as (1) Bernard Dolenz Life Estate and (2) Bernard Dolenz as an intervenor were denied due process because they had standing with a timely hired licensed Texas attorney." Dolenz cites one sentence of law for the general legal proposition regarding when a party may intervene in a lawsuit. Again, however, he fails to provide any discussion of the law cited to the relevant facts of this case. Consequently, we conclude that the issue is inadequately briefed. *See* TEX.R.APP. P. 38.1(i). We overrule the fourth issue.

In his fifth issue, Dolenz argues that the trial court erred by dismissing his case for want of jurisdiction because appellees admitted in their responses to requests for admissions that they were " currently unaware of any administrative prerequisites that were not met by Plaintiff" and that they " were not seeking damages/taxes." We disagree. Subject-matter jurisdiction cannot be conferred by judicial admission. *Dolenz v. Dallas Cent. Appraisal Dist.,* 259 S.W.3d 331, 333 (Tex.App.-Dallas 2008, pet. denied), *cert. dism'd,* __ U.S. __, 129 S.Ct. 1685, 173 L.Ed.2d 1035 (2009). Additionally, this issue was not raised in the trial court and was not preserved for appellate review. *See* TEX.R.APP. P. 33.1(a). Regardless, appellees were not seeking, nor were they awarded, damages in this case. We overrule the fifth issue.

We affirm the trial court's order dismissing the case for want of jurisdiction.

---------

Notes:

[1] The Notice of Protest For Year 2006 listed Universal Life Church of Texas Trust as the owner of the Swiss Avenue Property. On the notice form, Dolenz checked the box indicating " [o]wnership is wrong" and signed the form as Bernard Dolenz, Life Estate and Bernard Dolenz, Trustee ULC, as owner. The following year, the Notice of Protest listed the owner as Bernard J. Dolenz, Life Estate, and Dolenz again complained that ownership " is wrong" and signed the form as Bernard Dolenz, Trustee.

---------

**848 S.W.2d 83 (Tex. 1993)**

**FRUEHAUF CORPORATION, et al., Petitioners,**

**v.**

**Maria and Hilario CARRILLO, Individually, et al., Respondents.**

**No. D-3156.**

**Supreme Court of Texas.**

**February 24, 1993**

Rehearing Overruled March 31, 1993.

John L. Lancaster III, David C. Myers, Dallas, Knox D. Nunnally, Marie R. Yeates, Penelope E. Nicholson, Catherine (Smith) Bukowski, Houston, Baldemar Gutierrez, Alice, Jesus Maria Alvarez, Rio Grande City, Robert M. Schick, Houston, Arnulfo Guerra, Roma, for petitioners.

Frank R. Nye, Jr., Rio Grande City, Rudolfo Nava, San Antonio, William J. Chriss, Cage Wavell, Frank G. Davila, Augustin Rivera, Jr., Corpus Christi, for respondents.

PER CURIAM.

This is a negligence action arising out of a collision between a station wagon and a parked tractor trailer. A take-nothing judgment against the plaintiffs, relatives of several individuals killed in the accident, was signed on September 21, 1990. Plaintiffs filed motions for new trial which the trial court granted on December 4, 1990,

Page 84

the 74th day after the date of judgment. On the 75th day, December 5, 1990, the trial court set aside its order granting the motions for new trial and overruled the motions.

Plaintiffs appealed complaining that the trial court acted without authority when it vacated its order for a new trial. The court of appeals sustained plaintiffs' point of error as to the motions for new trial, holding that the trial court did not have the authority during the 75-day period provided by Texas Rule of Civil Procedure 329b to vacate the previously granted motions for new trial. 838 S.W.2d 573.

The pertinent provisions of Rule 329b provide as follows:

(c) In the event an original or amended motion for new trial or a motion to modify, correct or reform a judgment is not determined by written order signed within seventy-five days after the judgment was signed, it shall be considered overruled by operation of law on expiration of that period.

(d) The trial court, regardless of whether an appeal has been perfected, has plenary power to grant a new trial or to vacate, modify, correct, or reform the judgment within thirty days after the judgment is signed.

The court of appeals erred in holding that a trial court does not have the authority to vacate an order for a new trial during the 75-day period. *Fulton v. Finch,* 162 Tex. 351, 346 S.W.2d 823, 827 (1961).

A trial court has plenary power over its judgment until it becomes final. *Mathes v. Kelton,* 569 S.W.2d 876, 878 (Tex.1978); *Transamerican Leasing Co. v. Three Bears, Inc.,* 567 S.W.2d 799, 800 (Tex.1978). The trial court also retains continuing control over interlocutory orders and has the

power to set those orders aside any time before a final judgment is entered. *Texas Crushed Stone Co. v. Weeks,* 390 S.W.2d 846, 849 (Tex.Civ.App.--Austin 1965, writ ref'd n.r.e.). An order granting a new trial is an unappealable, interlocutory order. *B.F. Walker, Inc. v. Chaney,* 446 S.W.2d 896, 897 (Tex.Civ.App.--Amarillo 1969, writ ref'd n.r.e.). Denying the trial court the authority to reconsider its own order for new trial during the 75-day period needlessly restricts the trial court, creates unnecessary litigation, and is inconsistent with the notion of inherent plenary power vested in the trial courts.

Accordingly, pursuant to Texas Rule of Appellate Procedure 170, a majority of the court grants Petitioners' applications for writ of error, and without hearing argument, reverses the judgment of the court of appeals and remands this cause to that court for consideration of points of error not addressed on original appeal.

310 S.W.3d 19 (Tex.App.-Dallas 2009), 05-08-00824-CV, Gunter v. Empire Pipeline Corp.

Page 19

**310 S.W.3d 19 (Tex.App.-Dallas 2009)**

**H. Glenn GUNTER, Appellant,**

**v.**

**EMPIRE PIPELINE CORPORATION, Empire Exploration, L.P., and Empire Exploration Corporation, Appellees.**

**No. 05-08-00824-CV.**

**Court of Appeals of Texas, Fifth District, Dallas**

**July 24, 2009**

Page 20

[Copyrighted Material Omitted]

Page 21

Emil Lippe, Jr., Law Offices of Lippe & Associates, Dallas, TX, for Appellant.

Robert L. Harris, J. Stephen Gibson, Shannon, Gracey, Ratliff & Miller, L.L.P., Dallas, TX, for Appellee.

Before Justices FITZGERALD, LANG, and SMITH.[1]

**OPINION**

FITZGERALD Justice.

Appellant H. Glenn Gunter sued appellees Empire Pipeline Corporation, Empire Exploration, L.P., and Empire Exploration Corporation (collectively " Empire" ). The parties signed a mediated settlement agreement, but Gunter later filed a motion to invalidate the settlement. Instead, the trial court signed an order enforcing the settlement and dismissing the lawsuit. We conclude that the trial court erred by enforcing the settlement in the absence of proper pleadings, proceedings, and proof. We accordingly reverse and remand for further proceedings.

**I. BACKGROUND AND ISSUES ON APPEAL**

Gunter sued Empire, alleging breach of contract and other theories of recovery. The parties went to mediation after the case had been pending for almost two years, and they signed a document entitled " settlement agreement." About two months later, Gunter filed a motion to " vacate" the settlement agreement, contending that the agreement was invalid and unenforceable on grounds such as duress and fraud. A few days before the hearing, Gunter filed an amended motion to vacate the settlement agreement. Empire filed a response to the motion to vacate. Although Empire did not style this response as a cross-motion, it included in its prayer a request that the court " enter judgment enforcing the Settlement Agreement and Dismissal with Prejudice of all Plaintiff's Claims."

The trial court held a nonevidentiary hearing at which the parties presented argument as to the proper procedure to be followed when a party seeks to avoid a settlement agreement. Gunter argued that Empire could not obtain judicial enforcement of the settlement agreement without pleading and proving its right to enforcement through the usual channels-trial or summary judgment. Empire argued that the court could enforce the agreement in a summary fashion if it concluded that the agreement was not ambiguous on its face. The court took the matter under

advisement and later signed an order that both enforced the settlement agreement (by ordering Empire Pipeline Corporation to pay the consideration recited in the agreement) and dismissed Gunter's claims with prejudice. Gunter filed a motion for new trial, which the trial court heard and denied.

Gunter presents five issues on appeal. In his first issue, he argues that the trial court erred by enforcing the settlement agreement without proper pleadings by Empire and without proper proof adduced through a trial or motion for summary judgment. In his other issues, he argues the merits of his position that the settlement agreement is unenforceable for various reasons.

Page 22

## II. ANALYSIS

The law in this area is well-settled. The trial court cannot render an agreed judgment after a party has withdrawn its consent to a settlement agreement. *Padilla v. LaFrance,* 907 S.W.2d 454, 461-62 (Tex.1995); *Quintero v. Jim Walter Homes, Inc.,* 654 S.W.2d 442, 444 (Tex.1983); *Crump v. Crump,* No. 05-04-01515-CV, 2005 WL 2841146, at *1 (Tex.App.-Dallas Oct. 31, 2005, no pet.) (mem. op.). After consent has been withdrawn, a court may enforce a settlement agreement " only as a written contract." *Mantas v. Fifth Court of Appeals,* 925 S.W.2d 656, 658 (Tex.1996) (per curiam). The law does not recognize the existence of any special summary proceeding for the enforcement of a written settlement agreement, even one negotiated and executed in the context of a mediation. *Cadle Co. v. Castle,* 913 S.W.2d 627, 631 (Tex.App.-Dallas 1995, writ denied) (en banc). Thus, " [a]n action to enforce a settlement agreement, where consent is withdrawn, must be based on proper pleading and proof." *Padilla,* 907 S.W.2d at 462. Proper notice and hearing are also required. *See id.* at 461. In short, if consent is withdrawn, " the only method available for enforcing a settlement agreement is through summary judgment or trial." *Staley v. Herblin,* 188 S.W.3d 334, 336 (Tex.App.-Dallas 2006, pet. denied).

Empire had no pleadings to support rendition of judgment on the settlement agreement. It included a prayer for enforcement of the agreement in its response to Gunter's motion to vacate, but that is not a sufficient pleading for these purposes. *See Crump,* 2005 WL 2841146, at *1 (" Application for Approval of Agreement to Settle Estates" not a sufficient pleading); *Cadle Co.,* 913 S.W.2d at 631-32 (" Motion to Enforce Settlement Agreement" not a sufficient pleading); *see also Rupert v. McCurdy,* 141 S.W.3d 334, 339 (Tex.App.-Dallas 2004, no pet.) (" Pleadings are composed of petitions and answers." ). Moreover, the summary procedure employed by the trial court deprived Gunter of the right to be confronted by appropriate pleadings, assert defenses, conduct discovery, and submit factual disputes to a fact finder. *Staley,* 188 S.W.3d at 337; *Crump,* 2005 WL 2841146, at *1. *Cf. In re B.L.A.,* No. 05-07-00933-CV, 2008 WL 2313658, at *1 (Tex.App.-Dallas June 6, 2008, no pet.) (mem. op.) (" If parties do not adhere to summary judgment practice in cases such as this, the likely result will be uncertainty for the parties and trial courts and disparity in trial courts' consideration and treatment of individual cases." ). We agree with Gunter that the trial court erred by rendering a judgment that essentially ordered specific performance of the settlement agreement without proper pleadings, proceedings, and proof.

Empire argues that *Cadle, Crump,* and other cases cited by Gunter are distinguishable. According to Empire, the settlements in those cases were subject to unfulfilled conditions

precedent, so the parties could withdraw their consent before the agreements were consummated. Empire further argues that Gunter could not withdraw his consent to the settlement agreement because he " consummated [that agreement] unconditionally." We disagree with Empire's interpretation of the cases, and we conclude that *Cadle* and *Crump* are controlling. In both cases, one party contended that a settlement was an enforceable agreement, the other party notified the court that it no longer consented to the settlement, and we held that the trial court could not summarily enforce the agreement without proper pleadings, proceedings, and proof. *Crump,* 2005 WL 2841146, at *1; *Cadle,* 913 S.W.2d at 630-32. That is precisely the situation presented

Page 23

in this case. Just as in *Cadle* and *Crump,* we must reverse.

Empire contends that the execution of the settlement agreement destroyed the trial court's subject-matter jurisdiction by eliminating the " case or controversy" between it and Gunter. We disagree. Empire cites no authority to support the proposition that a contested settlement agreement can moot a lawsuit and destroy subject-matter jurisdiction under circumstances like those presented in this case. We conclude that the record in this case discloses no defect in the trial court's subject-matter jurisdiction.

Empire argues that a ruling in Gunter's favor would effectively grant him rescission of the agreement even though he did not plead sufficient grounds for such relief. We express no opinion as to the legal merit of any of Gunter's grounds for invalidating the settlement agreement, and we are not rendering judgment of rescission in his favor. The validity of the settlement agreement has yet to be properly tested, because neither side amended its pleadings to reckon with the settlement agreement and no trial or equivalent proceeding has been held. Gunter's filing of the motion to vacate meant only that a consent judgment could not be rendered and that the validity of the agreement had to be litigated according to the usual procedures. *See Staley,* 188 S.W.3d at 336 (" Where fact issues are raised or consent has been withdrawn, the only method available for enforcing a settlement agreement is through summary judgment or trial." ). As further discussed below, the merits of Gunter's grounds for invalidating the settlement agreement are not properly before us.

Finally, Empire argues that Gunter waived error by failing to make an offer of proof of the evidence he would have introduced if the trial court had conducted an evidentiary hearing. *See* TEX.R. EVID. 103(a)(2). We disagree. The error asserted by Gunter is not merely the erroneous exclusion of evidence. Gunter complains of the entire procedure employed by the trial court-the rendition of judgment enforcing the settlement agreement without supporting pleadings, evidence, or an appropriate proceeding such as a trial or summary judgment. Gunter made this complaint clear at the hearing on his motion to vacate. The trial court implicitly rejected Gunter's argument by rendering the judgment enforcing the settlement agreement. Gunter adequately preserved error. *See generally* TEX.R.APP. P. 33.1.

We sustain Gunter's first issue on appeal. In his remaining issues, Gunter contends that the trial court erred by enforcing the settlement agreement for a variety of substantive reasons. Moreover, Gunter prays for us to reverse the judgment and to render judgment vacating the settlement agreement, arguing in essence that he conclusively established his defenses to the

enforceability of the agreement. We need not address Gunter's other issues. Gunter did not amend his pleadings in the trial court to attack the validity of the settlement agreement, nor were his defenses to the agreement's enforceability properly adjudicated by summary judgment or trial. His merits arguments and his request for rendition of judgment are therefore premature. *See Pollard v. Merkel,* No. 05-96-00795-CV, 1999 WL 72209, at *3 n. 5 (Tex.App.-Dallas Feb. 12, 1999, no pet.) (not designated for publication) (refusing to address legal-sufficiency points on similar facts because no " trial" had been held).

## III. DISPOSITION

For the foregoing reasons, we reverse the trial court's judgment and remand this

Page 24

case for further proceedings consistent with this opinion.

---------

Notes:

[1] The Honorable Bea Ann Smith, Justice, Court of Appeals, Third District of Texas at Austin, Retired, sitting by assignment.

---------

**230 S.W.3d 685 (Tex.App.—Dallas 2007)**

**Ihor George KUPCHYNSKY, Melissa Twomey Kupchynsky, and FGH Homebuilders, Inc., Appellants,**

**v.**

**William V. NARDIELLO and Laree Caramella, Appellees.**

**No. 05-05-01134-CV.**

**Court of Appeals of Texas, Fifth District, Dallas.**

**June 6, 2007**

Rehearing Overruled Sept. 12, 2007.

On Appeal from the 44th Judicial District Court Dallas County, Texas Trial Court Cause No. 03-7423

Cynthia Hollingsworth, Gardere, Wynne, Sewell, L.L.P., Gregory Scott Heath, Gardere & Wynne, Dallas, for Appellant.

Lindy D. Jones, Jones, Allen & Fuquarry, L.L.P., Dallas, for Appellee.

Before Justices MOSELEY, FRANCIS, and MAZZANT

**OPINION**

MOLLY FRANCIS, JUSTICE.

In this case involving the sale of a private residence, appellees William V. Nardiello and Laree Caramella sued appellants FGH Homebuilders, Inc., Ihor George Kupchynsky, and Melissa Twomey Kupchynsky in connection with construction defects in the house. The jury awarded damages in appellees' favor. In four issues, appellants challenge the jury's liability findings. In a fifth issue, FGH complains it was not a party to the sale of the house and therefore cannot be liable under the DTPA. We affirm.

FGH builds homes at the Enclave, a residential development. George Kupchynsky is the vice president of FGH. In May 2002, appellees contracted to purchase the two-and-a-half-year-old Kupchynsky residence at the Enclave for $815,000. The residence featured two tiled balconies-one in the front and the other in the back of the house. According to Nardiello, Kupchynsky told him he was the builder of the home.

Over the next eighteen days, appellees obtained home, foundation, and termite inspections. During the home inspection, Nardiello and the inspector found water on the front balcony tile although it was a sunny day. When the water was dried off, Nardiello said it would "leach right back up into the grout of the tile." In his report, the inspector noted that moisture appeared to seep up between the joints of the tile floor. The inspector recommended appellees contact the builder for comment and noted "[r]epair may be needed." To the side of the report, Nardiello wrote, "Call Builder."

Nardiello contacted Kupchynsky, who told him "that was the design of the balcony per the blueprints" and suggested they meet with Darin Willard, who installed the pans for the balconies

and could "tell us how those things were to work." At that meeting, Willard told Nardiello that "[w]hat you're seeing here is the way that the water gets out of the pan." Nardiello asked if there was any other way for the water to get out, and Willard said, "No. It will evaporate back up through the grout, which is a porous material." Willard said "it was designed that way," like a "shower pan." Similarly, Kupchynsky told him that "it was built that way."

Appellees ultimately provided the Kup-chynskys with a list of thirteen items to be repaired; the items did not include the balcony drainage. The Kupchynskys agreed to make the repairs, and in exchange, appellees agreed that all contingencies had been satisfied or waived and that the $10,000 earnest money was immediately nonrefundable. Appellees then closed on the sale of the home.

Five months later, in October 2002, the back balcony began to leak in several places; in February 2003, the front balcony began to leak. Appellees had several people inspect the balconies to identify the reason for the leaks. After pulling up several tiles and removing the concrete mud, it appeared the balconies had been leaking "for quite some time." The galvanized metal pans were rusted and had holes. When the buyers contacted the architect for the detailed plans on the balcony, they learned there were none.

Construction experts concluded the home was not built in a good and workmanlike manner. In reports offered as evidence, they found the number and locations of drains were not according to the builder's plans; drainpipes were not installed according to the builder's plans; the plans specified the balconies sloping away from the rear of the house, but the balconies were level; and the pans were made of galvanized metal with a lifetime of three to five years, instead of copper pans, which would last a lifetime. According to the experts, once the water seeped through to the tile grout and filled the pans, the water had no means of escape, rusted the pan joints, and began leaking through the substructure. The experts recommended appellees tear out and rebuild the balconies or potentially face structural damage to the home and mold problems. When appellants refused to pay the costs of the repairs, appellees sued the Kupchynskys and FGH.

Following a three-day trial, the jury found appellants engaged in false, misleading, or deceptive acts or practices that appellees relied on to their detriment and that were a producing cause of damages; the Kupchynskys made a negligent misrepresentation on which appellees justifiably relied; and George Kupchynsky and FGH were the builders of the residence and failed to design or construct the home in a good and workmanlike manner to appellees' injury. The jury failed to find that appellants engaged in unconscionable, knowing, or intentional conduct. The jury awarded $52,695 in damages and also

Page 688

awarded attorney's fees and court costs. The trial court rendered judgment on the jury's verdict. This appeal ensued.

In their first and second issues, appellants complain the trial court erred in failing to direct a verdict or grant their motion for judgment notwithstanding the verdict on appellees' DTPA and negligent misrepresentation claims.

A directed verdict is proper only under limited circumstances: (1) when the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent

or (2) when the evidence is insufficient to raise a material fact issue. *Prudential Ins. Co. v. Fin. Review Servs., Inc.,* 29 S.W.3d 74, 77 (Tex. 2000).

A JNOV is proper when a directed verdict would have been proper. *See* Tex. R. Civ. P. 301; *Fort Bend County Drainage Dist. v. Sbrusch,* 818 S.W.2d 392, 394 (Tex. 1991). A motion for JNOV should be granted when the evidence is conclusive and one party is entitled to recover as a matter of law or when a legal principle precludes recovery. *Morrell v. Finke*, 184 S.W.3d 257, 290 (Tex. App.-Fort Worth 2005, pet. abated); *John Masek Corp. v. Davis,* 848 S.W.2d 170, 173 (Tex. App.-Houston [1st Dist.] 1992, writ denied). We review the trial court's determination under a legal sufficiency standard. *County of Dallas v. Wiland,* 124 S.W.3d 390, 401 (Tex. App.-Dallas 2003), *rev'd on other grounds*, 216 S.W.3d 344 (Tex. 2007).

In a legal sufficiency review, we view the evidence in a light most favorable to the judgment and indulge every reasonable inference to support it, crediting favorable evidence if a reasonable jury could and disregarding contrary evidence unless a reasonable jury could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 807, 822 (Tex. 2005). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex. 1996).

In their first issue, appellants contend appellees' independent inspections of the house and renegotiation of the sales contract "foreclose the element of reliance" as a matter of law. They argue this case is controlled by this Court's opinion in *Dubow v. Dragon,* 746 S.W.2d 857 (Tex. App.-Dallas 1988, no writ).

In Dubow, a couple contracted to purchase a house and had it inspected. The inspection report identified several existing problems and potential problems, including movement in the concrete slab. The buyers then hired a foundation specialist, who found additional problems attributable to differential foundation movement. The buyers also had an architect and a contractor look at certain aspects of the house prior to closing.

After receiving the reports on the condition of the house, the buyers were worried about the foundation and other problems. The buyers obtained estimates that the repairs would cost $4000 and demanded the sellers reduce the purchase price of the house. The sellers ultimately agreed to reduce the price of the house by $17,500, and the parties modified their contract to include the following language:

After careful inspection of the house, and with professional opinions, [w]e feel that the house will need extensive on-going maintenance because of the site positioning, foundation and drainage. See attached inspection report. We will take the home as is, WITH ALL CONTINGENCIES REMOVED.

(emphasis in original) *Dubow,* 746 S.W.2d at 859.

After closing and taking possession of the house, the buyers encountered problems with the house and ultimately sued the sellers for failure to disclose the foundation

Page 689

problems and roof leaks. The trial court granted summary judgment in favor of the sellers, and the buyers appealed, arguing a fact issue existed because there was evidence they had confronted the sellers with concerns about the house, and the sellers assured them it was a good house with

no problems.

This Court focused on the buyers' reliance upon the experts' opinions and the renegotiation of the contract to reject the buyers' claims. Relying on the language of the contract modification, the court concluded that, as a matter of law, the buyers' careful inspection of the house's condition "constituted a new and independent basis for the purchase which intervened and superseded the [sellers'] alleged wrongful act." *Id.* at 860. The court concluded any alleged statements or failures to disclose by the sellers were not a producing cause of any damages to the buyers. *Id.* As explained previously by this Court, "the crucial fact in Dubow was not the buyers' procurement of an independent inspection; it was their express and exclusive reliance on the 'professional opinions' they received to renegotiate the sales contract that resulted in the sale of the house." *Fernandez v. Schultz,* 15 S.W.3d 648, 652 (Tex. App.-Dallas 2000, no pet.).

Here, there is no evidence that appellees relied solely on the opinion of the inspector in making their decision to purchase the home. To the contrary, Nardiello followed the inspector's recommendation and questioned Kupchynsky about the moisture that appeared to seep up between the joints of the balcony tile. Kupchynsky, who had represented himself as the builder of the house, told Nardiello that the balconies drained as designed "per the blueprints." Yet, the evidence showed there was no detailed blueprint for the balconies' drainage system, and the only plans that did exist were not followed. Once they pulled up the tile, appellees found that the galvanized metal pan had already begun to corrode, a condition that was not ascertainable until the balcony tiles were removed.

In addition to the above, the contract in this case was never renegotiated in reliance on the inspection as it related to the balcony drainage system. Although the Kupchynskys agreed to repair the thirteen items listed on appelleees' repair list in exchange for appellees' agreement that the earnest money would become nonrefundable immediately, this agreement is qualitatively different from that in *Dubow*, where the parties reduced the price of the house substantially and included a provision in the renegotiated contract directed at the foundation. Here, there was no reduction of the price of the house at all and no provision in the contract related to the balconies. Under these circumstances, we conclude that *Dubow* does not, as a matter of law, preclude appellees' recovery on their claims against appellants, and the evidence is not legally insufficient to support the jury's DTPA and negligent misrepresentation findings on that basis.

Alternatively, appellants assert in two sentences that the evidence is factually insufficient to show appellees relied on appellants' representations regarding the balconies. Appellants make no separate argument with respect to this complaint. To the extent they rely on the previous argument, it is without merit. We overrule the first issue.

In their second issue, appellants argue appellees "assumed the risks of repairs to the [h]ome" because the sales contract included an "as is" provision that negates any causation as a matter of law. Here, they rely on Prudential Insurance Co. of *America v. Jefferson Associates, Ltd.,* 896 S.W.2d 156, 161 (Tex. 1995).

Prudential involved a commercial real estate transaction. The buyer purchased
Page 690
an office building. The contract he submitted contained the following provisions:

As a material part of the consideration for the Agreement, Seller and Purchaser agree that Purchaser is taking the Property "AS IS" with any and all latent and patent defects and that there is no warranty by Seller that the Property is fit for a particular purpose. Purchaser acknowledges that it is not relying on any representation, statement or other assertion with respect to the Property condition, but is relying upon its examination of the Property. . . .

*Prudential,* 896 S.W.2d at 160.

Two years later, the buyer learned the building contained asbestos fireproofing and sued the seller. The court concluded that the buyer's agreement to purchase the property "as is" precluded him from proving that the seller's conduct caused him any harm. "By agreeing to purchase something 'as is,'" the court explained, "a buyer agrees to make his own appraisal of the bargain and to accept the risk that he may be wrong. The seller gives no assurances, express or implied, concerning the value or condition of the thing sold." *Id.* at 161.

But the court qualified its holding by emphasizing that this type of agreement would not have "this determinative effect in every circumstance." *Id.* at 162. In particular, the court noted that a buyer would not be bound by an agreement to purchase something "as is" that he was induced to make because of a fraudulent representation or concealment of information by the seller. "A seller cannot have it both ways: he cannot assure the buyer of the condition of a thing to obtain the buyer's agreement to purchase 'as is', and then disavow the assurance which procured the 'as is' agreement." *Id.*

Finally, the court recognized that "other aspects" of a transaction may make an "as is" agreement unenforceable:

The nature of the transaction and totality of the circumstances surrounding the agreement must be considered. Where the "as is" clause is an important part of the basis of the bargain, not an incidental or "boiler plate" provision, and is entered into by parties of relatively equal bargaining position, a buyer's affirmation and agreement that he is not buying on representations of the seller should be given effect.... We think it too obvious for argument that an "as is" agreement freely negotiated by similarly sophisticated parties as part of the bargain in an arm's-length transaction has a different effect than a provision in a standard form contract which cannot be negotiated and cannot serve as the basis of the parties' bargain.

*Id.*

Here, the provision relied on by appellants is distinctly different from that in Prudential. The provision in Prudential, as quoted above, was contained in a contract submitted by the buyer and contained specific language that the buyer took the property as is with all latent and patent defects.

In contrast, the provision here is contained in a standard, preprinted One to Four Family Residential Contract (Resale): 7.

**PROPERTY CONDITION**

* * *

D. ACCEPTANCE OF PROPERTY CONDITION: Buyer accepts Property in its present condition; provided Seller at Seller's expense shall complete the following specific repairs and treatments: correct some flag stone work next to front steps of home.

(The underlined portion was handwritten and was included in the contract before any inspections.)

Nardiello testified the provision was neither discussed nor negotiated. Likewise, Kupchynsky testified the clause was never discussed with appellees and was not a part of the original negotiations or renegotiations. Rather, Kupchynsky acknowledged the clause was part of the boilerplate language in the contract. Even if we accept appellants' assertion that the parties were of equal bargaining position, we cannot conclude in light of all circumstances that the clause was an "important basis of the bargain" that negated causation as a matter of law. *See id.*

Moreover, the evidence shows that when appellees asked Kupchynsky about the water on the balcony tile, he replied that the balcony was designed to drain that way according to plans. As previously stated, the evidence showed there were no detailed drainage plans for the balconies, and the balconies varied from the only plans that existed. There is evidence Kupchynsky knew, but did not disclose, that the pans used were galvanized metal, which other evidence showed was prone to corrosion in this application. Kupchynsky's statement about the balcony drainage and nondisclosure of galvanized pans is significant not because he is the owner or seller of the house, but because he was the builder and therefore presumably would have more knowledge, and credibility, than an ordinary seller.

Given the totality of the circumstances and the nature of the transaction, we conclude the as-is clause in this case did not negate causation as a matter of law. In reaching this conclusion, we necessarily disagree with the dissent's analysis. The dissent would reverse this issue by crafting an argument for appellants that they never briefed, argued, or otherwise urged in this appeal or in the trial court. We perceive a fundamental problem with the dissent's suggestion that the buyers/plaintiffs' proof in response to the as-is clause constituted affirmative defenses for which they needed to plead and request issues. In particular, we question how the buyers/plaintiffs were supposed to know to plead "affirmative defenses" to the as-is clause when the sellers/defendants never pleaded the clause as a defense in the first place.

As in *Prudential,* this case comes to us on a jury verdict in which no issues or instructions were requested by either party with respect to the as-is clause. In our review, we have addressed this issue exactly as it was briefed and argued by all parties. More importantly, we have examined the case exactly as did the court in *Prudential*, as we are bound to do, considering the various factors that the court noted could render such an agreement unenforceable. *See Gym-N-I Playgrounds, Inc. v. Snider,* 220 S.W.3d 905, 912, n. 10 (Tex., 2007).

Appellants alternatively assert that because they have conclusively established appellees assumed the risks associated with the balconies, the evidence is factually insufficient to support the jury's DTPA and negligent misrepresentation findings. They do not make any separate argument. For the reasons previously stated, we reject this contention. We overrule the second issue.

In their third issue, appellants argue there is no evidence to support the jury finding that the Kupchynskys made a negligent misrepresentation. The jury charge defined negligent misrepresentation as follows:

Negligent misrepresentation occurs when—

(a) a party makes a representation in the course of his business or in a transaction in which he has a pecuniary interest,

Page 692

(b) the representation supplies false information for the guidance of others in their business, and

(c) the party making the representation did not exercise reasonable care or competence in obtaining or communicating the information.

Appellants argue that because appellees bought the home as a personal residence, there is no evidence that the Kupchynskys "made any representation for the guidance of the plaintiffs in their business." Other than a general cite to one case stating the elements of the cause of action and the restatement of torts, appellants make no argument that the cause of action is so limited. Under these circumstances, we conclude this issue is inadequately briefed. *See* Tex. R. App. P. 38.1(h). Additionally, we have previously rejected appellants' challenge to the legal and factual sufficiency of the evidence to sustain the jury's DTPA finding in Question No. 1. Because the judgment can be supported on this theory, we need not address the merits of this claim. *See* Tex. R. App. P. 47.1. We overrule the third issue.

In their fourth issue, appellants argue the trial court erred in refusing to disregard the jury's finding in Question No. 5 that George Kupchynsky was one of the builders of the house. Specifically, appellants argue that George was merely the vice president of FGH and FGH was the builder of the house. (Appellants do not challenge the finding in Question No. 5a that George and FGH failed "to design or construct the home in a good and workmanlike manner, to Plaintiff's injury[.]")

The jury was charged that a builder "is one whose occupation is the building or erection of structures, the controlling and directing of construction, or the planning, constructing, remodeling and adapting to particular purposes buildings and other structures."

Nardiello and appellants' own expert, Keith Harvey, both testified that Kupchynsky told them he was the builder of the home. In addition to this evidence, Willard testified that it was his understanding at the time he installed the pans that Kupchynsky was the builder. Mitch Campbell, who was a job supervisor for FGH, testified that Kupchynsky "completed the home" from the time it was framed. He testified that Kupchynsky actually dealt with the subcontractors and did so differently on this house because it was his home. In fact, the architectural plans, dated a year before the Kupchynskys' purchase of the home, stated they were for a residence for "George and Melissa Kupchynsky," not FGH. Finally, Kupchynsky signed documents with the City of Irving stating that he was the superintendent of the construction project.

We conclude a reasonable jury could find, given this evidence, that George Kupchynsky was a builder of the home. With respect to appellants' assertion that there can be only one builder of a home, the only case they referenced, *Wiggins v. Overstreet,* 962 S.W.2d 198 (Tex. App.-Houston [14th Dist.] 1998, pet. denied), does not support their position. To the extent appellants argue the evidence is factually insufficient because they have conclusively shown the contrary, we reject the claim. We overrule the fourth issue.

In the fifth issue, FGH argues the trial court erred in denying its motion for instructed verdict and JNOV on appellees' DTPA claims because FGH was not a party to the transaction. Relying

solely on this Court's opinion in *Todd v. Perry Homes,* 156 S.W.3d 919, 922 (Tex. App.-Dallas 2005, no pet.), FGH contends it was not a party to the sale and therefore cannot be held liable.

In *Todd,* subsequent purchasers of a house built by Perry Homes sued the homebuilder

Page 693

over damages from alleged improper drainage. The trial court granted a no-evidence summary judgment on the Todds' claims for breach of the implied warranty of habitability and unconscionable conduct under the DTPA; other claims, including a breach of the implied warranty of good workmanship, were resolved by jury trial. *Todd,* 156 S.W.3d at 921. The Todds appealed only the granting of the summary judgment.

This Court explained that the implied warranty of habitability extended only to latent defects, and there was no evidence of a latent defect. *Id.* With respect to the unconscionability claim, this Court concluded there was no evidence that Perry Homes was connected to the Todds' purchase of the home, that any representations Perry Homes made reached the Todds, or that Perry Homes benefitted from the purchase. Thus, the Court concluded that without evidence of a connection between Perry Homes and sale of the home to the Todds, Perry Homes could not be held liable for unconscionable conduct. *Id.* at 922.

Appellants rely on the Court's analysis of the unconscionable conduct claim. However, this case does not involve unconscionable conduct; rather, the jury found FGH and Kupchynsky breached the implied warranty of good and workmanlike manner. The Texas Supreme Court has held that the implied warranties of habitability and good workmanship are implicit in the contract between the builder/vendor and original purchaser and are automatically assigned to the subsequent purchaser. *Gupta v. Ritter Homes, Inc.,* 646 S.W.2d 168, 169 (Tex. 1983). *Todd* is not instructive, and appellants have made no attempt to distinguish Gupta or analyze any of the law that has developed in this area since *Gupta* issued. It is not the duty of this Court to make arguments for either side. Given the argument presented, we conclude appellants have not shown reversible error. We overrule the fifth issue.

We affirm the trial court's judgment.

MOSELEY, J., dissenting.

Concurring and dissenting by Justice MOSELEY.

In this suit arising from the sale of residential real estate, the trial court entered judgment in favor of appellees William V. Nardiello and Laree Caramella ("Buyers") and against appellants Ihor George Kupchynsky and Melissa Twomey Kupchynsky ("Sellers") and George Kup-chynsky's employer, appellant FGH Homebuilders, Inc., based in part on the Buyers' DTPA and negligent misrepresentation claims. It did so despite the existence of an "as-is" clause in the parties' sales contract, which if effective, conclusively negates proof of the causation elements inherent in those claims. *See Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.,* 896 S.W.2d 156, 161-62 (Tex.1995). The existence of this "as-is" clause is undisputed, and both parties introduced copies of the sales contract into evidence.

The majority opinion affirms the trial court's judgment, based on two of the exceptions to *Prudential's* principal holding mentioned in *Prudential* itself. However, these exceptions were not pleaded by the Buyers, asked of or found by the jury, or proved conclusively so as to obviate the

need for submitting them to the jury. Absent findings (or conclusive proof) in favor of the Buyers as to one of the *Prudential* exceptions, or as to some other matter that would vitiate the "as-is" clause, I would reverse the trial court's judgment and render judgment that the Buyers take nothing by way of those claims.[1]

Page 694

As indicated herein, I believe my differences with the majority opinion primarily hinge on the answer to one question: Who has the burdens of pleading and proof with respect to the efficacy of an "as-is" clause? That question is outcome-determinative here, because whoever had those burdens failed to meet them. None of the parties pled the existence of the "as-is" clause or any of the *Prudential* exceptions to the efficacy of that clause. Neither side submitted issues necessarily referable to the "as-is" clause or the *Prudential* exceptions that would render it ineffective to negate causation. Thus, if the Buyers were required to plead and obtain findings as to the existence of one or more of the *Prudential* exceptions, the judgment on their DTPA and negligent misrepresentation claims cannot stand on appeal. However, if the Sellers and FGH were required to specially plead the existence of the "as-is" clause, or if they were required to obtain findings that the "as-is" clause was effective, then they cannot rely on the "as-is" clause to avoid liability on those claims.

I. BACKGROUND

The Sellers and the Buyers entered into a real estate sales contract[2] that provided the "Buyer accepts the property in its present condition . . .";[3] the form contract thereafter provided a blank to facilitate the insertion of any exceptions to that clause, which the contracting parties did. The contract also provided the Buyers could terminate the contract within fourteen days and receive a full refund of their $10,000 earnest money deposit; this provision was designed to allow the Buyers to have the house inspected (which they did) and to determine whether they wished to go through with the transaction.

Thereafter the Buyers' inspector noted moisture seeping up from the tile grout on the north bedroom balcony and indicated to the Buyers that repair may be needed. When Nardiello asked Kupchynsky about the balcony, Kupchynsky made the statements described in the majority opinion (and summarized herein); he also set up a meeting between himself, Nardiello, and the subcontractor who built the balconies.

After the inspections and before the end of the fourteen day period, the Buyers and Sellers negotiated further; the Sellers agreed to repair a dozen or so additional items set forth in an addendum to the contract; and in return the Buyers agreed to remove the contingencies to the contract and make the earnest money deposit nonrefundable. It is undisputed the additional repair items listed in the addendum did not include any repairs to the balconies. The parties to the contract closed the sale and the Buyers moved in.

Later the Buyers sued the Sellers and FGH for damages resulting from the condition of the house's two balconies. The case was tried to a jury. At the close of the Buyers' case, the trial court granted the Sellers' and FGH's motion for instructed verdict as to all claims except the

Page 695

claims for DTPA violations, negligent misrepresentation, and breach of the implied warranty of

good and workmanlike construction. Thereafter, the jury found that:
the Sellers and FGH engaged in false, misleading, or deceptive acts or practices that the Buyers relied on to their detriment and that were the producing cause of the Buyers' damages;
the Sellers and FGH did not engage in any such conduct knowingly or intentionally;
the Sellers and FGH did not engage in any unconscionable action or course of action that was a producing cause of the Buyers' damages;
the Sellers (but not FGH) made negligent misrepresentations on which the Buyers justifiably relied;
both George Kupchynsky and FGH (but not Melissa Kupchynsky) were builders of the house, and they failed to design or construct the house in a good and workmanlike manner; and • as a result of the Sellers' and FGH's actions, the Buyers suffered damages of $52,695.[4]

Based on these findings, the trial court entered judgment in favor of the Buyers against the Sellers and FGH, who appeal.

## II. DTPA AND NEGLIGENT MISREPRESENTATION

In their second issue, the Sellers and FHG contend the "as-is" clause in the sales contract negated any of their actions as a cause-in-fact (and thus as a producing cause and proximate cause, respectively) for the Buyers' DTPA and negligent representation damages. On this basis they assert the trial court erred in denying their motion for instructed verdict and their motion for judgment notwithstanding the verdict as to the Buyers' DTPA and negligent misrepresentation claims.

### A. *Prudential,* Causation, and "As-is" Clauses

A valid "as-is" clause in a sales contract negates the buyer's ability to prove the seller's actions are an "actual [cause] in fact" of the buyer's injury. *See Prudential,* 896 S.W.2d at 161-62; *Welwood v. Cypress Creek Estates, Inc.,* 205 S.W.3d 722, 726 (Tex.App.-Dallas 2006, no pet.) (same); *Bynum v. Prudential Residential Servs., Ltd. P'ship,* 129 S.W.3d 781, 788 (Tex.App.-Houston [1st Dist] 2004, pet. denied) ("as-is" clause in sale agreement for remodeled home bars claims relating to remodeling work). *Prudential* treats the existence of a valid "as-is" clause—not as an affirmative defense to the buyer's claims—but as a matter of proof conclusively negating an element of those claims. *Prudential,* 896 S.W.2d at 164.[5] By agreeing to purchase the property "as-is," the buyer agrees to make his own assessment of the bargain and accepts the risk that he may be wrong. *See id.* at 161. The seller gives no assurances, express or implied, concerning the value or condition of the thing sold, and the buyer chooses to rely on his own determination of the value and condition of the purchase, thus eliminating the possibility that the seller's conduct will cause him damage. M[6]

Page 696

As a result, a valid "as-is" agreement "prevents a buyer from holding a seller liable if the thing sold turns out to be worth less than the price paid because it is *impossible* for the buyer's injury on account of this disparity to have been caused by the seller." *Id.* (emphasis added). As the supreme court summarized at the end of the *Prudential* opinion, "The issue which is dispositive in [the buyer's case is] whether his 'as is' agreement establishes that [the seller] could not have been a producing cause of his harm. ..." *Id.* at 164. This is the holding in *Prudential.*

**B. The *Prudential* Exceptions**

However, the presence of an "as-is" provision is not determinative in every circumstance. *Id.* at 162. *Prudential* itself describes three situations when a buyer will not be bound by an "as-is" clause:[7] (1) when the "as-is" agreement was "induced by fraudulent representation or concealment of information" by the seller; (2) when the buyer has a right to inspect the property sold but that right is "impaired" or "obstructed" by the seller; or (3) when "other aspects of the transaction ... make an 'as is' agreement unenforceable." *Id.*[8]

Page 697

(This exception will be discussed in more detail herein.)

The majority opinion rejects the Sellers' and FGH's argument that the "as-is" clause negates the causation elements inherent in the Buyers' DTPA and negligent misrepresentation claims. It does so based on the first and third exceptions set forth in *Prudential.* However, I disagree with the premise that either exception is available procedurally to support the Buyers' position or the trial court's judgment.

**1. Nature of *the* Exceptions—Affirmative Defenses**

A party must affirmatively plead certain matters, including duress, estoppel, illegality, waiver, and "any other matter constituting an avoidance or affirmative defense." Tex. R. Civ. P. 94. Without parsing the *Prudential* exceptions with respect to how they fit into one or more of the specific matters listed in Rule 94, it cannot be disputed that they constitute "matter[s] of avoidance or affirmative defense." If proved, they would render the "as-is" clause unenforceable and thus ineffective to preclude the Buyers from proving that the actions of the Sellers and of FGH were a cause-in-fact of the Buyers' damages.

The burden of pleading and proving the elements of an affirmative defense is on the party seeking to rely on that defense. *See Compass Bank v. MFP Fin. Servs., Inc.,* 152 S.W.3d 844, 851 (Tex. App.-Dallas 2005, pet denied). If not pleaded or tried by consent, an affirmative defense is waived. *See id.* (non-jury trial). Further, on an appeal from a jury trial, "all independent grounds of recovery or of defense not conclusively established under the evidence and no element of which is submitted or requested are waived." Tex. R. Civ. P. 279.

Here the Buyers failed to plead any grounds—specified by *Prudential* or otherwise—for disregarding the "as-is" clause. They also failed to request (and the trial court failed to submit to the jury) any element of any such matter in avoidance of the "as-is" clause. Therefore, unless an affirmative defense to the "as-is" clause was conclusively established by the evidence, it was waived. *See* Tex. R. Civ. P. 94, 279.

To conclusively prove an affirmative defense to the "as-is" clause, the Buyers had to "so conclusively proved each element of that affirmative defense ... that there was no fact question to submit to the jury on any of its elements." *See Brown v. Zimmerman,* 160 S.W.3d 695, 702 (Tex. App.-Dallas 2005, no pet.). A matter is conclusively established if ordinary minds could not differ as to the conclusion to be drawn from the evidence. *Talford v. Columbia Med. Ctr. at Lancaster Subsidiary, L.P.,* 198 S.W.3d 462, 464 (Tex.App.-Dallas 2006, no pet.) (citing *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.,* 644 S.W.2d 443, 446 (Tex.1982)).

In concluding that the "as-is" clause does not negate causation with respect to the Buyers'

DTPA and negligent misrepresentation claims, the majority opinion references evidence relevant to two of the *Prudential* exceptions—the fraudulent inducement exception and the generally phrased "other aspects of the transaction" exception. However, neither of these exceptions was conclusively proved by the evidence.

## 2. First Exception—Fraudulent Inducement

As the majority opinion correctly notes, a buyer is not bound to an "as-is" purchase agreement that was induced by the seller's fraudulent representation or concealment of information. Quoting from *Prudential,* 896 S.W.2d at 162, the majority opinion states: "A seller cannot have it both ways: he cannot assure the buyer of the condition of a thing to obtain the buyer's agreement to purchase 'as is', and then disavow the assurance which procured the 'as is' agreement."

Page 698

As support for this exception, the majority opinion references evidence that George Kupchynsky, when asked about the water on the balcony tile, responded that the balcony was designed to drain that way according to the plans; it then contrasts this statement with evidence that no detailed plans for the balconies existed and the balconies varied from the only plans that did exist. It also notes Kupchynsky did not disclose that the pans under the balconies were made of galvanized metal, and not more expensive (but longer lasting) copper. The majority opinion then concludes: "Kupchynsky's statement about the balcony drainage and nondisclosure of galvanized pans is significant not because he is the owner or seller of the house, but because he was the builder and therefore presumably would have more knowledge, and credibility, than an ordinary seller."

This analysis is similar to that utilized to review the sufficiency of the evidence supporting a jury finding. However, whether the evidence would *support* a finding that the Sellers and FGH fraudulently induced the Buyers into agreeing to the "as-is" clause is markedly different from whether the evidence so *"conclusively established* " the fraud affirmative defense so as to obviate even submitting the question to the jury. *See* Tex. R. Civ. P. 279 (emphasis added).

Without recounting the evidence in detail, it is clear reasonable minds could have differed as to whether the Sellers and FGH induced the Buyers to agree to the "as-is" clause through fraud. It was also undisputed that FGH was not a party to the sales contract and had no role in its negotiation. Additionally, the trial court granted the Sellers' and FGH's motion for instructed verdict on, among other things, the Buyers' fraud claims. And the jury specifically found the Sellers' misrepresentations were *negligent,* not intentional, and the Sellers' and FGH's violations of the DTPA were not knowing or intentional. Lastly, although there is evidence Kupchynsky knew the pans were made of galvanized metal, there is no evidence the Buyers asked him what material was used to construct the pans or that he answered falsely in response. In the face of these circumstances, there is no basis for concluding that the Buyers "so conclusively proved each element of [their fraud] affirmative defense ... that there was no fact question to submit to the jury on any of its elements." *Brown,* 160 S.W.3d at 702.

In fact, the majority opinion does not expressly hold that the Buyers conclusively proved the Sellers and FGH obtained their consent to the "as-is" clause through fraud. Absent such an

express conclusion, the majority opinion's analysis appears to expand *Prudential's* exceptions to vitiate an "as-is" clause based on the seller's *negligent or unintentional misrepresentation. Prudential* expressly rejects this concept. *See Prudential,* 896 S.W.2d at 162 ("Nor is a seller liable for failing to disclose what he only should have known.") (citing *Ozuna v. Delaney Realty, Inc.,* 600 S.W.2d 780, 782 (Tex.1980) (per curiam)).[9]

Page 699

### 3. Third Exception—"Other Aspects" of the Transaction

*Prudential* also stated an "as-is" clause may be unenforceable based on "other aspects of the transaction...." *Prudential,* 896 S.W.2d at 162. In describing this third exception, *Prudential* explains that the "nature of the transaction and the totality of the circumstances surrounding the agreement must be considered." It then illustrates the parameters of this situation through a negative example, stating the exception is inapplicable "[w]here the 'as is' clause is an important part of the basis of the bargain, not an incidental or 'boiler-plate' provision, and is entered into by parties of relatively equal bargaining position...." *Id.*

In discussing this exception, the majority opinion notes evidence in the record that the "as-is" clause was "boilerplate" in a pre-printed form contract and that it was not discussed or negotiated. It then concludes: "Even if we accept appellants' assertion that the parties were of equal bargaining position, we cannot conclude in light of all circumstances that the clause was an 'important basis of the bargain' that negated causation as a matter of law." I have two problems with this analysis.

First, the majority opinion's analysis appears to reverse the burden of proving an exception to the efficacy of the parties' "as-is" contract term. As an affirmative defense, the burden of proving such an exception is on its proponents—the Buyers— not the Sellers or FGH. *See Compass Bank,* 152 S.W.3d at 851; *Prudential,* 896 S.W.2d at 162-63 ("Goldman [the buyer] makes essentially three arguments for avoiding his 'as is' agreement.... None of Goldman's arguments avail to avoid the 'as is' agreement.").[10]

Second, the majority opinion's analysis again resembles a review of the evidence supporting a jury finding establishing the affirmative defense. As discussed with respect to the first *Prudential* exception, the proper standard of review is whether "ordinary minds could not differ as to the conclusion to be drawn from the evidence," *see Talford,* 198 S.W.3d at 464, and thus whether the Buyers "so conclusively proved each element of [this] affirmative defense ... that there was no fact question to submit to the jury on any of its elements." *See Brown,* 160 S.W.3d at 702.

Utilizing the *Talford* and *Brown* standard of review, and in addition to the evidence pointed out previously and in the majority opinion, there is evidence that:

the Sellers and the Buyer used a standard form contract approved by Texas Real Estate Commission;[11]

FGH was not a party to the sales transaction;

the sentence containing the "as-is" clause went on to state: "provided Seller, at Seller's expense, shall complete the following specific repairs and treatments ...";

thereafter, the form contained a blank line in which the following text had been hand-written by one of the parties: *"correct some flag stone work next to front steps of home* ";

most of the negotiations and communications about the transaction took

Page 700

place between George Kupchynsky and one of the Buyers (Nardiello);

Nardiello had purchased and sold five or six other homes and was a partner in several residential town home developments in Euless;

Nardiello knew when he signed the sales contract that the transaction was on an "as-is" basis (subject to the repair of the flag stones); and

Nardiello and George Kupchynsky later negotiated for the Sellers' repair of the additional items set forth in the addendum, in return for the Buyers' removal of the contingencies to the contract, making the earnest money deposit non-refundable.

And again, the jury found that any violations of the DTPA were not knowing or intentional, that the Sellers and FGH did not engage in any unconscionable action or course of action, and that any misrepresentations were made negligently.

In the face of these circumstances, there is again no basis for concluding the Buyers "so conclusively proved each element of [their] affirmative defense . .. that there was no fact question to submit to the jury on any of its elements." *Brown,* 160 S.W.3d at 702.

## 4. The Majority Opinion

The majority opinion characterizes the above affirmative-defense analysis as "crafting an argument for [the Sellers and FGH] that they never briefed, argued, or otherwise urged in this appeal or in the trial court." I disagree. The Sellers and FGH argue here—as they did below—that the "as-is" clause negated the causation element of the Buyers' causes of action as a matter of law.[12] If their argument is sound, then the majority opinion's criticism amounts to a complaint that the Sellers and FGH did not point out (or undertake themselves) the Buyers' burden of pleading, proving, and obtaining findings as to any grounds for avoiding the "as-is" clause. In contrast, it is the Buyers who assert on appeal—without benefit of pleading or answers to jury issues—that one or more of the *Prudential* exceptions avoids the effect of the "as-is" clause. And it is the Buyers and the majority opinion— again without benefit of jury findings— who rely on some evidence in the record to conclude the Buyers are not bound by the "as-is" clause. However, absent an affirmative finding on a basis for avoiding the "as-is" clause, some evidence is not enough—there must be conclusive evidence. *See Brown,* 160 S.W.3d at 702. Thus the above analysis merely points out why the Buyers' reply to the Sellers' and FGH's argument is unavailing.

The majority opinion also asks "how the buyers/plaintiffs were supposed to know to plead 'affirmative defenses' to the as-is clause when the sellers/defendants never pleaded the clause in the first place as a defense." As noted earlier, *Prudential* treats the existence of an "as-is" clause as a matter negating proof of an element of the plaintiffs claims, not as a defense or affirmative defense. *See Prudential,* 896 S.W.2d at 164. Thus, Rule 94 does not compel the Sellers and FGH to affirmatively plead the "as-is" clause as a prerequisite for arguing that the undisputed evidence of the "as-is" clause—introduced by both sides to the dispute—negates as a matter of law the causation elements of the Buyers' claims. Moreover, the Buyers— like any other civil litigants—are bound by the terms of Rule 94, and thus may be presumed to be aware that they must plead any of the matters listed therein, or

Page 701

"any other matter constituting an avoidance or affirmative defense ...," in order to avoid the "as-is" language in their contract. *See* Tex.R. Civ. P. 94.

**5. Conclusion**

Because the Buyers did not obtain a finding on any affirmative defenses to the enforceability of the "as-is" clause, and because they did not prove any such affirmative defense as a matter of law, they waived any affirmative defenses to the "as-is" clause in the parties' sales contract. *See* Tex.R. Civ. P. 94, 279. Thus any such affirmative defenses are not available to the Buyers to avoid the efficacy of the contract's "as-is" clause. I would conclude this clause negates the Buyers' assertions that the Sellers' or FGH's actions were a cause-in-fact of the Buyers' DTPA and negligent misrepresentation damages.

**III. WARRANTY OF GOOD AND WORKMANLIKE CONSTRUCTION**

In their fourth issue, George Kupchyn-sky and FGH also contend the trial court erred in entering judgment on the jury's finding that they were both builders and that they breached an implied warranty that the house was constructed in a good and workmanlike manner. In support of this contention, they argue that, as a matter of law, George Kupchynsky was not a "builder" and thus could not have violated the implied warranty.

I agree with the majority that a builder impliedly warrants that a building constructed for residential use is constructed in a good and workmanlike manner and that this implied warranty extends to subsequent purchasers with respect to latent defects not discoverable by a reasonably prudent inspection of the building at the time of sale. *See Gupta v. Ritter Homes, Inc.,* 646 S.W.2d 168, 169 (Tex.1983). I also agree that: (1) based on the evidence presented, a reasonable jury could have found that George Kupchynsky was a builder of the home; and (2) the case referenced in support of the George Kup-chynsky's contention that there can only be one "builder" of a home, *Wiggins v. Overstreet,* 962 S.W.2d 198 (Tex.App.-Houston [14th Dist.] 1998, pet. denied), does not support that argument. Thus, I join with the majority in overruling appellants' fourth issue.

**IV. CONCLUSION**

Based on the above analysis, I would sustain the Sellers' and FGH's second issue, reverse that portion of the trial court's judgment based on the Buyers' DTPA and negligent misrepresentation causes of action, and render judgment that the Buyers take nothing from Sellers or FGH by way of those claims. As a result, I would not address appellants' first, third and fifth issues. *See* Tex.R.App. P. 47.1.[13]

Additionally, I would affirm the trial court's judgment in favor of the Buyers

Page 702

and against George Kupchynsky and FGH based on their breach of the implied warranty that the house was constructed in a good and workmanlike manner. Thus, I concur in part and respectfully dissent in part from the majority opinion.

---------

Notes:

[1] The trial court also rendered judgment in favor of the Buyers and against George Kupchynsky and FGH based on breach of the implied warranty of good and workmanlike construction.

Because there is evidence that both of those parties were the "builders" of the house, and because the language in the sales contract is not effective to disclaim that warranty, I agree with the majority in affirming that portion of the judgment. Thus, I concur in the court's judgment in part and respectfully dissent in part.

[2] FGH was never a party to this contract, and was not involved in any negotiations or discussions concerning the sale.

[3] The language quoted from the form has been construed to constitute an agreement to purchase the property "as-is," *Cherry v. McCall,* 138 S.W.3d 35, 39 (Tex.App.-San Antonio 2004, pet. denied); *Fletcher v. Edwards,* 26 S.W.3d 66, 75 (Tex.App.-Waco 2000, pet. denied). None of the parties here argue for a different construction.

[4] The jury also found the amount of the Buyers' reasonable and necessary attorneys fees for the trial and the appeal of the case.

[5] "[W]e conclude that [the buyer's] agreement to buy the Jefferson Building 'as is', in these circumstances, conclusively shows that nothing Prudential did caused [the buyer] damages." *Id.*

[6] Further, causation in fact is essential to recover on either the Buyers' DTPA or their negligent misrepresentation claims:

Proof of causation is essential for recovery on all of [the buyer's] causes of action. Negligence, for example, requires proof of proximate cause. *Brown v. Edwards Transfer Co.,* 764 S.W.2d 220, 223 (Tex. 1988). For DTPA violations, only producing cause must be shown. Tex. Bus. & Comm.Code § 17.50(a). The element common to both proximate cause and producing cause is actual causation in fact. *General Motors Corp. v. Saenz,* 873 S.W.2d 353, 357 (Tex. 1993). This requires proof that an act or omission was a substantial factor in bringing about injury which would not otherwise have occurred. *McClure v. Allied Stores of Texas, Inc.,* 608 S.W.2d 901, 903 (Tex. 1980). Unless there is some evidence that [the seller] caused [the buyer] damages, and this evidence satisfies the requirement of actual causation in fact, [the buyer] is not entitled to recover on any of his claims. *Prudential,* 896 S.W.2d at 161.

[7] *Prudential's* discussion of situations in which an "as-is" clause is ineffective to negate causation is in response to Justice Cornyn's concurring opinion, and not in response to assertions by the buyer that any of these situations existed in that case. Thus, this language constitutes judicial dicta. *See Palestine Contractors Inc. v. Perkins,* 386 S.W.2d 764, 773 (Tex. 1963) (judicial dictum is "deliberately made for the purpose of being followed by the trial court. It is not simply 'obiter dictum.' It is at least persuasive and should be followed unless found to be erroneous.")-

[8] For convenience, the relevant text from *Prudential* is quoted in full:

By our holding today we do not suggest that an "as is" agreement can have this determinative effect in every circumstance. A buyer is not bound by an agreement to purchase something "as is" that he is induced to make because of a fraudulent representation or concealment of information by the seller. ... A seller cannot have it both ways: he cannot assure the buyer of the condition of a thing to obtain the buyer's agreement to purchase "as is", and then disavow the assurance which procured the "as is" agreement. Also, a buyer is not bound by an "as is" agreement if he is entitled to inspect the condition of what is being sold but is impaired by the seller's conduct. A seller cannot obstruct an inspection for defects in his property and still insist that the buyer take it "as is".

In circumstances such as these an "as is" agreement does not bar recovery against the seller. We also recognize that other aspects of a transaction may make an "as is" agreement unenforceable. The nature of the transaction and the totality of the circumstances surrounding the agreement must be considered. Where the "as is" clause is an important part of the basis of the bargain, not an incidental or "boiler-plate" provision, and is entered into by parties of relatively equal bargaining position, a buyer's affirmation and agreement that he is not relying on representations by the seller should be given effect. Justice Cornyn's concurring opinion argues that such factors are generally not important, and that "as is" agreements must be given the same effect in every transaction absent fraud or adhesion. We simply disagree. We think it too obvious for argument that an "as is" agreement freely negotiated by similarly sophisticated parties as part of the bargain in an arm's-length transaction has a different effect than a provision in a standard form contract which cannot be negotiated and cannot serve as the basis of the parties' bargain. *Prudential,* 896 S.W.2d at 162 (citations omitted).

[9] Further, expanding the *Prudential* exceptions to include negligent misrepresentation would allow courts and juries to reform a sales transaction and re-allocate the parties' risks based on what they think the parties *should have known,* rendering the efficacy of an "as-is" clause a matter of conjecture. This runs contra to the supreme court's recent opinion in *Gym-N-I Playgrounds, Inc.* v. *Snider,* 220 S.W.3d 905 (Tex., 2007), in which the supreme court again affirmed the parties' freedom to contract and allocate the risks of a transaction by entering into "as-is" agreements, stating "Texas strongly favors parties' freedom of contract." *Id.*

[10] *Cf.,* however, *Prudential,* 896 S.W.2d at 167 (Cornyn, J., concurring), which in dicta implies that the burden of disproving the third ("other aspects of the transaction") exception would be on the seller, though recognizing that the issue would be a fact question for the jury. ("When the seller can establish to the jury's satisfaction that the clause was actually negotiated in an arms-length transaction, the seller may indeed prevail. . . .") *Id.*

[11] Texas Real Estate Commission Form TREC 20-5.

[12] This argument was the basis for the Sellers' and FGH's motion for summary judgment (which was not ruled on by the trial court), their motion for instructed verdict, and their motion for judgment notwithstanding the verdict.

[13] In their first issue, appellants assert the trial court erred in entering judgment on the Buyers' DTPA and negligent misrepresentation claims because the evidence conclusively proved that the Buyers relied on their own inspections of the house and thus any representations of the Sellers were not a cause-in-fact of the Buyers' damages. In their third issue, appellants assert there is no evidence the Kupchynskys made an actionable negligent misrepresentation because such a representation (according to the jury charge) must supply "false information for the guidance of others in their business," and it is undisputed that the transaction at issue here involved the Buyers' purchase of a home for their personal residence and did not involve the Buyers' business. In their fifth issue, appellants assert the trial court erred in denying their motion for instructed verdict as to the Buyers' DTPA claims against FGH because it was undisputed that FGH was not a party to the transaction.

---------

323 S.W.3d 278 (Tex.App.-El Paso 2010), 08-08-00262-CV, Lozada v. Farrall & Blackwell Agency, Inc.

Page 278

**323 S.W.3d 278 (Tex.App.-El Paso 2010)**

**Teresa LOZADA, Appellant,**

**v.**

**FARRALL & BLACKWELL AGENCY, INC., Appellee.**

**No. 08-08-00262-CV.**

**Court of Appeals of Texas, Eighth District, El Paso**

**August 25, 2010**

Page 279

[Copyrighted Material Omitted]

Page 280

[Copyrighted Material Omitted]

Page 281

[Copyrighted Material Omitted]

Page 282

[Copyrighted Material Omitted]

Page 283

Joe P. Lopez IV, El Paso, TX, for Appellant.

Jeffrey T. Lucky, Ray, Valdez, McChristian & Jeans, P.C., El Paso, TX, for Appellee.

Before CHEW, C.J., McCLURE, and RIVERA, JJ.

**OPINION**

GUADALUPE RIVERA, Justice.

Appellant, Teresa Lozada, appeals the trial court's summary judgment entered in favor of Farrall & Blackwell Agency, Inc. In four issues on appeal, Lozada claims that the trial court erred by granting Farrall & Blackwell's amended motion for summary judgment and in denying her motion for new trial, that the trial court erred in its application of the law of agency to the facts of the case, that the trial court erred by considering Farrall & Blackwell's untimely amended motion for summary judgment, and that the trial court erred by not only sustaining Farrall & Blackwell's objections to her affidavits filed in response to the amended motion for summary judgment, but also by failing to allow her the opportunity to respond to the objections before ruling thereon. We affirm.

**BACKGROUND**

In August 2003, Jose and Teresa Lozada discussed acquiring life insurance with Michael Dennis, a retail insurance agent. After filling out the requisite applications, they were each offered a policy from American General Life Insurance Company (AIG) for $300,000 on October 17, 2003. Teresa Lozada accepted the policy, but Jose did not as the policy was more expensive than anticipated. Specifically, Jose's health exam revealed that he suffered from high cholesterol. When told the quoted policy was comparable with other insurance companies, Jose asked for the costs for different levels of benefits. After being shown different premiums for different benefits, Jose told

Dennis that he would think about it and let him know. By January 2004, Jose had still not purchased a policy and Dennis " gave up hope" that he would.

Meanwhile, AIG sent Jose a letter stating the policy offered to him was marked " not taken" as Jose failed to sign the policy, pay the initial premium, and return the policy. The letter concluded that " no coverage has been in force," " no coverage is in effect," and " no claim for benefits will be honored."

After attending a funeral in late February 2004, Jose told Dennis that he wanted to buy the AIG life insurance policy after all. On February 27, 2004, Dennis contacted the insurance broker and wholesaler, Farrall & Blackwell, to inquire as to what could be done to re-activate Jose's lapsed application. Farrall & Blackwell did not know off-hand but they contacted Miles Financial Services (MFS), the independent marketing organization that processed and submitted the insurance application

Page 284

to AIG, and obtained additional forms for Jose to sign.[1] And on February 28, 2004, Jose signed a Short Health Statement, " PAC" form (bank draft authorization), and Acknowledgment of Delivery of Policy.

A few days later, Dennis delivered the documents to Farrall & Blackwell, and Farrall & Blackwell, on March 4, 2004, sent an email to MFS summarizing the request to re-activate Jose's lapsed application. However, MFS could not find the file and requested " something that identified the policy," and Farrall & Blackwell complied. The next day, Farrall & Blackwell faxed the Short Health Statement, PAC form, and Acknowledgment of Delivery of Policy to MFS. That same day, MFS acknowledged receipt of the documents, responded that the underwriter had been emailed, warned that a new application might be required, and stated that " [f]or sure there will be an amendment needed." Also on that day, Jose died from a massive heart attack. However, on March 8, 2004, an AIG underwriter, apparently unaware that Jose had died, emailed MFS, stating that AIG " will need a new, currently dated Part B to consider reopening and redating." [2] As the previously offered policy was " off the table," a new underwriting process was required, including submission of " Part B," before there would be any offers of binding coverage.

Meanwhile, on March 6 or 7, the funeral home told Lozada that they had contacted AIG and that AIG took the position that Jose was not insured. Thus, on March 17, 2004, Lozada made a death benefits claim on Jose's purported insurance policy. AIG denied the claim on April 1, 2004, referencing the " Not Taken" letter issued on December 23, 2003, and stating that " the policy is not in force and there will be no claim benefits payable." Both AIG and Farrall & Blackwell believed that there was no offer of insurance pending after December 23, 2003. Lozada then filed suit against Farrall & Blackwell on July 20, 2006, for damages, alleging negligence, fraud, promissory estoppel, negligent misrepresentation, and violations of the Deceptive Trade Practices Act (DTPA) and the Insurance Code.

The trial court granted Farrall & Blackwell's amended motion for summary judgment as to all grounds claimed by Lozada, and also determined that Lozada's suit for negligence, negligent misrepresentation, and violations of the DTPA and Insurance Code were barred by limitations. The trial court further denied Lozada's motion for new trial.

## SCHEDULING ORDER

We begin with a discussion of Lozada's third issue, which asserts that the trial court erred by considering Farrall & Blackwell's amended motion for summary judgment at the summary judgment hearing on May 7, 2008. According to Lozada, Farrall & Blackwell failed to file their motion within the time limits proscribed by the trial court's scheduling order. The trial court's scheduling order, which was signed on November 5, 2007, provided for a trial date of May 5, 2008, and that " [a]ny dispositive motions, including motions for summary judgment, must be heard no later than thirty (30) days prior to the scheduled trial date." Thus, Lozada concludes that Farrall & Blackwell's amended

Page 285

motion for summary judgment filed on April 16, 2008, was untimely.

In response, Farrall & Blackwell assert that the trial court's order granting a continuance for trial on April 9, 2008, nullified any prior imposed deadlines for summary judgment motions. We do not agree.

Prior to 1999, the pretrial deadlines fluctuated with a change of trial setting. *Fort Brown Villas III Condo. Ass'n, Inc. v. Gillenwater,* 285 S.W.3d 879, 881 (Tex.2009). However, in 1999, the pretrial discovery rules were amended to establish certain dates for the completion of discovery and to exclude evidence that was untimely disclosed. *Id.* (citing Tex.R. Civ. P. 193.6). Thus, any evidentiary deadlines now no longer fluctuate with the change of a trial setting but are determined by the discovery plan applicable to the case under the current rules and apply to summary-judgment proceedings. *Fort Brown,* 285 S.W.3d at 882 (citing *United Blood Services v. Longoria,* 938 S.W.2d 29, 30 (Tex.1997)); *see also Blake v. Dorado,* 211 S.W.3d 429, 432 (Tex.App.-El Paso 2006, no pet.); *Ersek v. Davis & Davis, P.C.,* 69 S.W.3d 268, 274 (Tex.App.-Austin 2002, pet. denied).

However, Lozada points to nothing in the amended motion for summary judgment that contains new evidence. At the hearing on the motion, the trial court asked the parties whether the amended motion contained any new exhibits or evidence, and Lozada responded that the same evidence and exhibits attached to the amended motion were already filed with Farrall & Blackwell's original and supplemental motions for summary judgment, and Farrall & Blackwell made the same representation to the court. The only difference between the previously filed motions and the amended motion was that Farrall & Blackwell sought to reconstruct, clarify, and expand on arguments already asserted, and to respond to Lozada's new petition, filed April 4, 2008, which included new causes of action. As no new evidence was attached to the amended motion for summary judgment, *cf. Fort Brown,* 285 S.W.3d at 882; *Blake,* 211 S.W.3d at 432, there was no violation of the evidentiary exclusionary rules when the trial court considered the amended motion.

Moreover, we note that the amended motion was filed 21 days before the hearing, that Lozada filed a response to the motion, and that Lozada makes no complaint that she was prejudiced by or unprepared to respond to the amended motion. *See* Tex.R. Civ. P. 166a(c). Therefore, we conclude that the trial court did not abuse its discretion by considering the amended motion for summary judgment. Issue Three is overruled.

**HEARING ON OBJECTIONS**

We next address Lozada's fourth issue, which contends that the trial court not only erred by sustaining Farrall & Blackwell's various objections to Lozada's affidavits attached to her response to the motion for summary judgment, but also by failing to allow Lozada the opportunity to respond to the objections. Finding Lozada failed to adequately brief these contentions, we decline to address them.

*Applicable Law*

The Rules of Appellate Procedure require a party's brief to contain " a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." Tex.R.App. P. 38.1(i). When an appellate issue is not supported by argument or lacks citation to the record or legal authority, nothing is presented for review. *Republic Underwriters Ins. Co. v. Mex-Tex, Inc.,* 150 S.W.3d 423, 427 (Tex.2004);

Page 286

*Nguyen v. Kosnoski,* 93 S.W.3d 186, 188 (Tex.App.-Houston [14th Dist.] 2002, no pet.).

*Application*

*A. Opportunity to Object*

Lozada first asserts that the trial court failed to allow her the opportunity to respond to Farrall & Blackwell's objections before ruling on them. However, Lozada has not briefed this argument. Rather, she simply makes one conclusory statement on this matter before proceeding to engage in a discussion of why the trial court erred by sustaining each evidentiary objections for the various reasons asserted by Farrall & Blackwell. Because Lozada fails to present this Court with any argument and authority supporting the contention raised, we find Lozada's complaint inadequately briefed and decline to address it. Tex.R.App. P. 38.1(h); *Batto v. Gafford,* 119 S.W.3d 346, 350 (Tex.App.-Waco 2003, no pet.) (declining to address issue unsupported by a standard of review or argument).

*B. The Affidavits*

*1. Rick's Affidavits*

Lozada next challenges several of the trial court's evidentiary rulings that struck various sentences from Rick's affidavit and supplemental affidavit. First, she complains that the trial court erred by excluding certain sentences pursuant to Rule 703 as either (1) conclusory and unsupported by concrete and particular facts, (2) lacking a proper basis for a reliable expert opinion, or (3) lacking the factual predicate. However, Lozada's only argument in this regard consists of a conclusory sentence that either espouses that Rick's statements are " based either upon what actually transpired or should have transpired, as set forth elsewhere in his affidavit and deposition, or in the depositions and documents which he reviewed as set forth in his deposition, as well as, based upon his education, training and experience," or that the basis of his statements are " his experience set forth in his affidavit, or in the depositions and documents which he reviewed as set forth in his deposition, as well as, based upon his education, training and experience, as set forth in his deposition, including his CV." Lozada fails to explain what the actual events that transpired were, what information contained in the depositions supported the expert opinion, or which documents support the opinion for each statement stricken by the trial court.

Because Lozada engages in no discussion or analysis, and because her one conclusory sentence is insufficient to maintain her burden to adequately brief these complaints, we decline to address them. *See Eaves v. Unifund CCR Partners,* 301 S.W.3d 402, 409 (Tex.App.-El Paso 2009, no pet.) (holding issue inadequately briefed when argument consisted of only three conclusory sentences).

Second, Lozada asserts that the trial court erred by excluding other paragraphs on the basis of relevance under Rules 401 and 402. However, other than citing the general proposition that " to be relevant, the proposed testimony must be ' sufficiently tied to the facts of the case,' " Lozada fails to provide any discussion or argument of the cited principle to the relevant facts of the case. Thus, we find Lozada failed to adequately brief this contention, as well. *See Bradt v. West,* 892 S.W.2d 56, 68-69 (Tex.App.-Houston [1st Dist.] 1994, writ denied) (holding issue inadequately briefed when appellants provided some authority but failed to discuss relevant facts and only made fleeting, conclusory statements).

Third, Lozada contends that the following statements should not have been excluded as confusing under Rule 403: (1)

Page 287

" [w]ith the submission of Part ' B' to Michael Dennis as requested by AIG, the underwriting process commenced; " and (2) the " time involved for underwriting is not relevant to the case." But Lozada cites no authority explaining why, given the facts before the court, the statements were not confusing, much less does she assert why the statements were admissible. *See Johnson v. Oliver,* 250 S.W.3d 182, 187 (Tex.App.-Dallas 2008, no pet.) (issue inadequately briefed when party presented no authority to support their contention or argument). As such, this contention is also inadequately briefed.

### *2. Lozada's Affidavit*

Lozada next complains that the trial court erred by sustaining several objections to various statements in her affidavit. According to Lozada, any statements she made reciting what Michael Dennis said were admissible as statements by a party opponent or as statements against interests, and that the statements she made reciting what Jose Lozada uttered were admissible as Jose was unavailable because of death. She also attacks the trial court's exclusion of various other statements in her affidavit, contending that Farrall & Blackwell's expert objection to certain statements in her affidavit was " non-sensical," that her objected-to opinion statements " fall squarely within the letter and spirit of [Rule] 701," that another statement, which was truthful, was not prejudicial under Rule 403, that she had personal knowledge of another excluded statement, and that her remaining objected-to statements were not conclusory.

However, each complaint merely consists of one or two conclusory sentences with a general reference to an evidentiary rule or case. Again, Lozada engages in no legal analysis, discussion, or argument, that is, she does not analyze the rules or cases cited, or attempt to apply them to the facts at issue. Accordingly, we hold Lozada failed to adequately brief these contentions. *See* Tex.R.App. P. 38.1(i); *Dolenz, Life Estate v. Dallas Cent. Appraisal Dist.,* 293 S.W.3d 920, 923 (Tex.App.-Dallas 2009, pet. denied) (holding issue inadequately briefed where appellant's brief consisted of " one sentence of law" but did not include any discussion of the law

cited to the relevant facts of the case); *San Saba Energy, L.P. v. Crawford,* 171 S.W.3d 323, 337-38 (Tex.App.-Houston [14th Dist.] 2005, no pet.) (holding issue inadequately briefed when parties failed to make any specific argument or engage in any analysis showing how the record and the law supports their contentions).

### 3. Affidavits of Virginia Lozada and Fernando Mejorado

Lozada also raises various challenges to the trial court's exclusion of certain sentences from the affidavits of Virginia Lozada and Fernando Mejorado. Similar to the arguments made in response to the objections made to her affidavit, Lozada asserts that any statements made by them reciting Dennis' utterances were admissible as statements by a party opponent or as statements against interests. But again, other than making a general cite to the evidentiary rules and some cases, Lozada simply concludes in one sentence that the statements were admissible. Having failed to engage in any legal analysis, discussion, or argument explaining why the complained-of statements met the exception to the hearsay rule, we hold Lozada failed to adequately brief these contentions.[3] *See*

Page 288

Tex.R.App. P. 38.1(i); *Dolenz,* 293 S.W.3d at 923; *San Saba Energy,* 171 S.W.3d at 337-38. Issue Four is overruled.

## SUMMARY JUDGMENT

We now turn to Lozada's first issue, which contests the summary judgment entered in favor of Farrall & Blackwell, and the trial court's denial of Lozada's motion for new trial. Specifically, Lozada contests the applicability of the limitations bar to her claims for negligence, negligent misrepresentation, and violations of the DTPA and Insurance Code, and challenges the trial court's implicit determination that she failed to prove her claims for fraud and promissory estoppel.

### Standard of Review

We review summary judgments *de novo. Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005). Summary judgment is proper only when a movant establishes that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c). In reviewing a summary judgment, we indulge every reasonable inference in favor of the nonmovant, take all evidence favorable to the nonmovant as true, and resolve any doubts in favor of the nonmovant. *Valence Operating Co.,* 164 S.W.3d at 661.

### Statute of Limitations

We first address Farrall & Blackwell's contention that Lozada's causes of action for negligence, negligent misrepresentation, and violations of the DTPA and Insurance Code are barred by limitations. When a defendant moves for summary judgment on the affirmative defense of limitations, it has the burden to conclusively establish that defense. *KPMG Peat Marwick v. Harrison County Housing Finance Corporation,* 988 S.W.2d 746, 748 (Tex.1999). " The defendant must (1) conclusively prove when the cause of action accrued, and (2) negate the discovery rule, if it applies and has been pled or otherwise raised, by proving as a matter of law that there is no genuine issue of material fact about when the plaintiff discovered, or in the exercise of reasonable diligence should have discovered, the nature of its injury." *Walker v. Presidium, Inc.,* 296 S.W.3d 687, 694 (Tex.App.-El Paso 2009, no pet.) (citing *KPMG Peat Marwick,* 988 S.W.2d at 748). Once

the defendant establishes limitations as a bar to the action, the plaintiff must then adduce summary judgment proof raising a fact issue to avoid the statute of limitations. *Id.*

By statute, there is a two-year limitations period for violations of the DTPA and Insurance Code, and for suits for negligence and negligent misrepresentation. *See* Tex. Bus. & Com.Code Ann. § 17.565 (Vernon 2002); Tex. Ins.Code Ann. § 541.162 (Vernon 2009); Tex. Civ. Prac. & Rem.Code Ann. § 16.003(a) (Vernon Supp. 2009). Generally, that limitations period begins to run when a particular cause of action accrues, that is, " when a wrongful act causes a legal injury regardless of when the plaintiff discovers the injury or if all resulting damages have not yet occurred." *Walker,* 296 S.W.3d at 694 (citing *Childs v. Haussecker,* 974 S.W.2d 31, 36 (Tex.1998)). However, when insurance benefits are the issue in such causes of action, the statute of limitations begins running on the day the insurance claim is denied. *See*

*Provident Life and Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 221 (Tex.2003) (DTPA); *Celtic Life Ins. Co. v. Coats,* 885 S.W.2d 96, 100 (Tex.1994) (Insurance Code); *Johnson & Higgins v. Kenneco Energy,* 962 S.W.2d 507, 514 (Tex.1998) (negligence); *Walker,* 296 S.W.3d at 691, 694-95 (negligent misrepresentation).

Here, Lozada received a letter in April 2004, that revealed her claim for benefits was denied. Specifically, the letter stated that based on the " Not Taken" letter issued in December, no policy was in force and no benefits are payable. At that point, the two-year statute of limitations began running for any violations of the DTPA and Insurance Code, and for any claims of negligence and negligent misrepresentation. *See Knott,* 128 S.W.3d at 221; *Coats,* 885 S.W.2d at 100; *Johnson & Higgins,* 962 S.W.2d at 514; *Walker,* 296 S.W.3d at 691, 694-95. Thus, Lozada's suit for such claims filed on July 20, 2006, is barred by the statute of limitations.

Nevertheless, Lozada contends that the denial letter dated April 1, 2004, was insufficient to trigger the statute of limitations as the letter does not reveal that the decision to deny benefits was based upon the facts as they existed on February 28, 2004, namely, that Jose Lozada was in the process of reapplying for benefits and had signed a Short Health Statement, " PAC" form, and Acknowledgment of Delivery of Policy. However, nothing in the letter suggests that AIG did not take into consideration the facts as existed on February 28, 2004. Indeed, the letter was actually sent in response to a benefits claims made on March 17, 2004. And the evidence established that simply signing those documents was not sufficient to provide binding coverage as AIG needed a new Part B " to consider reopening and redating." Moreover, a claim-denial letter need not address such issues. Rather, it simply must convey the insurer's determination of the insurance claim and the reason for the decision. *Knott,* 128 S.W.3d at 222-23. The letter did so in this case-it conveyed AIG's determination regarding the claim (" there will be no claim benefits payable" ) and the reason for the decision (" the policy is not in force" ). And even if AIG issued a second letter specifically setting out the specific facts as they existed on February 28, 2004, settled law dictates that the first denial letter still triggered the statute of limitations. *See Coats,* 885 S.W.2d at 100; *Pace v. Travelers Lloyds of Tex. Ins. Co.,* 162 S.W.3d 632, 635 (Tex.App.-Houston [14th Dist.] 2005, no pet.).

Relying on the discovery rule, Lozada further asserts that the statute of limitations did not

begin running until August 9, 2004, when she and her daughter spoke to Dennis about what happened with the second application for benefits. According to Lozada, she lacked " enough information to make a determination on who had, or had not, done what, in connection with the issue of life insurance coverage for [her] husband" until she spoke to Dennis and received certain information. Although the discovery rule tolls the limitations period until a claimant discovers or in the exercise of reasonable diligence should have discovered the injury caused by the wrongful act of another, *Childs,* 974 S.W.2d at 40, the discovery rule " does not linger until a claimant learns of actual causes and possible cures." *PPG Industries, Inc. v. JMB/Houston Centers Partners,* 146 S.W.3d 79, 93 (Tex.2004). Rather, the limitations clock is ticking from the day the insurance company denies coverage. *Knott,* 128 S.W.3d at 222; *Johnson & Higgins,* 962 S.W.2d at 515. Therefore, it makes no difference that Lozada did not yet know the specific cause of the injury, the party responsible for it, the full extent of the harm, or the chances of avoiding it. *PPG Industries,* 146 S.W.3d at 93-94. Lozada

Page 290

should have brought her suit within two years from the day AIG denied benefits.

Finally, we reject Lozada's claim that limitations was tolled by fraudulent concealment. Fraudulent concealment defers an action's accrual period until the plaintiff discovers or should have discovered the deceitful conduct or facts giving rise to the cause of action. *Earle v. Ratliff,* 998 S.W.2d 882, 888-89 (Tex.1999). It " requires evidence that the defendant actually knew the plaintiff was in fact wronged, and concealed that fact to deceive the plaintiff." *Id.* at 888. A showing that the defendant was merely negligent in what it did is not sufficient to establish the affirmative defense. *Id.* at 889.

Here, there is no evidence that Farrall & Blackwell knew which documents to submit for insurance coverage and then purposely provided wrong documents for Jose to sign. Rather, they contacted MFS to inquire into what documents should be provided. This is not evidence that Farrall & Blackwell fraudulently concealed any facts giving rise to Lozada's cause of action. Accordingly, we find that the trial court did not err by granting summary judgment on Farrall & Blackwell's limitations defense for negligence, negligent misrepresentation, and violations of the DTPA and Insurance Code.

*Fraud*

Lozada also challenges the trial court's implicit determination that she failed to prove her cause of action for fraud. In this regard, Lozada makes two arguments: (1) that Farrall & Blackwell told Jose, through Dennis, that the Short Health Statement, PAC form, and Delivery of Policy were the documents that would effectuate coverage; and (2) that Farrall & Blackwell did not know what was needed to obtain the desired coverage and simply " guessed at what the answer might be." We disagree.

Statements are not fraudulent unless the speaker knew they were false when made or that they were made recklessly without knowledge of the truth. *Prudential Ins. Co. v. Jefferson Assocs.,* 896 S.W.2d 156, 163 (Tex.1995). Whether statements were made knowing of their falsity or without knowledge of their truth may be proved by direct or circumstantial evidence. *Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 435 (Tex.1986).

Here, there is no evidence that anyone ever told Jose Lozada that the subject documents would effectuate coverage. The depositions revealed that Farrall & Blackwell never spoke directly to the Lozadas, that Farrall & Blackwell never told Dennis to tell the Lozadas that the documents would guarantee coverage, and that Dennis knew the documents did not effectuate coverage and conveyed this understanding to the Lozadas. Moreover, even after the documents were signed, deposition testimony revealed that a new underwriting process would be required before approval as there was more than a three-month break since the policy was first offered to Jose. Although Lozada relies on statements contained in her affidavit and the affidavits of her daughter and Mejorado that Dennis told them that the documents effectuated coverage, the trial court struck those statements as hearsay. Accordingly, absent any evidence that Farrall & Blackwell told Jose, through Dennis, that the Short Health Statement, PAC form, and Delivery of Policy were the documents that would effectuate coverage, Lozada's first fraudulent complaint fails.

Furthermore, we have been unable to find any evidence that Farrall & Blackwell knowingly and recklessly gave any wrong

Page 291

documents to Jose Lozada to sign. Rather, the deposition testimony shows that Farrall & Blackwell contacted MFS, who then contacted AIG, to find out which documents to provide. Farrall & Blackwell then provided only those documents that MFS told it to provide. In other words, Farrall & Blackwell only gave Jose Lozada documents after making an investigation and obtaining sufficient information or basis to suggest that the documents provided were correct. *See Johnson & Higgins,* 962 S.W.2d at 527 (finding no fraud where defendant made investigation before making representation, even if the representation was incorrect). Thus, Lozada's second fraudulent complaint fails, and the trial court did not err by granting summary judgment in favor of Farrall & Blackwell on Lozada's fraud claim.

*Promissory Estoppel*

Lozada next challenges the trial court's implicit determination that she failed to prove the elements of promissory estoppel. The elements of a promissory estoppel claim are: (1) a promise; (2) reliance thereon that was foreseeable to the promisor; and (3) substantial reliance by the promisee to his detriment. *Miller v. Raytheon Aircraft Co.,* 229 S.W.3d 358, 378-79 (Tex.App.-Houston [1st Dist.] 2007, no pet.) (citing *English v. Fischer,* 660 S.W.2d 521, 524 (Tex.1983)). Here, we find no evidence that a promise was made and thus do not address the other elements. *See Boy Scouts of America v. Responsive Terminal Sys., Inc.,* 790 S.W.2d 738, 743 (Tex.App.-Dallas 1990, writ denied).

A promise is a declaration that binds the person who makes it to act or refrain from acting in a particular way. *Traco Inc. v. Arrow Glass Co.,* 814 S.W.2d 186, 190 (Tex.App.-San Antonio 1991, writ denied). Here, Lozada contends that Farrall & Blackwell's actions in providing paperwork to Dennis for Jose to sign for purposes of submitting the policy application to AIG for underwriting was sufficient to create a promise, that is, that Jose would be granted coverage once he signed the documents. But again, other than statements made in Lozada's affidavits, which were excluded by the trial court, there is no evidence that Farrall & Blackwell ever spoke directly to the Lozadas, that Farrall & Blackwell ever told Dennis to tell the Lozadas that the documents

would guarantee coverage, or that Dennis knew the documents effectuated coverage and conveyed that understanding to the Lozadas. Finding no promise that merely signing the documents created any binding coverage, the trial court did not err by granting summary judgment in favor of Farrall & Blackwell on Lozada's claim for promissory estoppel.[4]

### Damages

Finally, Lozada asserts that she is entitled to damages based on her causes of actions asserted. However, because we have found that the trial court correctly granted Farrall & Blackwell's amended motion for summary judgment on the actions alleged, Lozada is not entitled to damages. Issue One is overruled.

## LAW OF AGENCY

Lozada's remaining issue, that is, her second issue, contests the trial court's implicit determination that Dennis was not Farrall & Blackwell's agent. In this regard, Lozada argues that Dennis had actual

Page 292

or apparent authority to bind Farrall & Blackwell, and that Farrall & Blackwell ratified his conduct. We disagree.

### Applicable Law

The existence of an agency relationship may be based on actual or apparent authority. *Walker Ins. Servs. v. Bottle Rock Power Corp.,* 108 S.W.3d 538, 550 (Tex.App.-Houston [14th Dist.] 2003, no pet.). Actual authority, which includes both express and implied authority, generally denotes authority that a principal (1) intentionally confers upon an agent, (2) intentionally allows the agent to believe that he possesses, or (3) allows the agent to believe that he possesses by want of due care the authority to act on behalf of the principal. *Suarez v. Jordan,* 35 S.W.3d 268, 273 (Tex.App.-Houston [14th Dist.] 2000, no pet.). Express authority is delegated to an agent by words that expressly and directly authorize the agent to do an act or series of acts on behalf of the principal. *Crooks v. M1 Real Estate Partners, Ltd.,* 238 S.W.3d 474 (Tex.App.-Dallas 2007, pet. denied). Implied authority is the authority to do whatever is reasonably necessary and proper to carry out the agent's express powers. *Nears v. Holiday Hospitality Franchising, Inc.,* 295 S.W.3d 787, 795 (Tex.App.-Texarkana 2009, no pet. h.). If an agent does not have express authority, he does not have implied authority. *Crooks,* 238 S.W.3d at 483.

" Apparent authority arises through acts of participation, knowledge, or acquiescence by the principal that clothe the agent with the indicia of apparent authority." *Ins. Co. of North America v. Morris,* 981 S.W.2d 667, 672 (Tex.1998). " One seeking to charge a principal through the apparent authority of its agent must establish conduct by the principal that would lead a reasonably prudent person to believe that the agent has the authority that it purports to exercise." *NationsBank, N.A. v. Dilling,* 922 S.W.2d 950, 953 (Tex.1996). " The principal must have affirmatively held out the agent as possessing the authority or must have knowingly and voluntarily permitted the agent to act in an unauthorized manner." *Id.* Only the conduct of the principal is relevant to determining whether apparent authority exists. *Id.* at 952-53.

Moreover, even if the alleged agent is not initially authorized to act on behalf of a principal, that agent's actions may be attributed to the principal if the principal later ratifies the agent's

conduct. *Walker Ins. Servs.,* 108 S.W.3d at 552. Thus, ratification occurs when a principal supports, accepts, or follows through on the efforts of a purported agent. *Id.* As noted by our sister court of appeals, " Ratification is the affirmance by a person of a prior act which when performed did not bind him, but which was professedly done on his account, whereby the act is given effect as if originally authorized by him." *Disney Enters., Inc. v. Esprit Fin., Inc.,* 981 S.W.2d 25, 31 (Tex.App.-San Antonio 1998, pet. dism'd w.o.j.).

*Application*

Lozada relies on the fact that Farrall & Blackwell gave Dennis paperwork for Jose Lozada to sign to support a finding of actual and apparent authority, and ratification. However, in *Gaines,* the Supreme Court found that a mortgage broker's authority to deliver documents and facilitate the processing of the loan on the lender's behalf did not include the authority to negotiate terms and commit the lender. *Gaines v. Kelly,* 235 S.W.3d 179, 182-84 (Tex.2007); *see also Sanders v. Total Heat & Air, Inc.,* 248 S.W.3d 907, 915-17 (Tex.App.-Dallas 2008, no pet.) (finding general contractor was not homeowner's agent despite signing a contract with Total

Page 293

Heat & Air to perform work on the house). Similarly, here, we believe, given the evidence before us, that Dennis' action of simply delivering paperwork or assisting in their completion does not equate to a finding that Dennis was Farrall & Blackwell's agent, much less for binding purposes.

Moreover, the record does not contain any evidence that Dennis was an agent of Farrall & Blackwell. In his deposition, Dennis expressly denied that he was an agent for Farrall & Blackwell. Similarly, Farrall & Blackwell denied that Dennis was their agent. Even Lozada's own expert denied that Dennis was acting as Farrall & Blackwell's agent. Rather, Dennis solely represented that he was an agent of AIG. And even as AIG's representative, Dennis denied that he had any binding authority, that is, to issue the policy or put it in place. Accordingly, Issue Two is overruled.

**CONCLUSION**

Having overruled Lozada's issues, we affirm the trial court's judgment.

---------

Notes:

[1] Farrall & Blackwell could not contact AIG directly " because the way they were structured, the brokerages would go to the IMO and the IMO would present that to the [insurance] company."

[2] Part B is a form that asks detailed questions about a proposed insured's medical history and current medical conditions.

[3] In addition, Lozada asserts that the trial court erred by striking paragraphs 9 and 10 of Virginia's affidavit as irrelevant under Rule 402. However, the record reflects that the trial court overruled Farrall & Blackwell's objections to those paragraphs. Consequently, Lozada's complaint is misplaced.

[4] We note that the depositions revealed that once the documents were received, it would take at least ten days to make it through underwriting and issue a policy, if approved. Jose signed the documents on February 28, 2004, and died on March 5, 2004.

---------

858 S.W.2d 337 (Tex. 1993), D-1659, McConnell v. Southside Independent School Dist.

Page 337

**858 S.W.2d 337 (Tex. 1993)**

**John S. McCONNELL, Petitioner,**

**v.**

**SOUTHSIDE INDEPENDENT SCHOOL DISTRICT, Dr. David S. Smith,**

**Miguel M. Fernandez, Sammie Kerby, Joe L. Weiss,**

**Mack C. Stallcup, Gilbert P. Arredondo,**

**and Julian Gonzales, Respondents.**

**No. D-1659.**

**Supreme Court of Texas.**

**April 21, 1993**

Rehearing Overruled Sept. 10, 1993.

Page 338

James M. Heidelberg, Stacy C. Ferguson, San Antonio, for petitioner.

John T. Fleming, Austin, for respondents.

OPINION

HIGHTOWER, Justice.

This case presents the question whether grounds for summary judgment must be expressly presented in the motion for summary judgment itself or whether such grounds may be presented in either a brief filed contemporaneously with the motion or in the summary judgment evidence. We conclude that grounds for summary judgment must be expressly presented in the summary judgment motion itself. Consequently, we reverse the judgment of the court of appeals and remand this cause to the trial court for further proceedings consistent with this opinion.

John S. McConnell (McConnell) sued Southside Independent School District (Southside) after Southside failed to renew his contract of employment. Southside moved for summary judgment, stating in its motion only that there were "no genuine issues as to any material facts". [1] Southside

Page 339

also filed a twelve page brief in support of the motion in which it expressly presented the grounds allegedly establishing its entitlement to summary judgment. McConnell filed a written exception to the motion, arguing that the motion was defective in that it failed to present any grounds. The trial court overruled McConnell's exception and rendered summary judgment for Southside. The court of appeals affirmed, holding that "Rule 166a allows a summary judgment movant to set out the specific grounds for summary judgment in a brief served on all parties contemporaneously with the motion itself." 814 S.W.2d 247.

I.

McConnell argues that the specific grounds for summary judgment must be expressly presented in the motion for summary judgment itself and not in a brief filed contemporaneously with the motion or in the summary judgment evidence. We agree.

Motion For Summary Judgment

The first sentence of Rule 166a(c), added in 1971, plainly provides: "The motion for summary judgment shall state the specific grounds therefor." Tex.R.Civ.P. 166a(c). [2] Several cases have paraphrased this requirement as follows:

The motion for summary judgment must itself state specific grounds on which judgment is sought.... The motion for summary judgment must stand or fall on the grounds it specifically and expressly sets forth.... There is authority to the effect that a summary judgment cannot be sustained on a ground not specifically set forth in the motion.

*Westbrook Const. Co. v. Fidelity Bank of Dallas,* 813 S.W.2d 752, 754-55 (Tex.App.--Fort Worth 1991, writ denied) (emphasis added). See, e.g., *Roark v. Stallworth Oil and Gas, Inc.,* 813 S.W.2d 492, 494-95 (Tex.1991) ("[A]n unpleaded affirmative defense may also serve as the basis for a summary judgment when it is raised in the summary judgment motion...."); 410/*West Ave. Ltd. v. Texas Trust Savings Bank, F.S.B.,* 810 S.W.2d 422, 424 (Tex.App.--San Antonio 1991, no writ) ("Motions for summary judgment 'stand or fall on the grounds specifically set forth in the motions.' "); *Hall v. Harris County Water Control & Improvement Dist.,* 683 S.W.2d 863, 867 (Tex.App.--Houston [14th Dist.] 1984, no writ). Consequently, a literal reading of Rule 166a(c) and these authorities indicate that the motion itself must state the grounds.

Other cases have considered the same language of Rule 166a(c) when the motion for summary judgment presented no grounds. In *Boney v. Harris,* 557 S.W.2d 376 (Tex.Civ.App.--Houston [1st Dist.] 1977, no writ), the motion for summary judgment stated only that the defendant's answer was "insufficient in law to constitute a defense...." Id. at 378. The court held that such a motion failed to satisfy the requirements of Rule 166a(c). Id. In another case in which the motion presented absolutely no grounds, the court held:

The motion, however, does not state any grounds, specific or otherwise, upon which it is based, and, as a result, it is not in compliance with Rule 166-A(c) as amended.

*Moody v. Temple National Bank,* 545 S.W.2d 289, 290 (Tex.Civ.App.--Austin 1977, no writ). See also *Mallory v. Dorothy Prinzhorn Real Estate, Inc.,* 535 S.W.2d 371, 372 (Tex.Civ.App.--Eastland

Page 340

1976, no writ) (motion stating that "original answer is insufficient to raise a controverted fact issue" insufficient under rule 166a(c)). [3]

Finally, there are cases, such as the one before the court today, in which summary judgment grounds were expressly presented, but only in a brief in support of the motion. In *Shade v. City of Dallas,* 819 S.W.2d 578 (Tex.App.--Dallas 1991, no writ), the court held:

Although it raised these other grounds in a brief in support of the motion, we hold that this is not sufficient. A brief in support is not a motion, answer, or response as contemplated by rule 166a. The City's motion does not incorporate the brief, and the trial court's judgment does not state that the brief was considered. The right to summary judgment exists only where there is compliance with the rule.... Because those grounds were not contained in the City's motion, we hold that summary judgment was improper if granted on those grounds.

Id. at 583 (emphasis added). Additionally, in Watkins v. Hammerman & Gainer, 814 S.W.2d 867 (Tex.App.--Austin 1991, no writ), the court held:

H & G argued in its trial and appellate briefs that additional grounds entitled it to summary

judgment, but failed to raise the other grounds in its motion for summary judgment. The judgment must stand or fall on the grounds expressly alleged in the motion.

Id. at 869 n. 1 (emphasis added). The same result was reached in *Roberts v. Southwest Texas Methodist Hospital,* 811 S.W.2d 141 (Tex.App.--San Antonio 1991, writ denied). In Roberts, the movant identified two grounds in his motion and discussed two additional grounds in his brief. The court of appeals, holding that the grounds discussed in the brief could not provide the basis for summary judgment, stated:

It did make these arguments later in a brief, but its motion said only that limitations barred the suit and that hospitals have no duty to give informed consent. Apart from limitations, the motion simply did not address the cause of action for battery. The trial court could not have granted summary judgment on grounds that were not included in the motion, and likewise, we cannot uphold it on unstated grounds.

Id. at 145. On motion for rehearing, the court added:

There is nothing onerous or unreasonable about requiring the movant to state the grounds upon which he seeks to win a lawsuit without a trial. If the grounds are so obvious from the summary judgment proof, what is burdensome about requiring the movant to state them in the motion? Grounds may be stated concisely, without detail and argument. But they must at least be listed in the motion.

Id. at 146. If this court intended Rule 166a(c) to permit a summary judgment movant to place, or possibly hide, grounds

Page 341

for summary judgment in a brief filed in support of the motion or in accompanying summary judgment evidence, the Rule could have easily provided: "The motion for summary judgment or the brief in support thereof or the summary judgment evidence shall state the specific grounds therefor." Rule 166a(c), however, does not so provide. "[W]e are not free to disregard ... [the rule's] plain language. Nor should we revise the rule by opinion." *Alvarado v. Farah Mfg. Co., Inc.,* 830 S.W.2d 911, 915 (Tex.1992). [4] Although Rule 166a(c) is an admittedly rigorous rule, it must be applied as written.

Consistent with the precise language of Rule 166a(c), we hold that a motion for summary judgment must itself expressly present the grounds upon which it is made. A motion must stand or fall on the grounds expressly presented in the motion. In determining whether grounds are expressly presented, reliance may not be placed on briefs or summary judgment evidence.

Non-Movant's Answer or Response

Likewise, issues a non-movant contends avoid the movant's entitlement to summary judgment must be expressly presented by written answer to the motion or by other written response to the motion and are not expressly presented by mere reference to summary judgment evidence. See *City of Houston v. Clear Creek Basin Authority,* 589 S.W.2d 671, 678 (Tex.1979) ("the non-movant must expressly present to the trial court any reasons seeking to avoid movant's entitlement ...").

The summary judgment pleading rules we announce today are consistent with the express language of Rule 166a(c) requiring that the motion for summary judgment state the specific grounds therefor and further the purpose of Rule 166a(c) to provide adequate information for

opposing the motion, and to define the issues. See *Weaver v. Stewart,* 825 S.W.2d 183, 184-85 (Tex.App.--Houston [14th Dist.] 1992, writ denied) ("[Rule 166a(c) ] is important because it provides the opposing party with notice of all matters expected to be asserted in arguing the motion."). Carving exceptions to this simple requirement that the motion for summary judgment state the specific grounds frustrates the purpose of Rule 166a(c). Eventually the exceptions would consume the rule, and inject uncertainty into summary judgment proceedings concerning what issues were presented for consideration. Furthermore, it is certainly not unduly burdensome to require the movant to state the specific grounds in the motion for summary judgment. These rules also permit the trial court to consider a brief in support of a motion for summary judgment as guidance in making its determination whether the summary judgment evidence demonstrates that the moving party is "entitled to judgment", see Tex.R.Civ.P. 166a(c), but not in determining whether summary judgment grounds and issues are expressly presented. Finally, these rules further the policy of seeking clarity and simplicity in summary judgment practice. See, e.g., *Black v. Victoria*

Page 342

Lloyds Ins. Co., 797 S.W.2d 20, 27 (Tex.1990) ("[T]he motion [for summary judgment] must identify or address the cause of action or defense and its elements." (emphasis added)).

II.

A corollary question concerns whether a burden exists to except or object to a defective motion for summary judgment or response. In certain situations, we conclude that such a burden exists.

Motion Presenting No Grounds

When the grounds for summary judgment are not expressly presented in the motion for summary judgment itself, any confusion may and should be resolved by exception in the trial court. However, summary judgments must stand or fall on their own merits, and the non-movant's failure to except or respond cannot supply by default the grounds for summary judgment or the summary judgment proof necessary to establish the movant's right--the movant's right is not established and the movant must still assert grounds in the motion for summary judgment itself and establish its entitlement to summary judgment. See Clear Creek, 589 S.W.2d at 678. While it would be prudent and helpful to the trial court for the non-movant always to file an [exception,] answer or response, the non-movant needs no [exception,] answer or response to the motion to contend on appeal that the grounds expressly presented to the trial court by the movant's motion are insufficient as a matter of law to support the summary judgment.

Id. (emphasis in original). Even if the non-movant fails to except or respond, if the grounds for summary judgment are not expressly presented in the motion for summary judgment itself, the motion is legally insufficient as a matter of law. Consequently, we conclude that Rule 166a(c) does not require a non-movant to except in this situation. [5]

Motion Presenting Only Certain Grounds

When the motion for summary judgment clearly presents certain grounds but not others, a non-movant is not required to except. This distinction was recognized and correctly resolved in Roberts v. Southwest Texas Methodist Hospital, when the court held:

When a motion for summary judgment asserts grounds A and B, it cannot be upheld on grounds C and D, which were not asserted, even if the summary judgment proof supports them and the responding party did not except to the motion.

811 S.W.2d at 146. Why should a non-movant be required to except to a motion expressly presenting certain grounds and not others? The only effect of such a rule would be to alert the movant to additional unasserted grounds for summary judgment. Consequently, we conclude that Rule 166a(c) does not require a non-movant to except in this situation.

Grounds Unclear from Motion

An exception is required should a non-movant wish to complain on appeal that the grounds relied on by the movant were unclear or ambiguous. See *Lochabay v. Southwestern Bell Media, Inc.,* 828 S.W.2d 167, 170 n. 2 (Tex.App.--Austin 1992, no writ) ("Lochabay did not except to the motion for summary judgment, as he was required to do if he wished to claim lack of specificity."). Prudent trial practice dictates that such an exception should be lodged to ensure that the parties, as well as

Page 343

the trial court, are focused on the same grounds. [6] This prevents the non-movant from having to argue on appeal each and every ground vaguely referred to in the motion. The practical effect of failure to except is that the non-movant loses his right to have the grounds for summary judgment narrowly focused, thereby running the risk of having an appellate court determine the grounds it believes were expressly presented in the summary judgment. Even in this situation, however, "[a]n appellate court cannot 'read between the lines, infer or glean from the pleadings or the proof' any grounds for granting the summary judgment other than those grounds expressly set forth before the trial court [in the motion for summary judgment]." *Clark v. First National Bank of Highlands,* 794 S.W.2d 953, 956 (Tex.App.--Houston [1st Dist.] 1990, no writ) (quoting *Great-Ness Professional Serv., Inc. v. First Nat'l Bank of Louisville,* 704 S.W.2d 916, 918 (Tex.App.--Houston [14th Dist.] 1986, no writ)).

Non-Movant's Answer or Response

With one exception, the above rules apply equally to a non-movant's response. The non-movant must expressly present to the trial court, by written answer or response, any issues defeating the movant's entitlement. Clear Creek, 589 S.W.2d at 678 ("The written answer or response to the motion must fairly apprise the movant and the court of the issues the non-movant contends should defeat the motion."). If it is clear what issues the non-movant contends should defeat the movant's entitlement, the movant should be able to reply only to these issues. See Tex.R.Civ.P. 166a(c) ("Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal."). Any confusion regarding what issues are expressly presented by the non-movant can also be resolved by exception. [7] However, summary judgments must stand or fall on their own merits, and the non-movant's failure to answer or respond cannot supply by default the summary judgment proof necessary to establish the movant's right. Clear Creek, 589 S.W.2d at 678. If a non-movant fails to present any issues in its response or answer, the movant's right is not established and the movant must still establish its entitlement to summary judgment. The effect of such a failure is that the

non-movant is limited on appeal to arguing the legal sufficiency of the grounds presented by the movant. Id. at 678.

III.

The summary judgment pleading rules we announce today are simple, equitable, and prevent the confusion that results when parties fail to expressly present grounds and issues entitling or defeating entitlement to summary judgment. [8] They

Page 344

also prevent parties from arguing that grounds and issues were presented in lengthy briefs or voluminous summary judgment evidence. Finally, these rules ultimately prevent the controversies that result when appellate courts are forced to ascertain whether grounds and issues were expressly presented to the trial court.

Because Southside's motion for summary judgment stated no grounds and because McConnell properly excepted to this defect, the court of appeals erred in affirming the trial court's rendition of summary judgment for Southside. For these reasons, we reverse the judgment of the court of appeals and remand this cause to the trial court for further proceedings consistent with this opinion.

GONZALEZ, J., concurring.

HECHT, J., joined by CORNYN, J., dissenting.

ENOCH, J., joined by PHILLIPS, C.J., dissenting.

GONZALEZ, Justice, concurring.

I agree with the Court that Rule 166a(c) of the Texas Rules of Civil Procedure mandates that the grounds for a motion for summary judgment must be set out in the motion itself and cannot be furnished by an accompanying brief. If the Rule does not mean what it says, we ought to change it. Because I would not reach the other issues addressed by the Court, I join only in the judgment and not the majority opinion.

HECHT, Justice, dissenting.

Despite the discursive plurality opinion, the actual holding in this case is a narrow one. It is that the grounds for a motion for summary judgment must be set out in the motion itself and cannot be supplied by an accompanying brief on which the motion is expressly based. Because the motion in this case does not comport with this rule, the Court reverses the judgment for the movant, even though any error in granting the motion is made entirely harmless by the non-movant's concession that he was fully apprised of the grounds on which it was based. I disagree with the Court's rule; it is a rigid formality incongruent with the more basic principle it is meant to effectuate, which is, that the grounds for a summary judgment motion should be clear to the non-movant and the trial court. The Court's rule is concerned only with where the grounds for summary judgment are stated, and not with whether they are stated clearly. I also disagree that a violation of the rule requires reversal even when it has caused no prejudice. Finally, I do not join in the plurality opinion's extensive discussions of various other subjects, all obiter dicta, which are in some respects wrong and in all respects completely unnecessary to a decision of the dispute before us.

Defendants filed a motion for summary judgment stating as its only grounds "that there are no

genuine issues as to any material facts and that these Defendants are entitled to judgment dismissing Plaintiff's amended complaint as a matter of law." The motion also recited, however, that it was based on a supporting brief. That brief accompanied the motion (plaintiff does not contradict defendants' assertion that the two instruments were actually attached to each other), was 12 pages long, and clearly set out the grounds for granting summary judgment. Plaintiff concedes that he understood the basis for defendants' motion but made a tactical choice not to respond to it on the merits. Instead, plaintiff excepted to the motion because it did not itself, apart from the accompanying brief, state the grounds for summary judgment.

Page 345

Plaintiff's sole contention in this Court is that it was reversible error for the trial court to grant defendants' motion in the face of his exception.

Plaintiff's exception to defendants' motion for summary judgment is based upon the first sentence of Rule 166a(c), TEX.R.CIV.P., which provides simply: "The motion for summary judgment shall state the specific grounds therefor." In *Westchester Fire Ins. Co. v. Alvarez,* 576 S.W.2d 771, 772 (Tex.1978), we stated: "The purpose of this requirement is to provide the opposing party with adequate information for opposing the motion, and to define the issues for the purpose of summary judgment." There is no question that the purpose of Rule 166a(c) was fully served in this case by the brief accompanying defendants' motion. Plaintiff concedes as much. Nevertheless, the Court holds that the summary judgment must be reversed because defendants did not comply with the rule.

The plurality opinion reasons that Rule 166a(c) "plainly" requires that the grounds for a motion for summary judgment must actually be set out in the motion itself. The alternative, according to the plurality opinion, would be to permit the grounds to be stated anywhere in the summary judgment record. This procedure would fail to provide a cogent statement of the issues in a particular place and thus would defeat the purpose of the rule. Since this procedure is unacceptable, the plurality opinion concludes that its reading of the rule must be correct.

The fallacy in the plurality opinion's reasoning lies in its misapplication of the law of the excluded middle. It is just not true that the only alternatives are either to require that the grounds for summary judgment be recited in the motion, or to permit them to be raised anywhere in the record. There is a middle position more flexible than the Court's rule and still fully consistent with the underlying purpose: the motion may state the grounds for summary judgment by reference to other documents as long as the opposing party is provided with adequate information to oppose the motion, and the summary judgment issues are defined. That is precisely what happened in this case. Defendants' motion expressly stated that it was based upon a supporting brief, which accompanied the motion. From the motion and brief, plaintiff knew exactly what defendants' contentions were. Both the rule and its purpose were thus fully satisfied. The motion stated "the specific grounds therefor" by reference to the accompanying brief, giving plaintiff full notice of defendants' contentions and defining the issues for resolution.

This is not a less than literal reading of the rule. As long as the purpose of the rule is met, its precise language does not preclude specification of the grounds for summary judgment in documents accompanying or referenced in the motion. We have never suggested that the rule is

as restrictive as the Court views it. In *Chessher v. Southwestern Bell Telephone Co.,* 658 S.W.2d 563, 564 (Tex.1983) (per curiam), we wrote: "It is axiomatic that one may not be granted judgment as a matter of law on a cause of action not addressed in a summary judgment proceeding." (Emphasis added.) In *Black v. Victoria Lloyds Ins. Co.,* 797 S.W.2d 20, 27 (Tex.1990), we reiterated: "A summary judgment movant may not be granted judgment as a matter of law on a cause of action not addressed in a summary judgment proceeding." (Emphasis added.) In both instances we insisted that the issues determined by summary judgment must actually be raised, but only in the proceeding. In neither case did we suggest that those issues must always be recited in the motion.

No reported Texas case addresses the specific issue before us. Most of the cases cited by the plurality opinion stand only for the general proposition that the grounds for summary judgment must be stated and do not specify where or how. One court of appeals has held that issues in opposition to a motion for summary judgment may be raised in a brief incorporated in the non-movant's response. *In Resolution Trust Corp. v. Ammons,* 836 S.W.2d 705, 708-709 (Tex.App.--Houston [1st Dist.1992, no writ), the court explained:

Page 346

The RTC filed a response to Ammons' motion for summary judgment and incorporated a memorandum of law in support of its response that was served on all parties and the trial court contemporaneously with its response. It is undisputed that the RTC's motion in response and memorandum of law in support of the response were in 'writing' and 'before' the trial court at the summary judgment hearing. Moreover, the motion itself, by its language, expressly incorporated the memorandum of law. We find the RTC's motion in response and supporting memorandum of law constitutes the type of 'written motion, answer or other response' contemplated by rule 166a(c). See *S. McConnell v. Southside Indep. School Dist.,* 814 S.W.2d 247, 248 (Tex.App.--Austin 1991, writ granted) (Rule 166a allows a summary judgment movant to set out the specific grounds for summary judgment in a brief served on all parties contemporaneously with the motion itself); see also TEX.R.CIV.P. 1 (rules are to be given liberal construction).

Other courts have uniformly refused to consider grounds for summary judgment raised only in a brief not accompanying the motion. *Shade v. City of Dallas,* 819 S.W.2d 578, 583 (Tex.App.--Dallas 1991, no writ) (the "motion does not incorporate the brief, and the trial court's judgment does not state that the brief was considered"); *Roberts v. Southwest Texas Methodist Hosp.,* 811 S.W.2d 141, 144-146 (Tex.App.--San Antonio 1991, writ denied) (arguments not raised in motion were made "later in a brief"); *Avinger v. Campbell,* 499 S.W.2d 698, 702 (Tex.Civ.App.--Dallas 1973) (grounds cannot be raised for the first time in appellate briefs), writ ref'd n.r.e., 505 S.W.2d 788 (Tex.1974) (per curiam). The holding in each of these cases, as distinct from desultory language in some of the opinions, is correct. Raising issues in a brief which is filed separately and not referenced in the summary judgment motion or response may not comply with Rule 166a(c). Still, no Texas court has ever held that the grounds for or against a summary judgment cannot be stated in a brief accompanying the motion or response.

The plurality opinion argues that its rule promotes clarity and simplicity in summary judgment practice. Actually, however, a rigid rule requiring recitation of the grounds for summary judgment in

the motion itself does not make for clearer, simpler motions; to the contrary, such a rule simply encourages prudent counsel to incorporate any supporting briefing and affidavits in the body of the motion when it is possible to do so. As defendants' counsel in this case observed in oral argument: "Had I served this motion and left off the title of the third page which begins, "Brief in Support", the entire document would have been deemed a motion, and I wouldn't be here today." Under the Court's rule, counsel is correct. But merely deleting the caption on defendants' brief so that its text is inside the motion itself instead of attached to it does not make the issues in this case clearer or simpler. No such purely formal requirement can serve the purpose of clarifying the issues. In this case, the Court's clearer, simpler rule requires a remand so that the parties and lower courts can all reconsider the very same issues they have already considered. The needless delay and expense in this case will be multiplied in others.

The Court's objectives of clarity and simplicity are not achieved by its rule. A 1-page motion which does not state the grounds for summary judgment, attached to a 99-page brief which does, is not made clearer or simpler merely by combining the two documents into a single 100-page motion which states the grounds for summary judgment amid supporting arguments. Yet the 100-page motion in this example complies with the Court's rule while the 1-page motion does not. This sort of nonsense results when the application of a rule becomes divorced from its purpose. What is essential for summary judgment, as we explained in Westchester, is that the issues be set out with sufficient specificity to assure that they are fairly addressed by the parties and trial court. How that is achieved, while not totally immaterial, should certainly be of far less importance

Page 347

than whether it is achieved. A motion which does not serve the purpose of the rule should not be preferred to a motion and brief which, together, do.

Rules of procedure are not written to define a perverse game of legal hopscotch to test the adroitness of lawyers; they are devised to provide a logical, predictable, simple, sensible structure for achieving justice. When rules are divorced from the basic principles they effectuate, the resulting structure is deformed and arbitrary, and its purpose--achieving justice--is thwarted. A rule that does not simply restate the basic principle on which it is based, but instead prescribes a guideline which tends to further that principle, must be applied consistent with its principle. Rule 166a, for example, does not restate its purpose (fair notice and definition of issues), but prescribes a guideline (motion shall state grounds). The words of the rule are defined by its purpose. A motion which does not provide fair notice of the issues raised is not proper simply because somewhere in its ramblings the grounds are stated; a motion which does define the issues is not improper simply because the grounds are stated in an attachment. The plain language of the rule itself cannot be disregarded, but it does not supplant the purpose and cannot properly be construed to reach a result incongruent with that purpose.

There are many other examples of such rules. The "in anticipation of litigation" standard of Rule 166b is not a basic legal principle but an abbreviation to describe the balance struck among the conflicting purposes of privilege and discovery. The standard is intended to achieve in application the balance desired in the abstract. If the standard is applied without regard to its purpose, it may mean anything from the remotest speculation that litigation may be an eventuality

to service of summons. Application of the standard is defined not by the dictionary meaning of its words but by its underlying purposes. See *National Tank Co. v. Brotherton,* 851 S.W.2d 193 (Tex.1993). Likewise, the rules governing preservation of error in the jury charge are meant to assure that a party's position is fully communicated to the trial court and ruled upon. Application of those rules apart from their purpose leads to an endless development of arcane distinctions. See *State v. Payne,* 838 S.W.2d 235 (Tex.1992). There are many other similar examples. All such rules can be applied under the rubric of literal construction to defeat their own purposes unless those purposes govern and define the rules. The underlying principles must control.

I do not doubt that the Court's decision today is motivated by the very legitimate desire to clarify summary judgment procedure with a bright-line rule. I do not believe, however, that that desire is fulfilled. Rule 166a should be applied to serve its purpose; it should not be an end in itself.

At least as troubling as the rule the Court adopts is its conclusion that the judgment in this case must be reversed. Rule 184(b), TEX.R.APP.P., states:

No judgment shall be reversed on appeal and a new trial ordered in any cause on the ground that an error of law has been committed by the trial court in the course of the trial, unless the Supreme Court shall be of the opinion that the error complained of amounted to such a denial of the rights of the petitioner as was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case, or was such as probably prevented the petitioner from making a proper presentation of his case to the appellate courts....

The plurality opinion does not apply or mention this rule. Even if it be conceded that the trial court erred, reversal is not proper except under Rule 184. Petitioner does not argue that the trial court's alleged error "amounted to such a denial of the rights of the petitioner as was reasonably calculated to cause and probably did cause the rendition of an improper judgment". Nor does petitioner argue that the trial court's action "probably prevented the petitioner from making a proper presentation of his case to the appellate courts". The Court does not explain why reversal is necessary in these circumstances. The only logical alternatives are that the trial court

Page 348

committed fundamental error, or that Rule 184 does not apply to this case. Both alternatives are clearly wrong.

In very similar circumstances, the court in *McCloud v. Knapp,* 507 S.W.2d 644 (Tex.Civ.App.-- Dallas 1974, no writ), refused to reverse the judgment. In that case, as in this one, the trial court granted a motion for summary judgment which did not state specific grounds, although the grounds were stated in a supporting brief. The court reasoned:

Appellee cannot say that she was misled or misinformed concerning appellee's position; her only complaint is that there was technical noncompliance with the Rule.

We do not wish to be understood as holding that strict compliance with Rule 166-A is unnecessary, but it is our holding that in this particular factual situation it appears that no harm or prejudice was suffered by appellant and that she presents no proper ground for reversal. Rule 434. [Tex.R.Civ.P. 434, now TEX.R.APP.P. 81(b)(1), counterpart to TEX.R.APP.P. 184.]

Id. at 645. The Court should adopt the same reasoning in this case.

Finally, most of the plurality opinion is a discourse on summary judgment procedure unnecessary to a decision in this case. There has not been one word of argument in this Court or in the court of appeals concerning whether the grounds for summary judgment may be stated in the evidence, yet the plurality opinion undertakes not only to resolve this issue but to disapprove the three other cases which mention it. Two of those cases did hold that the grounds for summary judgment may be found in the evidence in at least some circumstances. *City of Asherton v. Trigo,* 714 S.W.2d 90, 92 (Tex.App.--San Antonio 1986, no writ) (grounds for motion may be found in affidavit even though not stated in the motion); *Sparks v. Cameron Employees Credit Union,* 678 S.W.2d 600, 602 (Tex.App.--Houston [14th Dist.] 1984, no writ) (grounds readily apparent from the evidence in suit on a note). In the other case, however, the issue appears, as in this case, only in dicta. *Albritton v. Henry S. Miller Co.,* 608 S.W.2d 693, 695 (Tex.Civ.App.--Dallas 1980, writ ref'd n.r.e.) (non-movant's complaint was not that motion failed to state grounds, but that it should have stated each element of the movant's cause of action). The plurality opinion also addresses when issues may be raised by the summary judgment evidence offered in response to a motion, another matter not involved in this case.

The plurality opinion indicates the level of specificity required of motions for summary judgment by disapproving *Bado Equip. Co. v. Ryder Truck Lines, Inc.,* 612 S.W.2d 81 (Tex.Civ.App.--Houston [14th Dist.] 1981, writ ref'd n.r.e.). There the court held that summary judgment was properly granted in a sworn account suit on a motion which stated only that defendant's answer was "insufficient in law to constitute a defense" and did not refer specifically to TEX.R.CIV.P. 185. Id. at 82. Whether Bado was correctly decided has nothing to do with the issues in the case before us.

The plurality opinion also decides what it euphemistically refers to as a "corollary question": in what circumstances must a non-movant except to a summary judgment motion which does not state grounds in order to preserve error. The plurality opinion suggests, among other things, that if the motion states no grounds at all, no exception is required. That is directly contrary to our decision in Westchester. There we wrote:

The question in this case is whether the specificity requirement in Texas Rules of Civil Procedure 166-A(c) is waived by failure to except to the motion for summary judgment prior to rendition of judgment....

Rule 166-A(c) states that "the motion for summary judgment shall state the specific grounds therefor." The purpose of this requirement is to provide the opposing party with adequate information for opposing the motion, and to define the issues for the purpose of summary judgment. In this respect, the specificity requirement in Rule 166-A(c) parallels the

Page 349

pleading requirements of Rule 45(b) and Rule 47(a) [TEX.R.CIV.P.]. Although Rule 90 [TEX.R.CIV.P.] does not specifically refer to summary judgment pleadings, the same considerations apply. Just as defects in pleadings are waived unless specifically pointed out by motion or exception in writing before the charge to the jury or rendition of judgment, we hold that the failure of a motion for summary judgment to specify grounds is a defect of form that is waived unless excepted to prior to rendition of judgment.

576 S.W.2d at 772-773. The plurality opinion states that this holding in Westchester was "effectively" overruled in *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979). By use of the word "effectively", the plurality opinion avoids pointing out that Clear Creek did not actually say it was overruling Westchester. In fact, Clear Creek does not even cite Westchester. The plurality opinion's reliance on a part of a sentence from Clear Creek is very misleading. What Clear Creek says is a non-movant may assert that a motion for summary judgment lacks legal substance without filing a response. Clear Creek does not suggest that a procedural deficiency, such as the failure to state grounds in the motion itself, can be asserted without some objection in the trial court. The relevant passage from Clear Creek makes this clear:

We are not to be understood, however, as shifting the burden of proof that exists in summary judgment proceedings. The trial court may not grant a summary judgment by default for lack of an answer or response to the motion by the non-movant when the movant's summary judgment proof is legally insufficient. The movant still must establish his entitlement to a summary judgment on the issues expressly presented to the trial court by conclusively proving all essential elements of his cause of action or defense as a matter of law. See *Swilley v. Hughes,* 488 S.W.2d 64, 67 (Tex.1972). Summary judgments must stand on their own merits, and the non-movant's failure to answer or respond cannot supply by default the summary judgment proof necessary to establish the movant's right.

While it would be prudent and helpful to the trial court for the non-movant always to file an answer or response, the non-movant needs no answer or response to the motion to contend on appeal that the grounds expressly presented to the trial court by the movant's motion are insufficient as a matter of law to support summary judgment. The non-movant, however, may not raise any other issues as grounds for reversal. Under the new rule, the non-movant may not urge on appeal as reason for reversal of the summary judgment any and every new ground that he can think of, nor can he resurrect grounds that he abandoned at the hearing.

Id. at 678 (footnote omitted) (emphasis added). A fair reading of this passage does not support the plurality opinion's position that Westchester was silently overruled and its rule abandoned. Nor should Westchester be overruled. A rule requiring the non-movant to object to procedural deficiencies in the trial court operates to assure a decision on the merits in the trial court, thereby minimizing unnecessary appeals.

However, the propriety of the Westchester rule is outside the proper scope of the issues in this case. The plurality opinion's discussion of these and other "corollary" questions comprises the bulk of its opinion. Some of it is wrong--such as the treatment of Westchester--most of it is ill-advised, and all of it is dicta entitled to no regard.

* * * * * *

For the reasons I have explained, I would affirm the judgment of the court of appeals. I therefore respectfully dissent.

CORNYN, J., joins in this dissenting opinion.

ENOCH, Justice, dissenting.

I agree with the Court that the plain words of Rule 166a(c) of the Texas Rules of Civil Procedure establish a bright line rule. The grounds for the granting of a motion for summary

judgment must be

Page 350

stated in the motion. [1] However, I would not address any of the other issues, nor can I agree that in this case the failure to include the grounds in the motion itself is harmful. The evidence in the record establishes that neither the court nor the non-movant was unaware, confused or mislead as to the specific grounds being relied upon by the movant. Therefore, I would affirm the judgment of the court of appeals.

PHILLIPS, C.J., joins in this dissenting opinion.

---------

Notes:

[1] Southside's motion for summary judgment, in its entirety, stated:

Defendants, SOUTHSIDE ..., in accordance with Rule 166a of the Texas Rules of Civil Procedure, move this Court for summary judgment in the above entitled action on the grounds that there are no genuine issues as to any material facts and that these Defendants are entitled to a judgment dismissing Plaintiff's amended complaint as a matter of law. The Defendants respectfully request this Court to enter a summary judgment based on the pleadings in file, this Brief in Support [sic], containing the undisputed facts and conclusions of law as required by the Local Rules, and transcripts, together with affidavits submitted along with this motion, or in the alternative to specify what, if any, facts remain to be determined.

[2] Consistent with Rule 166a, we use the term "grounds" to refer to the reasons entitling the movant to summary judgment. Likewise, we use the term "issues" to refer to the reasons the non-movant contends defeat the movant's entitlement to summary judgment.

[3] Ignoring the plain language of Rule 166a(c), some courts of appeals have reached the opposite result. In *City of Asherton v. Trigo,* 714 S.W.2d 90 (Tex.App.--San Antonio 1986, no writ), the motion stated only that "[t]he pleadings and affidavits on file in this cause show that there is no genuine issue of material fact and that Counter-Defendant is entitled to judgment on the Counterclaim as a matter of law." *Id.* at 92. Holding that the movant sufficiently presented the grounds to the trial court, the court stated that "[i]ssues may be expressly presented by considering all of the summary judgment evidence presented in the case." *Id.* Furthermore, in *Bado Equipment Co. v. Ryder Truck Lines Inc.,* 612 S.W.2d 81 (Tex.Civ.App.--Houston [14th Dist.] 1981, writ ref'd n.r.e.), the court held that a motion stating only that the answer filed was "insufficient in law to constitute a defense ..." "was sufficiently specific under rule 166a(c)." *Id.* at 82. *See also Sparks v. Cameron Emp. Credit Union,* 678 S.W.2d 600, 602 (Tex.App.--Houston [14th Dist.] 1984, no writ) (construing summary judgment motion stating no grounds, court holds that "the specific issues were readily apparent from this [summary judgment] evidence...."); *Albritton v. Henry S. Miller Co.,* 608 S.W.2d 693, 695 (Tex.Civ.App.--Dallas 1980, writ ref'd n.r.e.) ("It is clear, therefore, that issues are 'expressly presented' by all of the summary judgment evidence presented to and considered by the court."). To the extent that they conflict with our opinion today, we disapprove *City of Asherton v. Trigo, Bado Equipment Co. v. Ryder Truck Lines Inc., Sparks v. Cameron Emp. Credit Union* and *Albritton v. Henry S. Miller Co..*

[4] In arguing that the grounds for summary judgment may be specified "in documents

accompanying or referenced in the motion ...," the dissent consistently relies upon the "basic principle it [Rule 166a(c) ] is meant to effectuate" and its "underlying purpose." 858 S.W.2d 344, 347 (Hecht, J., dissenting). The dissent further states:

A rule [of procedure] that does not simply restate the basic principle on which it is based, but instead prescribes a guideline which tends to further that principle, must be applied consistent with its principle. * * * The words of the rule [Rule 166a] are defined by its purpose.

All such rules [of procedure] can be applied under the rubric of literal construction to defeat their own purposes unless those purposes govern and define the rules. The underlying principles must control.

858 S.W.2d 344, 347 (Hecht, J., dissenting). The Texas Rules of Civil Procedure including Rule 166a(c) should be clearly understandable and be applied in a predictable and consistent manner. In an attempt to avoid the effect of Rule 166a(c), the dissent would do a great disservice to the litigants whom we serve by rewriting the unambiguous text of Rule 166a(c) in light of the dissent's perceptions concerning Rule 166a(c)'s "underlying purpose and principles." This approach would inject an element of uncertainty into every rule, no matter how clearly stated.

[5] The dissent suggests that we have overruled *Westchester Fire Ins. Co. v. Alvarez,* 576 S.W.2d 771 (Tex.1978) when we allegedly state "that if the motion states no grounds at all, no exception is required." 858 S.W.2d 344, 348 (Hecht, J., dissenting). The statement in *Westchester,* 576 S.W.2d at 773, "that the failure of a motion for summary judgment to specify grounds is a defect of form that is waived unless excepted to prior to rendition of judgment," was effectively overruled fourteen years ago by *Clear Creek,* 589 S.W.2d at 678 ("the non-movant needs no answer or response to the motion to contend on appeal that the grounds expressly presented to the trial court by the movant's motion are insufficient as a matter of law to support the summary judgment.").

[6] When the non-movant files a proper exception to the motion stating that the movant's grounds are uncertain or ambiguous, and such an exception is overruled, the non-movant may have a valid complaint on appeal. *See Jones v. McSpedden,* 560 S.W.2d 177, 179 (Tex.Civ.App.--Dallas 1977, no writ).

[7] Concerning the form and time of exceptions, *Clear Creek* held that both the grounds for summary judgment and the issues defeating entitlement thereto must be in writing and before the trial court at the hearing. *Id.* at 677. We stated that to permit grounds and issues to be presented orally would encourage parties to request that a court reporter record summary judgment hearings, a practice neither necessary nor appropriate to the purposes of such a hearing. *Id.* This rationale compels the conclusion that exceptions to a motion or response must also be in writing. Furthermore, the requirement that a written response must be filed and served not later than seven days prior to the hearing applies equally to the non-movant's exceptions. *See* Tex.R.Civ.P. 166a(c). Similarly, any exceptions filed by the movant to the non-movant's response must be filed and served not less than three days prior to the hearing. *See* Tex.R.Civ.P. 21. Finally, a party asserting exceptions must obtain a ruling at or prior to the hearing of the motion for summary judgment. Tex.R.App.P. 52(a).

[8] We do not believe that our holding presents a trap for the unwary practitioner. For example, the *Texas Litigation Guide* provides a standard motion for summary judgment form consistent with our

holding today. *See* W. Dorsaneo, 4 *Texas Litigation Guide* § 101.101[2] (1992). Additionally, in an effort to avoid any resulting confusion, we point out that the oft-cited commentators on Texas summary judgment practice have recently changed positions on this issue in response to the incorrect opinion of the court of appeals in this case. *Compare* L. Liberato & D. Hittner, *Summary Judgments in State and Federal Courts,* in 1 State Bar of Texas, Fourth Annual Advanced Appellate Practice Course G-2 (1990) ("Rule 166a(c) unequivocally requires that the motion shall state with specificity the grounds upon which the movant is relying.") *with* D. Hittner, L. Liberato, B. Ramage, *Summary Judgments and Defaults in the State Courts of Texas,* 1:13.1 (1992) ("The movant may set out the specific grounds for a summary judgment in a *brief* served on all parties contemporaneously with the motion itself."). As our opinion indicates, the rule expressed in 1990 is correct.

[1] Responding to Justice Hecht's criticism that requiring the grounds for summary judgment to be stated in the motion is a technicality without a purpose, at least one court of appeals has stated "... the trial brief is neither in the record before us *nor would it properly be part of the appellate record." Concrete Constr. Supply v. M.F.C., Inc.,* 636 S.W.2d 475, 483-84 (Tex.App.--Dallas 1982, no writ) (*citing* TEX.R.CIV.P. 376a, now found in TEX.R.APP.P. 51 and 52 (emphasis added).

---------

**735 S.W.2d 558 (Tex.App. —Dallas 1987)**

**RADELOW-GITTENS REAL PROPERTY MANAGEMENT, Appellant,**

**v.**

**PAMEX FOODS d/b/a Pancho's Mexican Foods, Appellee.**

**No. 05-86-01136-CV.**

**Court of Appeals of Texas, Fifth District, Dallas**

**July 14, 1987**

Rehearing Denied July 23, 1987.

Keith A. Glover, Dallas, for appellant.

Dudley Chambers, Frank C. Vecella, Dallas, for appellee.

Before DEVANY, BAKER and McCRAW, JJ.

ON MOTION FOR REHEARING

DEVANY, Justice.

Our opinion dated June 16, 1987, is hereby withdrawn. The following is now our opinion.

This is a suit involving fire damage to real property that was owned by Radelow-Gittens Real Property Management, and leased to Pamex Foods d/b/a Pancho's Mexican Foods. The lawsuit was originally brought against Pamex by Glenn Grant

Company and Sleep Shop d/b/a Slumberland, whose property was also damaged by the fire. Radelow-Gittens, the landlord, intervened and assumed the posture of a plaintiff; it then brought in Texas Fire & Safety, Inc. as a third party defendant. After Pamex answered, it filed a motion for partial summary judgment, contending that the lease agreement between Pamex and Radelow-Gittens required Radelow-Gittens to repair the premises at its sole expense. The trial court agreed and granted partial summary judgment in favor of Pamex. That judgment stated that Radelow-Gittens' claim against Pamex was barred by the lease agreement. Radelow-Gittens subsequently filed a second and, later, a third amended petition; neither of these amended petitions contained any claim against Pamex despite the fact that each continued to use the style of the case, including the name Pamex. Radelow-Gittens proceeded to trial solely against the remaining defendant, but a judgment against Radelow-Gittens disposed of that last defendant. At that point all issues in the lawsuit were disposed of, hence, all prior orders by the trial court became final. *Runnymede Corporation v. Metroplex Plaza, Inc.,* 543 S.W.2d 4, 5 (Tex.Civ.App.--Dallas 1976, writ ref'd).

Radelow-Gittens now appeals from the partial summary judgment which was granted in favor of Pamex prior to the filing of the second and third amended petitions. In three points of error, Radelow-Gittens claims that the trial court erred in granting Pamex's motion for partial summary judgment because (1) Pamex was not a co-insured under the fire insurance policy referenced in the lease agreement; (2) even if Pamex were a limited or a special insured, then Pamex is only an insured to the extent of its leasehold and personal property interest; and (3) the lease agreement

attached to the motion for partial summary judgment was not sworn to or certified as required by the Texas Rules of Civil Procedure. The third point of error was abandoned by Radelow-Gittens' counsel in oral argument before this court because the lease agreement attached to the motion had been stipulated to by the parties as a true and correct copy of the agreement.

In its first counterpoint, Pamex argues that Radelow-Gittens cannot complain of the granting of the partial summary judgment in favor of Pamex because Radelow-Gittens abandoned its claims against Pamex when it amended its pleadings. We agree and dismiss the appeal.

An amended pleading supercedes and supplants all previous pleadings. TEX.R.CIV.P. 65; *Johnson v. Coca-Cola Company,* 727 S.W.2d 756, 758 (Tex.App.--Dallas 1987, no writ). For example, when a party's name is omitted from an amended pleading, he is as effectively dismissed as where a formal order of dismissal is entered. *Jauregui v. Jones,* 695 S.W.2d 258, 261 (Tex.App.--San Antonio 1985, writ ref'd n.r.e.). When Radelow-Gittens proceeded to trial on its third amended petition, at that point in time, it had abandoned all of its prior claims against Pamex under the first petition. *Dolenz v. All Saints Episcopal Hospital,* 638 S.W.2d 141, 142 (Tex.App.--Fort Worth 1982, writ ref'd n.r.e.). In Dolenz, a doctor sued a hospital for slander, seeking injunctive relief and money damages. The hospital moved for partial summary judgment on the claim for injunctive relief. The trial court granted the hospital's motion, and entered judgment against the doctor denying his claim for injunctive relief. After this order, the doctor twice amended his pleadings. The doctor then proceeded to trial on his third amended original petition. In that petition, he alleged no circumstances upon which injunctive relief could be granted, and his prayer did not request injunctive relief. At trial, the doctor also lost on his slander claim. The doctor then appealed on both the injunctive relief and the damages claim. The Fort Worth Court of Appeals held that the doctor had abandoned his claim for injunctive relief when he proceeded to trial on his third amended original petition. The Dolenz court stated: "[i]n a situation such as presented an amended pleading supplants the instrument amended and that which it amends is no longer proper to be considered part of the trial record." 638

Page 560

S.W.2d at 142. On appeal, the doctor could not complain of the trial court's action upon his original plea for injunction because that cause of action was abandoned when he went to trial on his third amended original petition. 638 S.W.2d at 142.

We agree with the reasoning of the Dolenz court and are persuaded that it applies to the instant case. When Radelow-Gittens amended its petition, it abandoned all claims against Pamex and waived error, if any, by the trial court in rendering the summary judgment for Pamex.

Another case which is analogous is *Chamberlain v. McReight,* 713 S.W.2d 372 (Tex.App.--Beaumont 1986, writ ref'd n.r.e.). In Chamberlain, the plaintiff sued a corporation and an officer of the corporation, individually. In an amended pleading, the plaintiff omitted the officer's name only in the complaint paragraph. The officer's name was left in the style of the petition, and it was alleged that he had been served. Nevertheless, on appeal, the court held that the officer had been dismissed from the lawsuit. 713 S.W.2d at 373-74. We are persuaded that Radelow-Gittens effectively dismissed Pamex from the lawsuit at the point when it amended its pleadings and omitted all claims of liability against Pamex.

Therefore, we hold that Radelow-Gittens may not now complain on appeal of the trial court's action in granting the motion for partial summary judgment in favor of Pamex. Dolenz, 638 S.W.2d at 142. In light of this holding, we need not address Radelow-Gittens' points of error. The last judgment by the trial court was a judgment against Radelow-Gittens in favor of Texas Fire and Safety, Inc., which disposed of the remaining issues and parties in the case. As stated above, that judgment was based upon Radelow-Gittens' third amended petition, which was focused entirely on Texas Fire and Safety, Inc. Pamex was no longer a party to the lawsuit at the time of the final judgment. In fact, the style of the final judgment reads: Radelow-Gittens Real Property Management v. Texas Fire & Safety, Inc.

Interlocutory judgments by the trial court are merged into the final judgment and thus become final for purposes of appeal, whether or not the interlocutory judgment is specifically named within the final judgment. *Webb v. Jorns,* 488 S.W.2d 407, 408-09 (Tex.1972); *Runnymede Corporation v. Metroplex Plaza, Inc.,* 543 S.W.2d 4, 5 (Tex.Civ.App.--Dallas 1976, writ ref'd). In the instant case, when the trial court entered its final judgment, the summary judgment in favor of Pamex became final and appealable. However, because Radelow-Gittens abandoned its claims against Pamex after the summary judgment was rendered, Radelow-Gittens waived error, if any, committed by the trial court in rendering that summary judgment. Therefore, Radelow-Gittens may not now appeal the summary judgment concerning those claims. Furthermore, the summary judgment in favor of Pamex operates as a bar to Radelow-Gittens asserting those same claims against Pamex because of res adjudicata. See *Person v. Latham,* 582 S.W.2d 246, 250 (Tex.Civ.App.--Beaumont 1979, writ ref'd n.r.e.). We recognize that Radelow-Gittens could have pursued its right to appeal if it had not abandoned its claims against Pamex. For example, if Radelow-Gittens had filed a supplemental pleading, instead of an amended pleading, containing its new claims against Texas Fire and Safety, Inc., the claims against Pamex would have been preserved. Therefore, we hold that Radelow-Gittens waived error, if any, by the trial court in rendering the summary judgment for Pamex and, consequently, waived its right to appeal.

The appeal is dismissed.

**488 S.W.2d 407 (Tex. 1972)**

**Robert WEBB, Individually and as next friend for his minor**

**children, et al., Petitioners,**

**v.**

**Dr. Kenneth JORNS et al., Respondents.**

**No. B--3132.**

**Supreme Court of Texas.**

**November 15, 1972**

Rehearing Denied Jan. 10, 1973.

John H. Holloway, Houston, for petitioners.

Cantey, Hanger, Gooch, Cravens & Munn, Sloan Blair, Richard L. Griffith and William B. David, Fort Worth, Brown, Crowley, Simon & Peebles, Richard U. Simon, Jr., Fort Worth, for respondent.

POPE, Justice.

Robert Webb, individually and as next friend for his minor children, brought this malpractice suit against Doctors General Hospital, Mrs. Irys Eakin, Dr. Kenneth L. Jorns, and Dr. E. D. Olcott. Mrs. Webb's parents were also joined as plaintiffs. The action arose out of the death of Mrs. Ella J. Webb thirteen minutes after Mrs. Eakin commenced the administration of an anesthetic in preparation for a surgical procedure. After a pre-trial hearing on October 28, 1970, the trial court dismissed Doctors General Hospital with prejudice. Thereafter, on January 18, 1971, the court rendered judgment upon an instructed verdict for the other three defendants and the plaintiffs appealed. The court of civil appeals ruled that the plaintiffs did not timely perfect an appeal from the pre-trial order dismissing the hospital, plaintiffs' notice of appeal was insufficient as to the order dismissing the hospital, and the instructed verdict for the other three defendants was proper. 473 S.W.2d 328. In our opinion, the judgments of the courts below should be reversed and the cause should be remanded to the trial court for trial.

The courts below erred in holding that plaintiffs did not timely appeal from the order dismissing the hospital. The order of October 28, 1970, dismissing the hospital was an interlocutory order, because it did not dispose of all parties and issues in the pending suit. Since the trial court

did not sever the cause against the hospital from the rest of the case, the interlocutory judgment did not become a final judgment until it was merged into the final judgment which the court rendered on January 18, 1971, disposing of the whole case. *Zachry Co. v. Thibodeaux,* 364 S.W.2d 192 (Tex.1963); *McEwen v. Harrison,* 162 Tex. 125, 345 S.W.2d 706 (1961). Plaintiffs properly gave notice of appeal on the date of the final judgment.

The court of civil appeals also erred in its holding that plaintiffs' notice of appeal was inoperative as to the hospital. The final judgment rendered on January 18, 1971, stated that plaintiffs 'in open court excepted to this judgment and now give notice of appeal to the Court of

Civil Appeals . . ..' The court of civil appeals was of the opinion that the notice of appeal did not specify an intent to appeal from the earlier interlocutory order. The notice stated the number and style of the case, the court in which the case was pending, and that plaintiffs desired to appeal from the judgment in the case. The notice met the requirements of Rule 353(b), Tex.R.Civ.P. We agree with the commentary following Rule 353, Vern.Tex.Rules Annot., which says: 'Under Rule 353, as amended in 1962, it appears clear that the entire case will be brought up on appeal unless the appellant specifically limits the scope of the appeal by giving the notice required therein.' We accordingly reinstate the appeal from the order which dismissed the hospital with prejudice. Since that appeal concerned a law question, we shall pass upon the point rather than remand the case to the court of civil appeals for its decision.

The trial court also erred in dismissing the hospital as a defendant. Plaintiffs' cause of action arose on October 7, 1966. They filed their original petition on March 21, 1968, and named three individuals and Doctors General Hospital as defendants. On February 9, 1970, they filed an amended original petition, again naming the three individuals as defendant, but they wholly omitted the hospital as a defendant. Someone, at some unknown time, had written in ink beneath the other three named defendants: 'Doctors General Hospital Inc. of Tarrant County, Texas.' Copies of the pleading which were sent to the other defendants did not contain those inked-in words. The amended pleading asserted no cause of action against the hospital. On April 3, 1970, plaintiffs filed their second amended petition which restored the hospital as a defendant and that pleading asserted a cause of action against it. The hospital then filed its motion to be dismissed which the trial court granted.

The court, by its order dismissing the hospital, correctly followed the rule that the amended petition, by omitting a defendant, operated as a voluntary dismissal as to that party. *Ridley v. McCallum,* 139 Tex. 540, 163 S.W.2d 833 (1942); *Brennan v. Greene,* 154 S.W.2d 523 (Tex.Civ.App.1941, writ ref'd). The trial court erred, however, in dismissing the cause 'with prejudice.' The voluntary dismissal of the hospital did not prevent plaintiffs from refiling an action against the hospital, and the phrase, 'with prejudice,' improperly barred such an action. *Crofts v. Court of Civil Appeals,* 362 S.W.2d 101 (Tex.1962); 4 R. McDonald, Texas Civil Practice §§ 17.15, 17.17 (Rev. ed. 1971). Some of the plaintiffs were minors against whom the statute of limitations may not have run, and the dismissal 'with prejudice' as to them was in error. See *McCrary v. City of Odessa,* 482 S.W.2d 151 (Tex.1972). We reverse the judgment of the trial court which dismissed the plaintiffs' action against the hospital 'with prejudice.' Upon remand the court may consider which plaintiffs may be barred by limitations.

On The Merits

The courts below erred in ruling that plaintiffs failed to make a prima facie malpractice case against Mrs. Irys Eakin or the two physicians. Mrs. Webb, a thirty-year-old patient, entered the Doctors General

Hospital in Fort Worth for the repair of a diaphragmatic hernia. She needed the operation, but there was no emergency situation. Mrs. Eakin, a nurse anesthetist, commenced administering the anesthetic and thirteen minutes later, the patient expired. Plaintiffs alleged a number of grounds of

negligence on the part of the anesthetist, among which were (1) the improper mixture of Halothane with oxygen and nitrous oxide, (2) improper use of the anesthesia machine, and (3) improper monitoring of the patient during the time she was inspiring the gas.

Plaintiffs called a Dr. Dannemiller as their expert medical witnesses. He testified that in reasonable medical probability, Mrs. Webb's cardiac arrest was caused either by an overdose of Halothane or a lack of proper oxygenation of the patient. He testified that Mrs. Eakin should have set the anesthesia machine so there would have been a flow rate of the gas mixture of at least four liters per minute. Instead, the proof showed that the flow rate was only two liters per minute which would magnify the vaporization of the Halothane and intensify its strength. That drug was described as a very potent one. He testified, when asked which anesthetic agent constituted the overdose, 'Well, on probability again, I would say that Halothane was probably the agent.' Dr. Dannemiller testified further that the machine setting did not conform to the manufacturer's instructions, and that it was necessary to compensate for the temperature factor which can cause the concentrations of Halothane to vary from double or half that which is intended. Mrs. Eakin had not considered room temperature as a factor in the strength of the gas. She testified that she was not able to calculate the concentration of Halothane to be administered by the machine and that she forgot that temperature had any effect. Dr. Dannemiller said a two degree variance of temperature can change the drug concentration seven percent.

Dr. Dannemiller narrowed the probable causes of the death to two factors: (1) the patient was either not getting adequate oxygen, or (2) the cardiac arrest had gone unnoticed for a period of three to five minutes. When asked whether he could state with certainty that either of those two things caused the death of the patient, he replied, 'I can't add another possibility.'

Plaintiffs also proved that proper monitoring while the patient was inspiring the anesthetic would require the anesthetist to take blood pressure readings at two minute intervals rather than at three or four minute intervals as proved. Dr. Dannemiller said the depth of the anesthesia is best indicated by blood pressure readings, but if the reading intervals are too far apart, the anesthetist can get well behind the patient in assessing the status of the anesthetic and its effect on the patient. He also expressed the opinion that the accepted technique and standard is to take readings at two minute intervals, because the three to five minute intervals would permit a cardiac arrest to occur at a time too remote to reverse the arrest and resuscitate the patient.

The defendants urge that the evidence failed to establish causation for two reasons. They say that there was proof of other possible non-negligent causes of Mrs. Webb's death. They say that Dr. Dannemiller failed to meet the community standard test as a predicate for his testimony and that all of it must be disregarded. Dr. Dannemiller eliminated all possible causes of death except two and then said that both of them caused the death. The court of civil appeals says that another possible cause was Mrs. Webb's allergic reaction to Halothane. Dr. Gwodz, the physician who performed the autopsy, mentioned this as a possible cause, but he also, when asked the direct question whether there was an allergic reaction, replied, 'No allergic reaction.'

The fact that there may have been conflicts between Dr. Dannemiller's and

Page 411

some of Dr. Gwodz's testimony concerning other possible causes does not defeat plaintiffs' prima

facie cause of action. It is an old and familiar rule that the fact finder may resolve conflicts and inconsistencies in the testimony of any one witness as well as in the testimony of different witnesses. *Ford v. Panhandle & Santa Fe Ry. Co.,* 151 Tex. 538, 252 S.W.2d 561 (1952); *Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792 (1951); *Rose v. O'Keefe,* 39 S.W.2d 877 (Tex.Com.App.1931). 1 McCormick and Ray, Texas Law of Evidence § 3 (1956).

Plaintiffs offered direct evidence which, if believed, eliminated all but two possible causes of Mrs. Webb's death and both of them were caused by the negligence of the anesthetist. Contrary to the defendants' arguments, *Bowles v. Bourdon,* 148 Tex. 1, 219 S.W.2d 779 (1949), is not authority which supports the judgment that plaintiffs take nothing. In the cited case two medical experts testified that a child's injured arm may have been caused by the doctor's negligence in binding the arm too tightly or the arm condition could have been caused at the time of the original accident in which the doctor had no part. The case holds that reasonable medical certainty is not proved when there is proof of two possible causes, one of which is the result of negligence and the other is not. Similar holdings were made in *Lenger v. Physician's General Hospital, Inc.,* 455 S.W.2d 703 (Tex.1970), and *Hart v. Van Zandt,* 399 S.W.2d 791 (Tex.1966). The difference between those cases and this one is that the medical expert testified that in reasonable medical probability Mrs. Eakin was the author of two causes either of which caused Mrs. Webb's death.

Defendants urge that all of Dr. Dannemiller's testimony should be disregarded because he failed to meet the community standard rule which is required of a nontreating expert. We do not agree. Mrs. Webb's death occurred in a Fort Worth hospital and plaintiffs' medical expert, Dr. Dannemiller, was practicing at Lackland Air Force Base in San Antonio. He was a lieutenant colonel in the Air Force. He was graduated from Yale Medical School after which he did further study of anesthesiology at Yale from 1959 to 1961. Since that time he has been in the active clinical practice of anesthesia which subject he also teaches to doctors and nurses. He recognized that procedures used by nurse anesthetists, such as Mrs. Eakin, and anesthesiologists differ and also that practices differ in certain localities. Dr. Dannemiller also testified that there are certain minimum safe and accepted practices and procedures that cannot vary in any locality or between nurses and anesthesiologists, since the human tolerance to certain conditions are uniform and apply to all persons wherever they may be. He said that all teaching of anesthetics involves standards, below which no technician or practitioner should fall, and that Mrs. Eakin's negligent acts did not conform with those minimum standards.

The community standard rule does not require a small office of a rural medical practitioner to possess either the skills or equipment of a sophisticated clinic; but the standard demands, at least, that one must exercise ordinary care commensurate with the equipment, skills and time available. A trial court has discretion in the administration of the community standard. Any other treatment of the rule would mean that some communities would be measured by standards which fall beneath those universally regarded as ordinary medical standards. The trial court did not abuse its discretion in the admission of Dr. Dannemiller's testimony.

We hold that plaintiffs proved a prima facie cause of action against the nurse anesthetist. The physicians have not questioned but concede that they are subject to vicarious liability in the event of a finding of liability on the part of persons under their supervision in the operating room. See

*Porter v. Puryear,* 153 Tex. 82, 262 S.W.2d 933 (1954); *McKinney v. Tromley,* 386 S.W.2d 564 (Tex.Civ.App.1965, writ

ref'd n.r.e.); Annot., Surgeons-Nurses Negligence, 12 A.L.R.3d 1017 (1967).

Plaintiffs also insist that they proved independent grounds of negligence as to the two physicians. They say that the physicians were negligent in several particulars in their efforts to reverse the cardiac arrest. Since the cause must be reversed as to all of the defendants for the reasons expressed above, it is unnecessary to comment about the state of the evidence as it relates to those other points.

The judgment of the court of civil appeals dismissing plaintiffs' appeal from the trial court's order dismissing Doctors General Hospital, Inc., is reversed and the appeal is reinstated as to that defendant. The judgment of the trial court dismissing Doctors General Hospital, Inc., and the judgment of the trial court and the court of civil appeals as to defendants, Mrs. Irys Eakin, Dr. Kenneth L. Jorns, and Dr. E. D. Olcott, are reversed and the entire cause is remanded to the trial court.

Rule 33. PRESERVATION OF APPELLATE COMPLAINTS.

**Texas Rules**

**TEXAS RULES OF APPELLATE PROCEDURE**

**Section Two. APPEALS FROM TRIAL COURT JUDGMENTS AND ORDERS**

*As amended through June 10, 2014*

**Rule 33. PRESERVATION OF APPELLATE COMPLAINTS**

**33.1. Preservation; How Shown**

**(a) In General.** As a prerequisite to presenting a complaint for appellate review, the record must show that:

(1) the complaint was made to the trial court by a timely request, objection, or motion that:

(A) stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context; and

(B) complied with the requirements of the Texas Rules of Civil or Criminal Evidence or the Texas Rules of Civil or Appellate Procedure; and

(2) the trial court:

(A) ruled on the request, objection, or motion, either expressly or implicitly; or

(B) refused to rule on the request, objection, or motion, and the complaining party objected to the refusal.

**(b) Ruling by Operation of Law.** In a civil case, the overruling by operation of law of a motion for new trial or a motion to modify the judgment preserves for appellate review a complaint properly made in the motion, unless taking evidence was necessary to properly present the complaint in the trial court.

**(c) Formal Exception and Separate Order Not Required.** Neither a formal exception to a trial court ruling or order nor a signed, separate order is required to preserve a complaint for appeal.

**(d) Sufficiency of Evidence Complaints in Nonjury Cases.** In a nonjury case, a complaint

regarding the legal or factual insufficiency of the evidence - including a complaint that the damages found by the court are excessive or inadequate, as distinguished from a complaint that the trial court erred in refusing to amend a fact finding or to make an additional finding of fact - may be made for the first time on appeal in the complaining party's brief.

## 33.2. Formal Bills of Exception

To complain on appeal about a matter that would not otherwise appear in the record, a party must file a formal bill of exception.

**(a) Form.** No particular form of words is required in a bill of exception. But the objection to the court's ruling or action, and the ruling complained of, must be stated with sufficient specificity to make the trial court aware of the complaint.

**(b) Evidence.** When the appellate record contains the evidence needed to explain a bill of exception, the bill itself need not repeat the evidence, and a party may attach and incorporate a transcription of the evidence certified by the court reporter.

**(c) Procedure.**

(1) The complaining party must first present a formal bill of exception to the trial court.

(2) If the parties agree on the contents of the bill of exception, the judge must sign the bill and file it with the trial court clerk. If the parties do not agree on the contents of the bill, the trial judge must-- after notice and hearing--do one of the following things:

(A) sign the bill of exception and file it with the trial court clerk if the judge finds that it is correct;

(B) suggest to the complaining party those corrections to the bill that the judge believes are necessary to make it accurately reflect the proceedings in the trial court, and if the party agrees to the corrections, have the corrections made, sign the bill, and file it with the trial court clerk; or

(C) if the complaining party will not agree to the corrections suggested by the judge, return the bill to the complaining party with the judge's refusal written on it, and prepare, sign, and file with the trial court clerk such bill as will, in the judge's opinion, accurately reflect the proceedings in the trial court.

(3) If the complaining party is dissatisfied with the bill of exception filed by the judge under (2)(C), the party may file with the trial court clerk the bill that was rejected by the judge. That party must also file the affidavits of at least three people who observed the matter to which the bill of exception is addressed. The affidavits must attest to the correctness of the bill as presented by the party. The matters contained in that bill of exception may be controverted and maintained by additional affidavits filed by any party within ten days after the filing of that bill. The truth of the bill

of exception will be determined by the appellate court.

**(d) Conflict.** If a formal bill of exception conflicts with the reporter's record, the bill controls.

**(e) Time to File.**

(1) Civil Cases. In a civil case, a formal bill of exception must be filed no later than 30 days after the filing party's notice of appeal is filed.

(2) Criminal Cases. In a criminal case, a formal bill of exception must be filed:

(A) no later than 60 days after the trial court pronounces or suspends sentence in open court; or

(B) if a motion for new trial has been timely filed, no later than 90 days after the trial court pronounces or suspends sentence in open court.

(3) Extension of Time. The appellate court may extend the time to file a formal bill of exception if, within 15 days after the deadline for filing the bill, the party files in the appellate court a motion complying with Rule 10.5(b).

**(f) Inclusion in Clerk's Record.** When filed, a formal bill of exception should be included in the appellate record.

**History.** Added Aug. 15, 1997, eff. Sept. 1, 1997; amended effective September 1, 2002.

**Note:**
### Notes and Comments

Comment to 1997 change: This is former Rule 52. Subdivision 33.1 is rewritten. Former Rule 52(b), regarding offers of proof, is omitted as unnecessary. See Tex. R. Civ. Evid. 103; Tex. R. Crim. Evid. 103. Subdivision 33.2 is also rewritten and the procedure is more definitely stated. Former Rule 52(d), regarding motions for new trial, is omitted as unnecessary. See Tex. R. Civ. P. 324(a) & (b).

Comment to 2002 change: The last sentence of former Rule 52(d) of the Rules of Appellate Procedure has been reinstated in substance.

Rule 38. REQUISITES OF BRIEFS.

**Texas Rules**

**TEXAS RULES OF APPELLATE PROCEDURE**

**Section Two. APPEALS FROM TRIAL COURT JUDGMENTS AND ORDERS**

*As amended through June 10, 2014*

**Rule 38. REQUISITES OF BRIEFS**

**38.1. Appellant's Brief**

The appellant's brief must, under appropriate headings and in the order here indicated, contain the following:

**(a) Identity of Parties and Counsel.** The brief must give a complete list of all parties to the trial court's judgment or order appealed from, and the names and addresses of all trial and appellate counsel, except as otherwise provided in Rule 9.8.

**(b) Table of Contents.** The brief must have a table of contents with references to the pages of the brief. The table of contents must indicate the subject matter of each issue or point, or group of issues or points.

**(c) Index of Authorities.** The brief must have an index of authorities arranged alphabetically and indicating the pages of the brief where the authorities are cited.

**(d) Statement of the Case.** The brief must state concisely the nature of the case (e.g., whether it is a suit for damages, on a note, or involving a murder prosecution), the course of proceedings, and the trial court's disposition of the case. The statement should be supported by record references, should seldom exceed one-half page, and should not discuss the facts.

**(e) Any Statement Regarding Oral Argument.** The brief may include a statement explaining why oral argument should or should not be permitted. Any such statement must not exceed one page and should address how the court's decisional process would, or would not, be aided by oral argument. As required by Rule 39.7, any party requesting oral argument must note that request on the front cover of the party's brief.

**(f) Issues Presented.** The brief must state concisely all issues or points presented for review. The statement of an issue or point will be treated as covering every subsidiary question that is fairly included.

**(g) Statement of Facts.** The brief must state concisely and without argument the facts pertinent to the issues or points presented. In a civil case, the court will accept as true the facts stated unless another party contradicts them. The statement must be supported by record references.

**(h) Summary of the Argument.** The brief must contain a succinct, clear, and accurate statement of the arguments made in the body of the brief. This summary must not merely repeat the issues or points presented for review.

**(i) Argument.** The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.

**(j) Prayer.** The brief must contain a short conclusion that clearly states the nature of the relief sought.

**(k) Appendix in Civil Cases.**

(1) Necessary Contents. Unless voluminous or impracticable, the appendix must contain a copy of:

(A) the trial court's judgment or other appealable order from which relief is sought;

(B) the jury charge and verdict, if any, or the trial court's findings of fact and conclusions of law, if any; and

(C) the text of any rule, regulation, ordinance, statute, constitutional provision, or other law (excluding case law) on which the argument is based, and the text of any contract or other document that is central to the argument.

(2) Optional Contents. The appendix may contain any other item pertinent to the issues or points presented for review, including copies or excerpts of relevant court opinions, laws, documents on which the suit was based, pleadings, excerpts from the reporter's record, and similar material. Items should not be included in the appendix to attempt to avoid the page limits for the brief.

**38.2. Appellee's Brief**

**(a) Form of Brief.**

(1) An appellee's brief must conform to the requirements of Rule 38.1, except that:

(A) the list of parties and counsel is not required unless necessary to supplement or correct the appellant's list;

(B) the appellee's brief need not include a statement of the case, a statement of the issues presented, or a statement of facts, unless the appellee is dissatisfied with that portion of the appellant's brief; and

(C) the appendix to the appellee's brief need not contain any item already contained in an appendix filed by the appellant.

(2) When practicable, the appellee's brief should respond to the appellant's issues or points in the order the appellant presented those issues or points.

**(b) Cross-Points.**

(1) Judgment Notwithstanding the Verdict. When the trial court renders judgment notwithstanding the verdict on one or more questions, the appellee must bring forward by cross-point any issue or point that would have vitiated the verdict or that would have prevented an affirmance of the judgment if the trial court had rendered judgment on the verdict. Failure to bring forward by cross-point an issue or point that would vitiate the verdict or prevent an affirmance of the judgment waives that complaint. Included in this requirement is a point that:

(A) the verdict or one or more jury findings have insufficient evidentiary support or are against the overwhelming preponderance of the evidence as a matter of fact; or

(B) the verdict should be set aside because of improper argument of counsel.

(2) When Evidentiary Hearing Needed. The appellate court must remand a case to the trial court to take evidence if:

(A) the appellate court has sustained a point raised by the appellant; and

(B) the appellee raised a cross-point that requires the taking of additional evidence.

**38.3. Reply Brief**

The appellant may file a reply brief addressing any matter in the appellee's brief. However, the appellate court may consider and decide the case before a reply brief is filed.

**38.4. *Deleted***

**38.5. Appendix for Cases Recorded Electronically.**

In cases where the proceedings were electronically recorded, the following rules apply:

**(a) Appendix.**

(1) In General. At or before the time a party's brief is due, the party must file one copy of an appendix containing a transcription of all portions of the recording that the party considers relevant to the appellate issues or points. Unless another party objects, the transcription will be presumed accurate.

(2) Repetition Not Required. A party's appendix need not repeat evidence included in any previously filed appendix.

(3) Form. The form of the appendix and transcription must conform to any specifications of the Supreme Court and Court of Criminal Appeals concerning the form of the reporter's record except that it need not have the reporter's certificate.

(4) Notice. At the time the appendix is filed, the party must give written notice of the filing to all parties to the trial court's judgment or order. The notice must specify, by referring to the index numbers in the court recorder's logs, those parts of the recording that are included in the appendix. The filing party need not serve a copy of the appendix but must make a copy available to all parties for inspection and copying.

**(b) Presumptions.** The same presumptions that apply to a partial reporter's record under Rule 34.6(c)(4) apply to the parties' appendixes. The appellate court need not review any part of the electronic recording.

**(c) Supplemental Appendix.** The appellate court may direct or allow a party to file a supplemental appendix containing a transcription of additional portions of the recording.

**(d) Inability to Pay.** A party who cannot pay the cost of an appendix must file the affidavit provided for by Rule 20. The party must also state in the affidavit or a supplemental affidavit that the party has neither the access to the equipment necessary nor the skill necessary to prepare the appendix. If a contest to the affidavit is not sustained by written order, the court recorder must transcribe or have transcribed those portions of the recording that the party designates and must file the transcription as that party's appendix, along with all exhibits.

**(e) Inaccuracies.**

(1) Correction by Agreement. The parties may agree to correct an inaccuracy in the transcription of the recording.

(2) Correction by Appellate or Trial Court. If the parties dispute whether an electronic recording or transcription accurately discloses what occurred in the trial court but cannot agree on corrections, the appellate court may:

(A) settle the dispute by reviewing the recording; or

(B) submit the dispute to the trial court, which must - after notice and hearing - settle the dispute and ensure that the recording or transcription is made to conform to what occurred in the trial court.

**(f) Costs.** The actual expense of preparing the appendixes or the amount prescribed for official reporters, whichever is less, is taxed as costs. The appellate court may disallow the cost of any portion of the appendixes that it considers surplusage or that does not conform to any specifications prescribed by the Supreme Court or Court of Criminal Appeals.

## 38.6. Time to File Briefs

**(a) Appellant's Filing Date.** Except in a habeas corpus or bail appeal, which is governed by Rule 31, an appellant must file a brief within 30 days - 20 days in an accelerated appeal - after the later of:

(1) the date the clerk's record was filed; or

(2) the date the reporter's record was filed.

**(b) Appellee's Filing Date.** The appellee's brief must be filed within 30 days - 20 days in an accelerated appeal - after the date the appellant's brief was filed. In a civil case, if the appellant has not filed a brief as provided in this rule, an appellee may file a brief within 30 days - 20 days in an accelerated appeal - after the date the appellant's brief was due.

**(c) Filing Date for Reply Brief.** A reply brief, if any, must be filed within 20 days after the date the appellee's brief was filed.

**(d) Modifications of Filing Time.** On motion complying with Rule 10.5(b), the appellate court may extend the time for filing a brief and may postpone submission of the case. A motion to extend the time to file a brief may be filed before or after the date a brief is due. The court may also, in the interests of justice, shorten the time for filing briefs and for submission of the case.

## 38.7. Amendment or Supplementation

A brief may be amended or supplemented whenever justice requires, on whatever reasonable terms the court may prescribe.

## 38.8. Failure of Appellant to File Brief

**(a) Civil Cases.** If an appellant fails to timely file a brief, the appellate court may:

(1) dismiss the appeal for want of prosecution, unless the appellant reasonably explains the failure

and the appellee is not significantly injured by the appellant's failure to timely file a brief;

(2) decline to dismiss the appeal and give further direction to the case as it considers proper; or

(3) if an appellee's brief is filed, the court may regard that brief as correctly presenting the case and may affirm the trial court's judgment upon that brief without examining the record.

**(b) Criminal Cases.**

(1) Effect. An appellant's failure to timely file a brief does not authorize either dismissal of the appeal or, except as provided in (4), consideration of the appeal without briefs.

(2) Notice. *If the appellant's brief is not timely filed*, the appellate clerk must notify counsel for the parties and the trial court of that fact. If the appellate court does not receive a satisfactory response within ten days, the court must order the trial court to immediately conduct a hearing to determine whether the appellant desires to prosecute his appeal, whether the appellant is indigent, or, if not indigent, whether retained counsel has abandoned the appeal, and to make appropriate findings and recommendations.

(3) Hearing. *In accordance with (2)*, the trial court must conduct any necessary hearings, make appropriate findings and recommendations, and have a record of the proceedings prepared, which record - including any order and findings - must be sent to the appellate court.

(4) Appellate Court Action. *Based on the trial court's record*, the appellate court may act appropriately to ensure that the appellant's rights are protected, including initiating contempt proceedings against appellant's counsel. If the trial court has found that the appellant no longer desires to prosecute the appeal, or that the appellant is not indigent but has not made the necessary arrangements for filing a brief, the appellate court may consider the appeal without briefs, as justice may require.

### 38.9. Briefing Rules to Be Construed Liberally

Because briefs are meant to acquaint the court with the issues in a case and to present argument that will enable the court to decide the case, substantial compliance with this rule is sufficient, subject to the following.

**(a) Formal Defects.** If the court determines that this rule has been flagrantly violated, it may require a brief to be amended, supplemented, or redrawn. If another brief that does not comply with this rule is filed, the court may strike the brief, prohibit the party from filing another, and proceed as if the party had failed to file a brief.

**(b) Substantive Defects.** If the court determines, either before or after submission, that the case has not been properly presented in the briefs, or that the law and authorities have not been

properly cited in the briefs, the court may postpone submission, require additional briefing, and make any other order necessary for a satisfactory submission of the case.

**History.** Added Aug. 15, 1997, eff. Sept. 1, 1997; amended effective September 1, 2002; amended August 20, 2008, effective September 1, 2008; Rule 38.4 deleted August 10, 2012, effective December 1, 2012.

**Note:**

### Notes and Comments

Comment to 1997 change: This is former Rule 74. The rule is substantially rewritten. Paragraph 38.1(e) now specifically allows a party to either present issues or points of error. Paragraphs 38.1(f) and (g) are new and require a brief to include a statement of facts and summary of the argument. Paragraph 38.2(b) is new and gives specific requirements for cross-points. See also Tex. R. Civ. P. 324(c). Subdivision 38.3 is new and provides for a reply brief. Subdivision 38.4 imposes a total brief limit of 90 pages on each party. Thus, if more than one party has filed a notice of appeal, there will be multiple appellant's, appellee's, and reply briefs, but each party is limited to a total of 90 pages. Subdivision 38.5 is new and provides for an appendix in cases recorded electronically in the trial court. Paragraph 38.6(b) now provides that the appellee has 30 - rather than 25 - days to file a brief. The provisions of former Rules 74(i) (Number of Copies), (j) (Briefs Typewritten or Printed), and (q) (Service of Briefs) are omitted as unnecessary. See Rule 9.

Comment to 2002 change: Rule 38.6(d) is amended to clarify that an appellate court may postpone the filing of any brief, not just the appellant's brief.

Comment to 2008 change: A party may choose to include a statement in the brief regarding oral argument. The optional statement does not count toward the briefing page limit.